**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) THE CHEROKEE NATION, a federally recognized Indian Tribe, on its own behalf and as *parens patriae*, (2) THE CHICKASAW NATION, a federally recognized Indian Tribe, on its own behalf and as *parens patriae*, and (3) THE CHOCTAW NATION OF OKLAHOMA, a federally recognized Indian Tribe, on its own behalf and as *parens patriae*, <br><br> Plaintiffs, <br><br> v. <br><br> (1) WADE FREE, in his official capacity as Director, Oklahoma Department of Wildlife Conservation, (2) NELS RODEFELD, in his official capacity as Assistant Director, Oklahoma Department of Wildlife Conservation, (3) NATHAN ERDMAN, in his official capacity as Chief of Law Enforcement Division, Oklahoma Department of Wildlife Conservation, (4) J. KEVIN STITT, in his official capacity as Governor of the State of Oklahoma, and (5) RUSSELL COCHRAN in his official capacity as special counsel employed by the Governor, <br><br> Defendants. | Civil Action No. 4:25-cv-00630-CVE-JFJ |

**COMPLAINT**

## I.    NATURE OF THE ACTION

1.    This is an action for declaratory and injunctive relief, brought by the Cherokee

Nation, Chickasaw Nation, and Choctaw Nation of Oklahoma (collectively, "Nations" or "Plaintiff

Nations"), on their own behalf and as *parens patriae* on behalf of their members, (a) to protect

1

each Nation's and its members' right, held under its Treaties and inherent sovereign authority to hunt, fish, and gather on their Reservation, under Plaintiff Nation's laws, free from interference by Defendants' actual and threatened exercise of state jurisdiction and application of state law; (b) to protect each Plaintiff Nation's right, held under its Treaties and inherent sovereign authority, to permit the members of each other Plaintiff Nation to hunt, fish, and gather on its Reservation, subject to its laws and to the imposition of a single bag limit that applies without regard to where the harvesting occurs pursuant to the Five Tribes Wildlife Management Reciprocity Agreement ("Reciprocity Agreement"), *see* Ex. 1, free from interference by Defendants' actual and threatened exercise of state jurisdiction and application of state law; (c) to protect each Plaintiff Nation's right, held under its Treaties and inherent sovereign authority, to exercise jurisdiction over and apply its laws to all other Indians hunting, fishing, and gathering on that Plaintiff Nation's Reservation, free from interference by Defendants' actual and threatened exercise of state jurisdiction and application of state law.

2.      Defendants' interference with these rights violates federal law because Plaintiff Nations' Treaty rights and inherent sovereign authority preempt the application of state law to these rights, and because the state lacks criminal jurisdiction over Indians in Indian country, *McGirt v. Oklahoma*, 591 U.S. 894, 928-32 (2020); *Ute Indian Tribe v. Utah* (*Ute VI*), 790 F.3d 1000, 1006-07 (10th Cir. 2015) (Gorsuch, J.), and therefore cannot enforce the state fish and game code—which imposes criminal penalties—against Indians on Plaintiff Nations' Reservations, which are Indian country, 18 U.S.C. § 1151(a).  Defendants should be enjoined from further interference with these rights as their actual and threatened actions cause irreparable harm to Plaintiff Nations and their members, *Ute VI*, 790 F.3d at 1005-06; *see id.* at 1007-09.

3.      Defendants, each of whom is sued in his official capacity under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), *see generally Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 (10th Cir. 2012) (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)), are: Wade Free, Director of the Oklahoma Department of Wildlife Conservation ("ODWC"); Nels Rodefeld, Assistant Director of the ODWC; Nathan Erdman, Chief of Law Enforcement Division for the ODWC; J. Kevin Stitt, Governor of the State of Oklahoma; and Russell Cochran, special counsel employed by Defendant Stitt (collectively, "Defendants").

4.      Plaintiff Nations seek to have this Court declare that

(a) each Plaintiff Nation and its members have the right, held under the Plaintiff Nation's Treaties and inherent sovereign authority, to hunt, fish, and gather on their Reservation under the Plaintiff Nation's laws, free from Defendants' actual and threatened exercise of state jurisdiction and application of state law to the exercise of these federal rights by Plaintiff Nations and their members;

(b) each Plaintiff Nation has the right, held under its Treaties, inherent sovereign authority, and by federal statute, *see* 25 U.S.C. § 1301(2), to exercise jurisdiction over and apply its laws to members of the other Plaintiff Nations hunting, fishing and gathering on its Reservation under the Reciprocity Agreement, and each Plaintiff Nation has the right to be free from Defendants' actual and threatened exercise of state jurisdiction and application of state law to members of the other Plaintiff Nations engaged in such activities;

(c) each Plaintiff Nation has the right, held under its Treaties, inherent sovereign authority, and by federal statute, *see* 25 U.S.C. § 1301(2), to exercise jurisdiction over and apply its laws to all other Indians hunting, fishing and gathering on its Reservation, and each Plaintiff Nation has the right to be free from Defendants' actual and threatened exercise of state jurisdiction and

application of state law to all other Indians engaged in such activities under the Plaintiff Nation's laws.

5.    Plaintiff Nations seek to have this Court enjoin Defendants from

(a) applying or enforcing, or threatening to apply or enforce, state laws against Plaintiff Nations and their members engaged in hunting, fishing, and gathering on Plaintiff Nations' Reservations in the exercise of their Treaty rights and under Plaintiff Nations' laws, by means that include demands that they obtain a state license, threatened and actual citation, arrest, detention, seizure of Plaintiff Nations' members' personal property, continuation of ongoing and initiation of new state court proceedings, and prosecution, trial, and punishment in state court; and

(b) applying or enforcing, or threatening to apply or enforce, state laws against members of the Plaintiff Nations hunting, fishing, and gathering on Plaintiff Nations' Reservations under the law of the Plaintiff Nation on whose Reservation they are doing so and pursuant to the Reciprocity Agreement, by means that include demands that they obtain a state license, threatened and actual citation, arrest, detention, seizure of personal property, continuation of ongoing and initiation of new state court proceeding, and prosecution, trial, and punishment in state court; and

(c) interfering with Plaintiff Nations' exercise of jurisdiction and enforcement of their laws over all Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations, by means that include demands that they obtain a state license, threatened and actual citation, arrest, detention, seizure of personal property, and prosecution, trial, and punishment in state court.

## II.    PARTIES

6.    Plaintiff Cherokee Nation is a federally-recognized Indian Tribe, *see* Indian Entities Recognized by and Eligible to Receive Services From the United States Bureau of Indian Affairs, *see* 89 Fed. Reg. 99899 (Dec. 11, 2024), with a governing body duly recognized by the Department of the Interior.

7.      Plaintiff Chickasaw Nation is a federally-recognized Indian Tribe, 89 Fed. Reg. at 99901, with a governing body duly recognized by the Department of the Interior.

8.      Plaintiff Choctaw Nation of Oklahoma ("Choctaw Nation") is a federally-recognized Indian Tribe, 89 Fed. Reg. at 99901, with a governing body duly recognized by the Department of the Interior.

9.      Defendant Wade Free is the Director of the ODWC and is sued in his official capacity under the doctrine of *Ex parte Young*.  Pursuant to state law, Defendant Free is responsible for the administration and enforcement of the state fish and game laws.[1]  Defendant Free has the "specific power[] and dut[y]"

> [t]o make a complaint and cause proceedings to be commenced against any person for violation of any of the laws for the conservation of wildlife with the sanction of the district attorney of the county in which such proceedings are brought, and shall not be required to give security for costs.  The Director may also appear in behalf of the people in any court of competent jurisdiction in any prosecution for a violation of any of the laws for the protection of wildlife, and may prosecute the same in the same manner and with the same authority as the district attorney of the county where such proceedings are pending in cases where such attorney is unable to be present or refuses to prosecute such case.

Okla. Stat. tit. 29, § 3-105(A)(6).  Pursuant to state law and the authority described in Okla. Stat. tit. 29, § 3-105(A)(6), Defendant Free has directed those under his legal supervision or direction to enforce state law against Indians hunting, fishing, and gathering on the Nations' Reservations, and has threatened that state law will imminently be enforced against Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations.  Ex. 2, Memorandum from Wade Free, Interim Dir., Okla. Dep't of Wildlife Conservation (Oct. 7, 2025) ("Oct. 7, 2025 ODWC Memo").

---

[1] Any reference to "state fish and game laws" in this Complaint includes Okla. Stat. tit. 29 and Okla. Admin. Code tit. 800, and any other state law or regulation concerning hunting, fishing, and gathering, which Defendants or those under their direction are authorized to enforce within the State or which they purport to have authority to enforce within the State.

10.     Defendant Nels Rodefeld is the Assistant Director of the ODWC and is sued in his official capacity under the doctrine of *Ex parte Young*.  Defendant Free has directed Defendant Rodefeld "to implement uniform enforcement of the Oklahoma Wildlife Code in state court[s] in accordance with applicable state law," relying on "[t]he Stroble v. Oklahoma Tax Commission case."  Oct. 7, 2025 ODWC Memo.

11.     Defendant Nathan Erdman is the Chief of Law Enforcement for the ODWC and is sued in his official capacity under the doctrine of *Ex parte Young*.  As Chief of Law Enforcement, Defendant Erdman shares in the responsibility for the administration and enforcement of state game and fish laws and oversees the game wardens stationed in all 77 counties of Oklahoma, *see Meet the Staff*, Okla. Dep't of Wildlife Conservation, https://www.wildlifedepartment.com/about/meet-the-staff (last visited Nov. 14, 2025), which area includes Plaintiff Nations' Reservations. Game wardens under Defendant Erdman's supervision or direction have threatened, directed, and caused state law to be enforced against Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations by informing Indians in Oklahoma that ODWC will enforce state law against them for their conduct within Indian country, threatening individual Indians with enforcement of state law against their conduct in Indian country, issuing citations for alleged violations of state law against Indians for their conduct on Plaintiff Nations' Reservations, and referring such citations to state courts, state district attorneys, and other counsel employed by Defendant Stitt, *see infra* ¶¶ 12-13, 21-22, for prosecution.

12.     Defendant J. Kevin Stitt is the Governor of the State of Oklahoma, *see* Okla. Const. art. VI, § 2, and is sued in his official capacity under the doctrine of *Ex parte Young*.  He contends that the State has jurisdiction over all Indians who allegedly do not comply with state law in Indian country.  He has also relied on assertions of state law authority in his official capacity as Governor,

6

*see* Okla. Const. art. VI, § 2, to direct that state law be enforced against Indians hunting and fishing on Plaintiff Nations' Reservations, including by employing special counsel to prosecute Indians for allegedly not complying with state fish and game laws while hunting, fishing, or gathering in Indian country, *see* Okla. Stat. tit. 74, § 6.  He asserts sole authority to direct special counsel he has employed, exclusive of the rights of the Attorney General of Oklahoma to represent the interests of the State, *see id.* § 18c(A)(4)(a).  *See* Ex. 3, Gov. J. Kevin Stitt's Not. of Appointment of Special Counsel, *State v. Shepherd*, No. WL-2025-02 (Okla. Dist. Ct. filed Nov. 7, 2025).

13.    Defendant Russell Cochran is special counsel employed by Defendant Stitt to "prosecute offenses against the law of the state, and . . . institute and conduct proceedings before grand juries," Okla. Stat. tit. 74, § 6; *see* Entry of Appearance, *State v. Robertson*, No. CM-2025-136 (Okla. Dist. Ct. filed Nov. 13, 2025)[2]; *see* Ex. 4, Entry of Appearance, *State v. Shepherd*, No. WL-2025-03 (Okla. Dist. Ct. filed Nov. 13, 2025); Ex. 5, *Governor Stitt Defends Equal Enforcement of State Hunting Laws, Appoints Special Prosecutor*, Off. of Okla. Gov. (Nov. 13, 2025).[3]  He is sued in his official capacity under the doctrine of *Ex parte Young*.  Defendant Stitt has directed Defendant Cochran to accept referrals of investigations and citations of Indians in Indian country from ODWC game wardens and to prosecute Indians who allegedly do not comply with state fish and game laws in Indian country and seek to impose punishment for such alleged violations.  Pursuant to state law and his employment by Defendant Stitt, he contends that he may exercise state jurisdiction over Indians who allegedly do not comply with state fish and game laws in Indian country and may subject them to prosecution in state court to enforce state law against

---

[2] https://www.oscn.net/dockets/GetDocument.aspx?ct=pushmataha&bc=1063625816&cn=CM-2025-136&fmt=pdf

[3]    https://oklahoma.gov/governor/newsroom/newsroom/2025/governor-stitt-defends-equal-enforcement-of-state-hunting-laws--.html

them.  He is currently exercising such state jurisdiction over Indians in Indian country and will continue to do so, *inter alia* by continuing ongoing prosecutions and filing new cases against Indians for their conduct of hunting and fishing in Indian country and seeking to impose upon them state law punishments for hunting and fishing activities that they have a federal law right to undertake.

14.     Defendants will continue to violate federal law by exercising state jurisdiction and applying state law to Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations unless enjoined by this Court.

### III.     JURISDICTION, VENUE, AND STANDING

15.     This Court has subject matter jurisdiction over this action under 28 U.S.C. Sections 1331 and 1362 because it states substantial questions of federal law arising under the United States Constitution, treaties between the United States and Plaintiff Nations, and federal statutory and common law, and is brought by federally recognized Indian tribes with governing bodies duly recognized by the United States Secretary of the Interior.  "[A] suit to enjoin a State from exercising jurisdiction contrary to federal law," including a "suit seeking an injunction to halt the proceedings in state court," "is an action 'arising under' federal law" over which jurisdiction exists under 28 U.S.C. §§ 1331 and 1362.  *Ute Indian Tribe v. Lawrence* (*Lawrence I*), 875 F.3d 539, 543-44 (10th Cir. 2017); *see also Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1202-05 (10th Cir. 2002); *Cheyenne-Arapaho Tribes v. Oklahoma*, 618 F.2d 665, 666 (10th Cir. 1980).

16.     This action seeks declaratory and injunctive relief and presents a "case of actual controversy" under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, because "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Hooper v. City of Tulsa*, 71 F.4th 1270, 1277 (10th Cir. 2023) (quoting

8

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941))). This standard is satisfied by showing that this action presents a case or controversy within the meaning of Article III of the Constitution, "'in other words, standing,'" *id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)), which is demonstrated by the factual allegations recited *infra* ¶¶ 20-23, 96-110.

17.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims herein occurred within this district.

18.    Standing requires that the Nations "'show (i) that [t]he[y] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by [Defendants]; and (iii) that the injury would likely be redressed by judicial relief.'" *Hooper*, 71 F.4th at 1277 (quoting *TransUnion*, 594 U.S. at 423). Each of these elements is satisfied here, as shown *infra* ¶¶ 19-24.

19.    Defendants' past, continuing, and threatened exercise of state jurisdiction and application of state law to Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations in accordance with Plaintiff Nations' laws, *see supra* ¶¶ 9-12 and *infra* ¶¶ 96-108, constitutes an injury in fact because it (i) deprives Plaintiff Nations and their members of their Treaty right to hunt, fish, and gather on their Reservations free from state interference, which is relied on by Plaintiff Nations and their members for subsistence, cultural, and ceremonial purposes, and (ii) deprives each Plaintiff Nations of its federal right to exercise jurisdiction and apply their laws to members of the other Plaintiff Nations hunting, fishing, and gathering on its Reservation, exclusive of state jurisdiction, on the terms authorized by the Reciprocity Agreement, and (iii) deprives Plaintiff Nations of their federal right to exercise jurisdiction and apply their

laws to all Indians hunting, fishing, and gathering on their Reservations, exclusive of state jurisdiction.

20.     ODWC officials acting under the direction of Defendants Free, Rodefeld, and Erdman, including the ODWC's game wardens, have cited and are currently citing Plaintiff Nations' members and other Indians for hunting on Plaintiff Nations' Reservations without complying with state fish and game laws or threatening them with citation if they do not comply with those laws, which include the Oklahoma Wildlife Conservation Code found at Title 29 of the Oklahoma Statutes and the ODWC's regulations implementing the Oklahoma Wildlife Conservation Code, which are found at Title 800 of the Oklahoma Administrative Code. *See infra* ¶ 90 n.11.  Defendant Stitt has employed Defendant Cochran as special counsel to prosecute these citations in the courts of the State.  Defendant Cochran claims authority under state law, pursuant to his employment by Defendant Stitt, to do so, and he is currently or imminently exercising such authority to seek to impose state court jurisdiction and state law punishments on Indians engaged in hunting and fishing activities in Indian country.

21.     As a result, Plaintiff Nation members face actual prosecution in state court and significant fines or incarceration, and the imminent threat of prosecution, which deny Plaintiff Nation members their Treaty rights to harvest game and fish and to gather for subsistence purposes on Plaintiff Nations' Reservations.  In addition, some Plaintiff Nation members are subject to threats by ODWC game wardens to either buy a state license in the field or be cited by the warden for supposed violations of state fish and game law, which violates federal law and imposes injury on the Nations and their members.  Other Plaintiff Nation members, facing the threat of citation by ODWC game wardens, plan to stop hunting and fishing to avoid that threat, even though they rely on hunting and fishing for subsistence and as a family or cultural tradition.  These actions and

threatened actions, as well as the chilling effect of Defendants' and the ODWC game wardens' actions, impose injuries in fact on Plaintiff Nations and their members. Defendants' actual and threatened actions virtually nullify Plaintiff Nations' Treaty rights to hunt, fish, and gather on their Reservations by refusing to recognize those rights, and by making state law controlling of Plaintiff Nation members' hunting, fishing, and gathering activities on Plaintiff Nations' Reservations.

22.    The types of injuries that Defendants violations of federal law are currently imposing on Plaintiff Nations and their members are illustrated by the following examples:

a.    Larry Soap is a Cherokee elder, Cherokee tribal citizen, and avid hunter who resides on the Cherokee Nation Reservation. He regularly hunts on fee land on the Cherokee Nation Reservation with the permission of the landowners and was looking forward to doing so this season with his nine-year-old grandson, who is also a Cherokee citizen. It will be his grandson's first deer hunt. Both he and his grandson intended to rely on their tribal licenses to hunt. After he learned that the ODWC would be enforcing state law against Indians hunting in Indian country, Mr. Soap asked an ODWC game warden whether he could still rely on his tribal license to hunt on the Cherokee Nation Reservation. The warden told Mr. Soap that the state would require him and his grandson to hunt using a state license and that, if he caught either Mr. Soap or his grandson hunting without a state license, he would cite them. Mr. Soap concerned that his grandson, or he, or both could be cited, then purchased state licenses for them to avoid the risk of citation in the field. The purchase of these licenses was a financial burden, coerced by the ODWC game warden's threat.

b.    Shawn Robertson is an avid hunter and Choctaw Nation member who resides on the Choctaw Reservation. He hunts deer on the Choctaw Reservation every year to harvest meat for himself, his wife, and his young daughter. That meat is an important part of their

11

diet throughout the year.  On October 14, Mr. Robertson was hunting at the Hugo Wildlife Management Area ("Hugo WMA") using a compound bow, relying on his Choctaw Nation tribal hunting license.  He had traveled to the Hugo WMA in his father's truck, which has Choctaw Nation tribal license plates.  He did not harvest any deer that day.  When he returned to his truck, a state game warden was waiting for him.  The state game warden asked Mr. Robertson if he had a hunting license, and Mr. Robertson said that he had a tribal license.  The warden responded that the State had done away with tribal licenses and cited Mr. Robertson for hunting without a state license.  The citation imposes a $264 fine and requires Mr. Robertson to report to state court.  On October 24, 2025, the District Attorney for Pushmataha County brought a case against Mr. Robertson in Oklahoma District Court in Pushmataha County, *see State v. Robertson*, No. WL-2025-21 (Okla. Dist. Ct. dismissed Oct. 29, 2025), but it was dismissed by the state Attorney General, *see* Att'y Gens.' Entry of Appearance as Counsel for Okla., *State v. Robertson*, No. WL-2025-21 (Okla. Dist. Ct. filed Oct. 29, 2025);[4] State's Not. of Dismissal, *State v. Robertson*, No. WL-2025-21 (Okla. Dist. Ct. filed Oct. 29, 2025).[5]  Notwithstanding the dismissal of that case, Defendant Cochran now claims authority under state law pursuant to his employment as special counsel by Defendant Stitt to prosecute Mr. Robertson in state court, and has initiated a new prosecution against Mr. Robertson for the criminal misdemeanor charge of hunting without a state license, *see State v. Robertson*, No. CM-2025-136 (Okla. Dist. Ct. filed Nov. 13, 2025); *supra* ¶ 13 (citing Defendant Cochran's Entry of Appearance in *State v. Robertson*, No. CM-2025-136).  After his experience of being cited, Mr. Robertson decided to purchase a state license so he could

---

[4] https://www.oscn.net/dockets/GetDocument.aspx?ct=pushmataha&bc=1063625194&cn=WL-2025-21&fmt=pdf

[5] https://www.oscn.net/dockets/GetDocument.aspx?ct=pushmataha&bc=1063625198&cn=WL-2025-21&fmt=pdf

keep hunting deer to feed his family, but he has reduced the locations where he hunts on the Choctaw Reservation out of fear of encountering state game wardens again and being subject to unlawful citation. He cannot risk the financial burden of additional fines or seizure of his hunting gear.

   c. Kodie Shepherd is a small business owner, Chickasaw tribal member, and avid hunter who resides on the Chickasaw Reservation. He regularly hunts on the Chickasaw National Recreation Area ("Chickasaw NRA") near Sulphur, Oklahoma, within the Chickasaw Reservation. Hunting is an important part of subsistence for his family, which includes his wife and three children. This year he bought a new, larger freezer to store processed deer meat to supplement his family's diet. He relies on his Chickasaw Nation tribal license to hunt, and it is important to him that he can hunt near his home after work, which is why he regularly hunts on the Chickasaw NRA. He hunts using traditional archery techniques that he is teaching his children. On October 27, Mr. Shepherd drove to the Chickasaw NRA in his truck, which has Chickasaw Nation tribal license plates. He did not harvest any deer that day, but when he returned to his truck an ODWC game warden was parked nearby. Mr. Shepherd approached the warden and presented his Chickasaw Nation hunting and fishing license. The ODWC game warden responded that the State did not recognize tribal licenses anymore and wrote him two state law citations—one for hunting without a state license, and one for hunting deer without a state deer tag—which together imposed fines totaling $513. The citations also require Mr. Shepherd to report to state court. Despite this citation and the threat of further citation, Mr. Shepherd feels he cannot stop hunting on the Chickasaw Reservation. Doing so could have significant consequences for him and his family, who rely on the meat he harvests by taking deer on the Chickasaw Reservation for subsistence. Defendant Stitt appointed the District Attorney for Murray County to serve as special

4905-1916-9658, v. 4

counsel in Mr. Shepherd's case, and she filed criminal charges against Mr. Shepherd on November 7, *see* Ex. 3.  On November 12, the District Attorney resigned her appointment as special counsel and dismissed the case against Mr. Shepherd without prejudice, *see* Ex. 6, Resignation of Special Prosecutor, *State v. Shepherd*, No. WL-2025-02 (Okla. Dist. Ct. filed Nov. 12, 2025); Ex. 7, Dismissal without Prejudice, *State v. Shepherd*, No. WL-2025-02 (Okla. Dist. Ct. filed Nov. 12, 2025).  On November 13, Defendant Cochran filed a new case against Mr. Shepherd in state court in Murray County, for the same charges, and that case is currently pending, *see State v. Shepherd*, No. WL-2025-03 (Okla. Dist. Ct. filed Nov. 13, 2025); *see* Ex. 4, Entry of Appearance, *State v. Shepherd*, No. WL-2025-03 (Okla. Dist. Ct. Nov. 13, 2025); Ex. 8, Information, *State v. Shepherd*, No. WL-2025-03 (Okla. Dist. Ct. Nov. 13, 2025).

23.    Using these and other enforcement efforts and strategies, ODWC game wardens, acting at the direction and under the supervision of one or more of Defendants, are currently enforcing state fish and game laws against Indians throughout the Nations' Reservations and coercing Indians into complying with state fish and game laws on the Nations' Reservations in order to avoid a citation for allegedly violating those laws by relying on a tribal hunting and fishing license.  Defendants' denial of Nation members' Treaty right to harvest deer on their Reservations and their actions in furtherance of that denial impose injuries in fact on the Nations and their members.  "[T]he prosecution of [the tribal member is] itself an infringement on tribal sovereignty," *Ute VI*, 790 F.3d at 1005, and such an unlawful state prosecution constitutes irreparable harm, *id.*; *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (finding that the threat of continued citation by the state for motor vehicle licensing infringements "created the prospect of significant interference with [tribal] self-government." (citation modified)).  And "[s]tate-court jurisdiction plainly would interfere with the powers of

14

self-government" by subjecting Indians in Indian country "to a forum other than the one they have established for themselves." *Fisher v. Dist. Ct.*, 424 U.S. 382, 387-88 (1976); *Iowa Mut. Ins. Co. v LaPlante*, 480 U.S. 9, 16 (1987) (the adjudication of any case arising on the reservation and involving Indians "by any nontribal court … infringes upon tribal law-making authority."); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60 (1978) (such an adjudication "cannot help but unsettle a tribal government's ability to maintain authority.").

24.     The injuries in fact described in Paragraphs 21-23, *supra*, are caused by and are directly attributable to Defendants because, acting in their official capacities, they have directed: that state fish and game laws be enforced against Indians throughout Oklahoma, and thus within Indian country and on the Nations' Reservations, by ODWC game wardens; and that violations of those laws be prosecuted in state courts without regard to tribal citizenship.

25.     The injuries-in-fact caused by Defendants' actual and threatened actions will be redressed by a decision of this Court ruling that Defendants' past, continuing, and threatened imminent exercise of state jurisdiction and application of state law to Plaintiff Nations' members and to other Indians hunting, fishing, and gathering on Plaintiff Nations' Reservation violates federal law, and by an injunction barring Defendants from continuing to exercise state jurisdiction and apply state law to Plaintiff Nations' members and to other Indians hunting, fishing, and gathering on the Plaintiff Nations' Reservations.

## IV.     ALLEGATIONS COMMON TO ALL CLAIMS

**A.     The Nations' Federal Rights To Hunt, Fish, and Gather On Their Reservations And To Regulate Indians Engaged In Such Activities On Their Reservations.**

26.     Pursuant to treaties they signed in the 1830s, the United States patented to the Nations new homelands in what is now Oklahoma, in exchange for the cession of the Nations' lands east of the Mississippi River.  Under these treaties, Plaintiff Nations were "[i]n many respects

15

… promised virtually complete sovereignty over their new lands." *Choctaw Nation*, 397 U.S. at 635 (citing *Atl. & Pac. R.R. v. Mingus*, 165 U.S. 413, 435-36 (1897)) (discussing Choctaw and Cherokee treaties).  And the terms on which Plaintiff Nations hold their new homelands were confirmed in subsequent treaties.

27.    In addition to the inclusion of hunting, fishing, and gathering rights within the extraordinary breadth of Plaintiff Nations' Treaty rights to self-government within the boundaries of their Reservations, and their right to be free from state interference in the exercise of these rights, their hunting, fishing, and gathering rights "are part of the[ir] larger rights of possession" of their Reservations, *N. Arapahoe Tribe v. Hodel*, 808 F.2d 741, 748 (10th Cir. 1987) (citing *United States v. Winans*, 198 U.S. 371, 381 (1905); *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 406 & n.2 (1968)), and as such "need not be expressly mentioned in the treaty" to be recognized, *Timpanogos Tribe*, 286 F.3d at 1202 (quoting *United States v. Dion*, 476 U.S. 734, 738 (1986).  It is also settled that Nation members "enjoy a right of user in the tribe's hunting and fishing rights." *United States v. Fox*, 573 F.3d 1050, 1054 (10th Cir. 2009) (quoting *United States v. Felter*, 752 F.2d 1505, 1509 (10th Cir. 1985)).[6]

28.    Under the 1830 Treaty of Dancing Rabbit Creek, Sept. 27, 1830, 7 Stat. 333 ("1830 Treaty"), the Choctaw Nation "cede[d] to the United States, the entire country they own and possess, east of the Mississippi River; and they agree[d] to move beyond the Mississippi River, early as practicable .…"  1830 Treaty art. 3.  In exchange, the Choctaw Nation secured a new homeland for as long as "they shall exist as a nation and live on it," which was to be granted in

---

[6] "The right of user in a tribal right to hunt or fish confers 'a personal right' upon which an individual member of the tribe may rely.  Likewise, the Supreme Court has explicitly held that such hunting treaty rights 'can be asserted by … an individual member of the Tribe.'" *Id.* (quoting *Hackford v. Babbitt*, 14 F.3d 1457, 1467 (10th Cir. 1994), and *Dion*, 476 U.S. at 738 n.4).

fee, with boundaries that were explicitly defined. *Id.* art. 2. The Treaty grant was made in those terms "[a]s a guarantee that [the Choctaws] would not again be forced to move." *Choctaw Nation*, 397 U.S. at 625. The Indian Removal Act had expressly authorized the grant of the treaty territory in fee, as follows:

> Congress authorized the President "to assure the tribe … that the United States will forever secure and guaranty to them … the country so exchanged with them." Indian Removal Act of 1830, § 3, 4 Stat. 412. "[A]nd if they prefer it," the [Indian Removal Act] continued, "the United States will cause a patent or grant to be made and executed to them for the same …."

*McGirt*, 591 U.S. at 900 (quoting Indian Removal Act § 3, 4 Stat. at 412).

29.    Article 2 of the 1830 Treaty established the Choctaw Nation's right to exist as a nation and continue their way of life on the Choctaw Reservation. "The essence of the Treaty of [Dancing Rabbit Creek] was that the Indians were authorized to maintain on the new lands ceded to them as a reservation their way of life which included hunting and fishing," *Menominee Tribe*, 391 U.S. at 406.

30.    The 1830 Treaty also guaranteed the Choctaw Nation rights of self-government and jurisdiction over all persons and property within the boundaries of their reservation and promised that no state shall interfere with those rights. This was done in Article 4 of the Treaty as follows:

> The Government and people of the United States are hereby obliged to secure to the said Choctaw Nation of Red People the jurisdiction and government of all the persons and property that may be within their limits west, so that no Territory or state shall ever have a right to pass laws for the government of the Choctaw Nation of Red People and their descendants; and that no part of the land granted them shall ever be embraced in any Territory or State; but the U.S. shall forever secure said Choctaw Nation from, and against, all laws except such as from time to time may be enacted in their own National Councils, not inconsistent with the Constitution, Treaties, and Laws of the United States; and except such as may, and which have been enacted by Congress, to the extent that Congress under the Constitution are required to exercise a legislation over Indian Affairs.

*Id*. art. 4.

31.    In the 1830 Treaty, the United States also promised to furnish to each Choctaw "warrior" who removed west "a rifle, moulds, wiper and ammunition," art. 20, which would have been required for hunting.

32.    The Choctaw Nation's rights to "exist as a nation and live on [the Choctaw Reservation]," *id.* art. 2, and to exercise "the jurisdiction and government of all the persons and property that may be within their limits west, so that no Territory or State shall ever have a right to pass laws for the government of the Choctaw Nation of Red People and their descendants," *id.* art. 4, includes: the right of self-government; the right to exercise criminal jurisdiction over all Indians within the boundaries of the Choctaw Reservation; the right of the Nation and its members to hunt, fish, and gather within the boundaries of the Reservation established under Article 2 of the 1830 Treaty; the right of the Nation to permit other Plaintiff Nations' members and other Indians to hunt, fish, and gather within those boundaries and to exercise jurisdiction over and apply its laws to all Plaintiff Nations' members and Indians engaged in such activities within those boundaries; and the right to be free from state interference in the exercise of those rights within those boundaries.

33.    The 1837 Treaty of Doaksville, Jan. 17, 1837, 11 Stat. 573 ("1837 Treaty"), entered into by the Chickasaw and Choctaw Nations with the United States, secured to the Chickasaw Nation "all the rights and privileges" the Choctaw Nation held under the 1830 Treaty. *Id.* art. 1; *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 465 n.15 (1995) (recognizing that Article 1 of the 1837 Treaty applied the 1830 Treaty to the Chickasaw Nation). In addition, the 1837 Treaty secured to the Chickasaw Nation a "district within the limits of [the 1830 Treaty Territory]," as follows:

> It is agreed by the Choctaws that the Chickasaws shall have the privilege of forming a district within the limits of their country, to be held on the same terms that the

18

Choctaws now hold it, except the *right* of disposing of it, (which is held in common with the Choctaws and Chickasaws,) to be called the Chickasaw district of the Choctaw Nation ….

*Id.* art. 1. The 1837 Treaty also expressly defined the boundaries of the Chickasaw district. *Id.* art. 2. These terms established the Chickasaw Reservation.

34. The Chickasaw and Choctaw Nations subsequently entered into the 1855 Treaty with the Choctaw and Chickasaw, June 22, 1855, 11 Stat. 611 ("1855 Treaty"), by which their common ownership of the "Choctaw and Chickasaw country"—i.e., the Choctaw and Chickasaw Reservations—was reaffirmed, and the boundaries of that country were modified and explicitly set forth. *Id.* art. 1. The 1855 Treaty also reaffirmed the existence of the Chickasaw district and explicitly modified its boundaries, *id.* art. 2,[7] established that "[t]he remainder of the country held in common by the Choctaws and Chickasaws, shall constitute the Choctaw district," *id.* art. 3 and modified and otherwise reaffirmed the Choctaw and Chickasaw Nations' rights of self-government. *Id.* art. 7. In addition, the Choctaw Nation ceded "any and all lands, west of the one hundredth degree of west longitude" and agreed to lease to the United States their lands "west of the ninety-eighth degree of west longitude." *Id.* art. 9. These terms reaffirmed the existence of the Chickasaw and Choctaw Reservations, and modified the boundaries of each Reservation, which had earlier been established in the 1830 and 1837 Treaties, respectively.

---

[7] The 1854 Treaty of Doaksville, November 4, 1854, 10 Stat. 1116, had redefined the boundaries of the Chickasaw district that were set forth in Article 2 of the 1837 Treaty to resolve a boundary dispute between the Chickasaw and Choctaw Nations. 1854 Treaty pmbl.; 1855 Treaty art. 1. In Article 2 of the 1855 Treaty, one further modification was made. In the 1854 Treaty, the western boundary of the Chickasaw district was established as "to one hundred degrees of west longitude," which ran from a point on the "main Canadian [River]" "south to Red River." *Id.* art. 1. In the 1855 Treaty, the western boundary was made "the ninety-eighth degree of west longitude," which ran from a point "along the main Canadian" to "thence south to Red River." 1855 Treaty art. 2. That modification reflected the Choctaw and Chickasaw Nations' agreement to lease to the United States "all that portion of their common territory west of the ninety-eighth degree of west longitude …." *Id.* art. 9.

35.     Following the Civil War, the Choctaw and Chickasaw Nations entered into a treaty with the United States, which provided that "[p]ermanent peace and friendship are hereby established between the United States and said nations."  Treaty with the Choctaw and Chickasaw, art. 1, Apr. 28, 1866, 14 Stat. 769 ("1866 Choctaw & Chickasaw Treaty").  The Choctaw and Chickasaw Nations also "cede[d] to the United States the territory west of the 98 degrees west longitude," *id.* art. 3.  In addition, the Choctaw and Chickasaw Nations' rights of self-government, *see id.* art. 7, and all pre-existing Treaty rights not inconsistent with the 1866 Choctaw & Chickasaw Treaty were reaffirmed, *id.* arts. 10, 45.

36.     As the Supreme Court explained in *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 197-98 (1978), "the broad terms of th[e] governmental guarantee" set forth in Article 4 of the 1830 Treaty excludes only non-Indians from those Nations' jurisdiction.  In addition, the 1855 and 1866 Treaties reserved to the Choctaw and Chickasaw Nations the right to self-government, as well as "the right … to control the presence within the territory assigned to [them] of persons who might otherwise be regarded as intruders," *Morris v. Hitchcock*, 194 U.S. 384, 389 (1904).  "[U]nder the authority of these treaties," the Nations can "exercise[] the power to attach conditions to the presence within its borders of persons who might otherwise not be entitled to remain within the tribal territory," *id.*, including requiring compliance with tribal licensing laws, *see id.* at 392-93.

37.     The 1830 Treaty established, and the 1855 and 1866 Treaties reaffirmed, the Chickasaw and Choctaw Nations' Reservations; the Chickasaw and Choctaw Nations' rights of self-government; rights to exercise criminal jurisdiction over all Indians within the boundaries of their Reservations; rights of the Nations and their members to hunt, fish, and gather within Reservation boundaries; rights of the Nations to permit other Plaintiff Nations' members and other

20

Indians to hunt, fish, and gather within those boundaries and to exercise jurisdiction over and apply their laws to all Plaintiff Nations' members and other Indians engaged in such activities within those boundaries; and rights to be free from state interference in the exercise of these rights within those boundaries.

38.     The Choctaw Reservation—comprised of the lands reserved to the Choctaws in the 1830 Treaty that are neither within the Chickasaw district nor ceded in the 1855 and 1866 Treaties—continues to exist and has not been disestablished, *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 632-34 (2022) (citing *State ex rel. Matloff v. Wallace*, 2021 OK CR 21, 497 P.3d 686, 689); *Sizemore v. State*, 2021 OK CR 6, ¶¶ 8, 14-15, 485 P.3d 867, 869-71.

39.     The Chickasaw Reservation—comprised of the Chickasaw district established in the 1837 Treaty, the boundaries of which were modified in the 1855 Treaty—continues to exist and has not been disestablished. *Castro-Huerta*, 597 U.S. at 632-34 (citing *Matloff*, 2021 OK CR 21, ¶ 15, 497 P.3d at 689); *Bosse v. State*, 2021 OK CR 30, ¶¶ 7-9, 12, 499 P.3d 771, 774.

40.     The Cherokee Nation Reservation was established by the Cherokee Treaty of 1828, May 6, 1828, 7 Stat. 311 ("1828 Treaty"), and the Treaty of New Echota, Dec. 29, 1835, 7 Stat. 478 ("1835 Treaty"), and reaffirmed in Article 1 of the Cherokee Treaty of 1846, Aug. 6, 1846, 9 Stat. 871 ("1846 Treaty").  In the 1828 Treaty, the United States promised a "permanent home" to "the Cherokee nation of Indians," including all Cherokee living west or east of the Mississippi River.  *See* 1828 Treaty pmbl.; *see also id.* art. 2.  The United States "solemnly promised" to the Nation "forever" a seven-million-acre Cherokee Nation Reservation, *id.* arts. 1-2; "a perpetual outlet, West, and a free and unmolested use of all the country lying West of the Western boundary of [said seven millions of acres], and as far West as the sovereignty of the United States, and their right of soil extend," *id.* art. 2 (these land are known as the Cherokee Outlet); and promised that

21

the United States would "remove, immediately after the running of the Eastern line from the Arkansas River to the South-West corner of Missouri, all white persons from the West to the East of said line, and also all others, should there be any there, who may be unacceptable to the Cherokees, so that no obstacles arising out of the presence of a white population, or a population of any other sort, shall exist to annoy the Cherokees," *id.* art. 3.

41.    In the 1835 Treaty, "[o]nce again, the United States assured the Indians that they would not be forced to move from their new lands: a patent would issue to convey those lands in fee simple, and they would never be embraced within the boundaries of any State or Territory." *Choctaw Nation*, 397 U.S. at 626.  Under the 1835 Treaty, the Cherokee Nation ceded to the United States "all the lands owned claimed or possessed by them east of the Mississippi river," 1835 Treaty art. 1, in exchange for a new homeland in present day Oklahoma of seven million acres, plus the outlet west, *id.* art. 2-3 (incorporating 1833 Treaty of Fort Gibson, Feb. 14, 1833, 7 Stat. 414, and 1828 Treaty), and an "additional tract of land situated between the west line of the State of Missouri and the Osage reservation," which was purchased from the United States by the Nation and "estimated to contain eight hundred thousand acres of land," *id.* art. 2.  The boundaries of each of these parcels were explicitly set forth in the 1835 Treaty.  *Id.*  All of these lands were to "be included in one patent executed to the Cherokee nation of Indians by the President of the United States according to the provisions of the [Indian Removal Act]."  *Id.* art. 3.  The 1835 Treaty established the Cherokee Nation Reservation and defined its boundaries.

42.    The 1835 Treaty also guaranteed the Cherokee Nation rights of self-government and jurisdiction over all persons and property belonging to their members or persons connected with the Cherokee Nation within the boundaries of their Reservation and promised that no state shall interfere with those rights in the following terms:

22

The United States hereby covenant and agree that the lands ceded to the Cherokee Nation in the foregoing article shall, in no future time without their consent, be included within the territorial limits or *jurisdiction* of any State of Territory.  But they shall secure to the Cherokee nation the right by their national councils to make and carry into effect all such laws as they may deem necessary *for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them*: provided always that they shall not be inconsistent with the constitution of the United States and such acts of Congress as have been or may be passed regulating trade and intercourse with the Indians; and also, that they shall not be considered as extending to such citizens and army of the United States as may travel or reside in the Indian country by permission according to the laws and regulations established by the Government of the same.

*Id.* art. 5 (emphasis added).

43.    The rights held by the Cherokee Nation under Article 5 include the right of self-government; the right to exercise criminal jurisdiction over all Indians within the boundaries of the Cherokee Nation Reservation; the right of the Nation and its members to hunt, fish, and gather within the boundaries of the Reservation established under Article 2 of the 1835 Treaty; the right to permit other Plaintiff Nations' members and other Indians to hunt, fish, and gather within those boundaries; the right to exercise jurisdiction over and apply their laws to all Plaintiff Nations' members and other Indians authorized by the Nation to hunt, fish, and gather within those boundaries; and the right to be free from state interference in the exercise of these rights within those boundaries.

44.    In the 1846 Treaty, political factions of the Cherokee Nation resolved disputes within the Nation by signing a treaty with the United States.  That treaty protected individual rights, expressly providing that Cherokee paramilitary forces would be abolished, civil authority over the entire Nation restored, and that "[n]o one shall be punished for any crime or misdemeanor, except on conviction by a jury of his country, and the sentence of a court duly authorized by law to take cognizance of the offense."  *Id.* art. 2; *see id.* arts. 1, 4 (referring to the Cherokee Nation Reservation as the "country" of the Cherokee).

23

45.    In 1866, the Cherokee Nation and the United States entered into the Treaty with the Cherokee, July 19, 1866, 14 Stat. 799 ("1866 Cherokee Treaty").  The 1866 Cherokee Treaty authorized the United States to "settle friendly Indians in any part of the Cherokee country west of 96 [degrees]," *id.* art. 16, i.e. the Cherokee Outlet, and further provided

> Said lands thus disposed of to be paid for to the Cherokee Nation at such price as may be agreed on between the said parties in interest, subject to the approval of the President; and if they should not agree, then the price to be fixed by the President.

*Id.*[8]  In addition, the Nation ceded to the United States its lands in Kansas.  *Id.* art. 17.  No other lands of the Cherokee Nation Reservation were ceded by or pursuant to the 1866 Cherokee Treaty.

46.    The 1866 Cherokee Treaty also "guarantee[d] to the people of the Cherokee Nation the quiet and peaceable possession of their country," and promised that "[t]hey shall also be protected against interruptions or intrusion from all unauthorized citizens of the United States who may attempt to settle on their lands or reside in their territory."  *Id.* art. 26 (cleaned up).

47.    In addition, the 1866 Cherokee Treaty affirmed all pre-existing Treaty rights not inconsistent with the 1866 Cherokee Treaty, as follows:

> All provisions of treaties heretofore ratified and in force, and not inconsistent with the provisions of this treaty, are hereby re-affirmed and declared to be in full force; and nothing herein shall be construed as an acknowledgment by the United States, or as a relinquishment by the Cherokee Nation of any claims or demands under the guarantees of former treaties, except as herein expressly provided.

*Id.* art. 31.

48.    The Cherokee Treaties established the Cherokee Nation Reservation, defined its boundaries, and secured to the Cherokee Nation the right of self-government; the right to exercise criminal jurisdiction over Indians within the boundaries of the Cherokee Nation Reservation; the

---

[8] The cession of the entire Cherokee Outlet was finalized in an 1891 Agreement with the Cherokee Nation that was approved by Congress, with modifications, in the Act of March 3, 1893, ch. 209, § 10, 27 Stat. 612, 640-43.

right of the Nation and its members to hunt, fish, and gather within Reservation boundaries; the right of the Nation to permit other Plaintiff Nations' members and other Indians to hunt, fish, and gather within those boundaries and to exercise jurisdiction over and apply their laws to other Plaintiff Nations' members and all Indians engaged on such activities within those boundaries; and the right to be free from state interference with the exercise of these rights within those boundaries.

49.     The Cherokee Nation Reservation, as established by the 1828 and 1835 Treaties and reaffirmed by the 1846 Treaty, with boundaries modified by the 1866 Cherokee Treaty and the Act of March 3, 1893, continues to exist and has not been disestablished. *Castro-Huerta*, 597 U.S. at 632-34 (citing *Matloff*, 2021 OK CR 21, ¶ 15, 497 P.3d at 689); *Spears v. State*, 2021 OK CR 7, ¶ 8, 14-15, 485 P.3d 873, 875-77; *Hogner v. State*, 2021 OK CR 4, ¶¶ 9-11, 17-18, 500 P.3d 629, 631-35.

50.     Under federal law, all land within the boundaries of the Choctaw, Chickasaw, and Cherokee Reservations, whether held in trust or fee, is Indian country. *See* 18 U.S.C. § 1151(a) (defining "Indian country" as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation"). Section 1151 "expressly contemplates private land ownership within reservation boundaries. Nor under the statute's terms does it matter whether these individual parcels have passed hands to non-Indians." *McGirt*, 591 U.S. at 906; *see also United States v. Baker*, 894 F. 2d 1144, 1149 (10th Cir. 1990) ("[P]rivate property owned by non-Indians but situated within the boundaries of an Indian reservation is still 'Indian country' for jurisdictional purposes.").

51.     Plaintiff Nations' Treaty rights to self-government; to hunt, fish, and gather within the boundaries of their Reservations; to permit all Plaintiff Nations' members and other Indians to

hunt, fish, and gather within those boundaries and to exercise jurisdiction over and apply their laws to all Plaintiff Nations' members and other Indians engaged in such activities within those boundaries; and to be free from state interference in the exercise of these rights within those boundaries remain in effect because they have never been abrogated. Under settled law, "Congress 'must clearly express' any intent to abrogate Indian treaty rights," *Herrera v. Wyoming*, 587 U.S. 329, 340 (2019) (quoting *Minnesota v. Mille Lacs Band*, 526 U.S. 172, 202 (1999)), through "clear evidence" showing "Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Dion*, 476 U.S. at 739-40. Congress has never expressed such an intention or decision with respect to the Nations' foregoing Treaty rights.

52.    Oklahoma's admission to the Union did not abrogate Plaintiff Nations' Treaty rights as "there is nothing inherent in the nature of reserved treaty rights to suggest that they can be extinguished by *implication* at statehood." *Herrera*, 587 U.S. at 341-42 (quoting *Mille Lacs*, 526 U.S. at 207). "[*Mille Lacs*] established that the crucial inquiry for treaty termination analysis is whether Congress has expressly abrogated an Indian treaty right or whether a termination point identified in the treaty itself has been satisfied. Statehood is irrelevant to this analysis unless a statehood Act otherwise demonstrates Congress' clear intent to abrogate a treaty, or statehood appears as a termination point in the treaty." *Id.* at 341 (citing *Mille Lacs*, 526 U.S. at 207). In enacting the Oklahoma Enabling Act, Congress did not abrogate Plaintiff Nations' Treaty rights as nothing in that Act "demonstrates Congress' clear intent to abrogate [those rights], [n]or [does] statehood appear[] as a termination point in the treaty." *See id.* at 341.

53.    To the contrary, Section 1 of the Enabling Act explicitly provides that:

[N]othing contained in the [Oklahoma] constitution shall be construed to limit or impair the rights of person or property pertaining to the Indians of said Territories

(so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this Act had never been passed.

Ch. 335, § 1, 34 Stat. 267 (1906).  "Section one is a general reservation of federal and tribal jurisdiction over 'Indians, their lands, [and] property,' except as extinguished by the tribes or the federal—not state—government."  *Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Okla. Tax Comm'n*, 829 F.2d 967, 979 (10th Cir. 1987).

54.    In addition to their Treaty rights, Plaintiff Nations have inherent sovereign authority "to make their own substantive law in internal matters and to enforce that law in their own forums." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55-56 (1978) (citations omitted).  This power includes the right to regulate the activities of all Indians authorized by the Nations to hunt, fish, and gather on their Nations' Reservations.  "A tribe's power to prescribe the conduct of tribal members has never been doubted, and [the Supreme Court's] cases establish that 'absent governing Acts of Congress,' a State may not act in a manner that 'infringed on the right of reservation Indians to make their own laws and be ruled by them.'"  *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332-33 (quoting *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 171-72 (1973), and *Williams v. Lee*, 358 U.S. 217, 219-20 (1959)); *Fisher*, 424 U.S. at 387-88 (denying state court jurisdiction over an adoption proceeding involving only tribal members as "[s]tate-court jurisdiction plainly would interfere with the powers of self-government conferred upon the … Tribe and exercised through the Tribal Court" by subjecting "a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves.").

55.    Each Plaintiff Nation's Treaty right of self-government and inherent sovereign authority to regulate the hunting, fishing, and gathering activities of Indians on its Reservation

includes the power to enter into the Reciprocity Agreement in the "exercise of their respective sovereignties and in the interests of effective inter-Tribal relations and cooperation" and in order "to recognize and give effect under its own laws each other signatory Nation's licensure, permitting, or authorization of its own members' or citizens' hunting, fishing, trapping, and/or gathering rights or permissions, provided, that the hunting, fishing, trapping, and/or gathering activities of any member or citizen of a signatory Nation shall be subject to and must conform with the laws of the signatory Nation on whose reservation such activities occur." Reciprocity Agreement, eleventh whereas clause.

56.    Within Indian country, which includes their Reservations, Plaintiff Nations also have inherent sovereign authority to exercise criminal jurisdiction over all Indians. *United States v. Lara*, 541 U.S. 193, 210 (2004) (upholding the exercise of tribal criminal jurisdiction over nonmember Indians under 25 U.S.C. § 1301(2), in which Congress recognized that Indian tribes have "inherent power … to exercise criminal jurisdiction over all Indians" on their Indian country); *United States v. Wheeler*, 435 U.S. 313, 323-24 (1978) ("It is evident that the sovereign power to punish tribal offenders has never been given up by the Navajo Tribe and that tribal exercise of that power today is therefore the continued exercise of retained tribal sovereignty.").

**B.    The Nations Exercise Jurisdiction Over And Regulate Hunting, Fishing, And Gathering By All Indians On Their Reservations.**

57.    In the exercise of their Treaty rights and inherent sovereign authority, Plaintiff Nations regulate hunting, fishing, and gathering on their Reservations by Plaintiff Nations' members and other Indians, including members of one Plaintiff Nation engaged in such activities on another Plaintiff Nation's Reservation under the Reciprocity Agreement, which expressly authorizes each signatory Nation to apply its laws to members of other signatory Nations engaged in hunting, fishing, and gathering on its Reservation. Arts. 2.A., B., F.

58.     Each Plaintiff Nation also exercises criminal jurisdiction over all Indians on its Reservation under its inherent sovereign power to punish tribal offenders, *see* 25 U.S.C. § 1301(2); *Lara*, 541 U.S. at 199-200; *see also Wheeler*, 435 U.S. at 328-29 (citing *Talton v. Mayes*, 163 U.S. 376 (1896)), under its own criminal code, Chickasaw Nation Code, tit. 17; Choctaw Nation Criminal Code, tit. 70; Cherokee Nation Tribal Code, tit. 21, and under its conservation code, *see infra* ¶¶ 59-62.

59.     Each Plaintiff Nation has also adopted a code which governs the management and conservation of its Reservation's species and other natural resources, is designed to protect the health and abundance of wildlife on their respective Reservations and within the State, protects public health and safety, and regulates the time, place, and manner of Plaintiff Nation members' hunting, fishing, and gathering on the Plaintiff Nations' Reservations.  *See* Cherokee Nation Hunting and Fishing Code ("Cherokee HFC"), tit. 29, ch.1; Chickasaw Nation Wildlife Conservation Act ("Chickasaw WCA"), tit. 11, chs. 1-4; Choctaw Nation Fish, Game, and Animals Code ("Choctaw FGA"), tit. 110, §§ 1-37.  These codes are supplemented by regulations issued annually by each Plaintiff Nation.

60.     Each Plaintiff Nation manages its Reservation's fish, game, plants, and other natural resources for conservation purposes.  *See* 29 Cherokee HFC § 109; Chickasaw WCA §§ 11-103, 301(2), 402(1); 110 Choctaw FGA §§ 4-6, 8, 32.  Each Plaintiff Nation establishes hunting and fishing seasons, sets bag and catch limits, issues licenses, permits, and tags, and requires Plaintiff Nations' members to report their harvest of particular species to the Nation.  *See* 29 Cherokee HFC §§ 103(C), 106, 107; Chickasaw WCA §§ 11-201(1), (9), (10), (13), 11-301(2)(c), 11-401; 110 Choctaw FGA §§ 2(4), 5, 13, 15-19, 22, 26-27, 33.

61.    Each Plaintiff Nation prohibits entry onto privately-owned lands to hunt, fish, and gather without the consent of the landowner.  *See* 21 Cherokee Nation Code § 1835(A); Chickasaw WCA § 11-104(1)-(2); 110 Choctaw FGA §§ 6(G), 7(B).

62.    Each Plaintiff Nation's code is wholly or partially enforceable in the exercise of its criminal jurisdiction.  *See* 29 Cherokee HFC §§ 108(D)(2), (5)(a); Chickasaw WCA § 11-302(2)(a); 110 Choctaw FGA §§ 5.B., 7.B.(a), 8.F., 9.B., 10.B., 11.E., 12.C., 17.A.(b), B.(c), C.(e), D.(b), 19.A.(i), H.(i), 22.J.(a), 23.E.(b), 30, 32.E.(1), 33.C.

63.    Each Plaintiff Nation maintains its own judicial system, consisting of a Supreme (or Constitutional) Court, *see* Cherokee Const. art. VIII, § 1; Chickasaw Const. amend. V, § 1; Choctaw Const. art. XII, § 1, and legislatively-established lower courts, *see* Cherokee Const. art. VIII, §§ 1, 6; Chickasaw Nation Code § 5-201.1; An Act Establishing a Court of General Jurisdiction for the Choctaw Nation of Oklahoma § 1.101 (2009).  And each Plaintiff Nation enforces its conservation code through designated departments, officials, and officers, *see* 29 Cherokee HFC §§ 111-112; Chickasaw WCA § 11-302; 110 Choctaw FGA §§ 3, 7, and prosecutes violations of its code in its tribal court, *see* 29 Cherokee HFC §§ 104(B)(4), 112-13; Chickasaw WCA §§ 11-302(1)-(2); 110 Choctaw FGA § 3(D).

64.    Each Plaintiff Nation has regularly provided the State with the Plaintiff Nation's conservation code and amendments to that code.  Each Plaintiff Nation has also cross-deputized the ODWC wardens responsible for the counties that include each Plaintiff Nation's Reservation so that these wardens may enforce each Plaintiff Nation's conservation code and cite offenders into the appropriate Plaintiff Nation's tribal court system.  *See* State Addendum, Addition of State Agency to Deputation Agreement for Law Enforcement in the Choctaw Nation, Okla. Dep't of Wildlife Conservation (Mar. 2, 2021), https://www.sos.ok.gov/documents/filelog/94012.pdf; State

Addendum, Addition of State Agency to Deputation Agreement for Law Enforcement in the Chickasaw Nation, Okla. Dep't of Wildlife Conservation (Jan. 15, 2021), https://www.sos.ok.gov/documents/filelog/93919.pdf; State Addendum, Addition of State to Deputation Agreement for Law Enforcement in the Cherokee Nation, Okla. Dep't of Wildlife Conservation (Sep. 18, 2020), https://www.sos.ok.gov/documents/filelog/93715.pdf.

65.     The Reciprocity Agreement is based in part on recognition that the Reservations of the Five Tribes are neighboring, Reciprocity Agreement, eleventh whereas clause (quoting Inter-Tribal Council of the Five Civilized Tribes, Resolution No. 22-05 (January 14, 2022)), that wildlife does not recognize the boundaries of each Nation's Reservation, and that accordingly, coordination among and between the Nations is important to ensure healthy and abundant wildlife resources across the entire territory that comprises their five Reservations.

66.     In furtherance of its conservation objectives, the Reciprocity Agreement ensures that permitting signatory Nation members to hunt on another signatory Nation's Reservation will not increase the total allowed harvest of fish and game by Nation members either on the Nations' Reservations *or elsewhere in the State* by providing that "[e]ach signatory Nation will enact law to prohibit its members or citizens from harvesting separate bag limits within its reservation or elsewhere in the State of Oklahoma." *Id.* art. 2.E.  The bag limit set by each Nation therefore limits its members' total harvest, "regardless of where such harvest occurs." *Id.*  Each of the Plaintiff Nations has enacted such laws.

67.     The Reciprocity Agreement also provides each Nation's express consent to the application to its members of the wildlife laws of the Nation on whose Reservation the member is engaging in hunting, fishing, or gathering. *Id.* art. 2.F.

68.    In accordance with the terms of the Reciprocity Agreement and the laws of each signatory Nation implementing these terms, Nation members who choose to hunt, fish, or gather on the Reservation of a signatory Nation other than the Nation of which they are a member have expressly consented to the application of the laws of that signatory Nation to their activities.

## C.    The Nations' Treaty Rights Bar Defendants From Interfering With Nation Members' Exercise Of Those Rights On Their Own Reservation.

69.    "[A]ll Treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; *see also United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 196 (1876) ("[T]he Constitution declares a treaty to be the supreme law of the land."). By virtue of the Supremacy Clause, treaties are "superior and paramount to the authority of any State within whose limits are Indian tribes." *Antoine v. Washington*, 420 U.S. 194, 204 (1975) (quoting *Dick v. United States*, 208 U.S. 340, 353 (1908)). Accordingly, "a state law that burdens a treaty-protected right is pre-empted by the treaty." *Wash. Dep't of Licensing v. Cougar Den, Inc.*, 586 U.S. 347, 367 (2019). As the Supreme Court made clear in *Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658 (1979), in upholding certain Treaty fishing rights and the federal regulations implementing those rights: "To the extent that any … State statute imposes any conflicting obligations, the statute is without effect … and must give way to the federal treaties, regulations, and decrees." *Id*. at 691-92. So too here.

70.    Plaintiff Nations' Treaty rights preempt the exercise of state jurisdiction over and the application of state law to Plaintiff Nations and their members hunting, fishing, and gathering on their Reservations under the laws of Plaintiff Nations, including members of one Plaintiff

Nation hunting, fishing, and gathering on another Plaintiff Nation's Reservation in accordance with the Reciprocity Agreement.

71.     Defendants deny effect to the Treaty rights of each Plaintiff Nation and its members to hunt, fish, and gather on their Reservation, and to each Plaintiff Nation's Treaty right to permit members of the other Plaintiff Nations to hunt, fish, and gather on its Reservation under the Plaintiff Nation's laws and in accordance with the Reciprocity Agreement by: exercising state jurisdiction and applying state law to Plaintiff Nations and their members engaged in such activities through means that include requiring Plaintiff Nation members to obtain a state license to hunt, fish, and gather on Plaintiff Nations' Reservations; allowing Plaintiff Nation members to hunt, fish, and gather on Plaintiff Nations' Reservations only to the extent and on the terms authorized by state law; and subjecting Indians to arrest, seizure of personal property, prosecution, punishment, and incarceration for hunting, fishing, and gathering on Plaintiff Nations Reservations in violation of state law.

72.     Defendants have no authority to require an Indian exercising a treaty right to obtain a state license. *See Tulee v. Washington*, 315 U.S. 681, 685 (1942) (explaining that "the state is without power to charge the Yakima[] [Indians] a fee for fishing" because the state license fee "acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve"); *Cougar Den*, 586 U.S. at 365, 367 (reaffirming *Tulee*'s "holding that the fishing right reserved by the Yakamas in the treaty pre-empted the application to the Yakamas of a state law which prohibited 'catch[ing] ... fish for food' without having purchased a license" (quoting *Tulee*, 315 U.S. at 682 n.1)). That the license fees fund the State's conservation programs does not authorize their imposition as "the imposition of license fees is not indispensable to the effectiveness of a state conservation program." *Tulee*, 315 U.S. at 864.

73.     Nor can Defendants regulate Plaintiff Nation members hunting, fishing, and gathering on Plaintiff Nations' Reservations under the State's authority to "impose reasonable and nondiscriminatory regulations on an Indian tribe's treaty-based hunting, fishing, and gathering rights on state land when necessary for conservation." *Herrera*, 587 U.S. at 339 (citations omitted); *see Fishing Vessel Ass'n*, 443 U.S. at 682 ("Although nontreaty fishermen might be subjected to any reasonable state fishing regulation serving any legitimate purpose, treaty fishermen are immune from all regulation save that required for conservation."); *id.* at 687 n.28 (recognizing that "[t]his Court's decision in [*Puyallup Tribe, Inc. v. Department of Game* (*Puyallup III*), 433 U.S. 165 (1977)] approved state regulation of on-reservation fishing in the interest of conservation"). As Defendants have the burden to "demonstrate that [State] regulation is a reasonable and necessary conservation measure, and that its application to the Indians is necessary in the interest of conservation," *Antoine*, 420 U.S. at 207 (citations omitted),[9] and have not met that burden, they have no such authority.

74.     In fact, the State reported that in "[t]he 2024-25 big game hunting season, … favorable environmental and habitat conditions, … [c]oupled with robust and healthy wildlife populations … contributed to a substantial combined deer harvest of 128,375—a figure that underscore[d] the continued vitality of Oklahoma's big game resources." Dallas Barber, *2024-25 Big Game Harvest Report*, Okla. Dep't of Wildlife Conservation (Aug. 29, 2025), https://www.wildlifedepartment.com/outdoorok/ooj/2024-25-big-game-harvest-report. That season was the "No. 2 most-successful in terms of number of animals harvested." *Id.* Antlerless deer "made up 48% of the total take," which "mark[ed] a new record," and "indicat[ed] a

---

[9] In *Antoine*, 420 U.S. at 207-08, the Court applied the conservation necessity standard to bar enforcement of state deer hunting seasons against an Indian exercising an off-reservation treaty hunting right.

widespread understanding among hunters of the importance of managing herd dynamics to prevent overpopulation and ensure ecological balance." *Id.*

75.    As Plaintiff Nations comprehensively regulate hunting, fishing, and gathering activities on their Reservations in the interest of conservation, *see supra* ¶¶ 57-68, the proper course of action if conservation concerns were to arise would be for Defendants to raise those concerns with Plaintiff Nations, so that the parties could discuss an appropriate course of action that each would then implement.  A unilateral decision by the Defendants to address such concerns by exercising criminal jurisdiction over Plaintiff Nation members' and other Indians' hunting, fishing, and gathering activities could not be shown to be "a reasonable and necessary conservation measure" whose "application to the Indians is necessary in the interest of conservation," *Antoine*, 420 U.S. at 207 (citations omitted), given Plaintiff Nations' demonstrated commitment to conservation and their comprehensive and successful management on their Reservations of their members' and other Indians' hunting, fishing, and gathering activities.  *See United States v. Washington*, 520 F.2d 676, 686 (9th Cir. 1975) (holding that tribes meeting requirements for self-regulation established by the district court "should have the power, subject to certain conditions, to regulate their own members in the interest of conservation free of state controls.  So long as the tribes responsibly insure that the run of each species in each stream is preserved, the legitimate conservation interests of the state are not infringed").  In fact, the Nations' hunting and fishing regulations are tailored to mirror the State's own—including imposing the same seasons and bag limits as the State—in order to ensure protection of species health and abundance throughout the State.  In addition, by imposing a single bag limit, applicable state-wide, on Plaintiff Nations' members hunting, fishing, and gathering on Plaintiff Nations' Reservations under the Reciprocity Agreement, Plaintiff Nations ensure that agreement will not pose conservation concerns.

Furthermore, the exercise of criminal jurisdiction over Indians by the State would not itself have any impact on conservation—it would simply punish Indians for exercising their Treaty rights.

**D.      Federal Law Preempts State Jurisdiction Over Indians Hunting, Fishing, And Gathering On Plaintiff Nations' Reservations Under The Nations' Laws Because It Would Interfere With Treaty-Protected Rights Of Tribal Self-Government.**

76.      The exercise of state jurisdiction over and the application of state law to Plaintiff Nations, their members, and other Indians hunting, fishing, and gathering on the Nations' Reservations under the laws of Plaintiff Nations, including Plaintiff Nation members doing so under the Reciprocity Agreement, is also preempted by the rule that "'absent governing Acts of Congress,' a State may not act in a manner that 'infringe[s] on the right of reservation Indians to make their own laws and be ruled by them.'"  *Mescalero Apache*, 462 U.S. at 332-33 (first quoting *McClanahan,* 411 U.S. at 171-72; then quoting *Williams*, 358 U.S. at 219-20).

77.      Under their Treaties with the United States, Plaintiff Nations are promised sovereign autonomy in uniquely powerful terms, which includes the power to regulate their members,' members of the other Plaintiff Nations, and other Indians' hunting, fishing, and gathering activities on their Reservations, and the power to punish Indian offenders who violate the Nations' laws regulating such activities.  *See supra* ¶¶ 26-52.

78.      Article 4 of the 1830 Treaty guarantees to the Choctaw Nation "the jurisdiction and government of all the persons and property that may be within their limits west, so that no Territory or State shall ever have a right to pass laws for the government of the Choctaw Nation of Red People and their descendants."  Those rights are also held by the Chickasaw Nation under Article 1 of the 1837 Treaty.  And those rights were reaffirmed for both Nations in Articles 10 and 45 of the Choctaw and Chickasaw Nations' 1866 Choctaw & Chickasaw Treaty.

79.      The Cherokee Nation's 1835 Treaty "secure[s] to the Cherokee [N]ation the right by their national councils to make and carry into effect all such laws as they may deem necessary

for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them," excepting therefrom only "such citizens and army of the United States as may travel or reside in the Indian country by permission according to the laws and regulations established by the Government of the same." Art. 5. These terms recognize the criminal jurisdiction of the Cherokee Nation and were reaffirmed in the Cherokee Nation's 1866 Cherokee Treaty. *See Talton*, 163 U.S. at 379-81.

80.    Plaintiff Nations' sovereign interests in hunting, fishing, and gathering on their Reservations are also demonstrated by the code each Nation has adopted for the management and conservation of their Reservation's species and other natural resources and for the protection of public health and safety, which regulates the time, place, and manner in which Nation members may hunt, fish, and gather on the Reservation, and by each Plaintiff Nation's entry into the Reciprocity Agreement and the imposition of its single bag limit. *See supra* ¶¶ 65-68. Plaintiff Nations' codes also require the consent of the landowner for hunting, fishing, and gathering on private land within their Reservations. *See supra* ¶ 61. Plaintiff Nations also have sovereign interests in enforcing their codes in the field and in their courts, free from state interference.

81.    If the State had jurisdiction over hunting, fishing, and gathering by Indians on Plaintiff Nations' Reservations, it would interfere with tribal self-government by: denying Plaintiff Nations and their members their Treaty rights to hunt, fish, and gather on their Reservations for the subsistence of themselves and their families in accordance with the laws of Plaintiff Nations; denying Plaintiff Nations their right to regulate, free from state interference other Plaintiff Nations' members' hunting, fishing, and gathering on their Reservations under the Plaintiff Nation's laws and the Reciprocity Agreement, and all other Indians authorized by Plaintiff Nations to hunt, fish, and gather on their Reservations; requiring all Indians to obtain the State's prior permission to

hunt, fish, and gather on those Reservations and to comply with all state fish and game laws and regulations in doing so; and subjecting Indians to an additional criminal justice system, with different laws applied by different courts from Plaintiff Nations', in which punishment would be meted out by the State.  These impacts would negate the legal effect of Plaintiff Nations' laws regulating hunting, fishing, and gathering on their Reservations, and deny effect to the Reciprocity Agreement.  As the Supreme Court explained in in *Mescalero Apache*, 462 U.S. at 338, when weighing state regulatory jurisdiction against tribal and federal interests, "[i]t is important to emphasize that concurrent jurisdiction would effectively nullify the Tribe's authority to control hunting and fishing on the reservation.  Concurrent jurisdiction would empower [the State] wholly to supplant tribal regulations."

82.     In addition, "[s]tate-court jurisdiction plainly would interfere with the powers of self-government conferred upon the … Tribe and exercised through the Tribal Court" by subjecting "a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves." *Fisher*, 424 U.S. at 387-88; *accord Williams*, 358 U.S. at 223.

83.     As the exercise of state jurisdiction over and the application of state law to Plaintiff Nations and their members hunting, fishing, and gathering on their Reservations, including members of one Plaintiff Nation engaging in such activities on another Plaintiff Nation's Reservation in accordance with the Reciprocity Agreement, would "infringe[] on the right of reservation Indians to make their own laws and be ruled by them," it is preempted by federal law. *Mescalero Apache*, 462 U.S. at 332-33 (quoting *Williams*, 358 U.S. at 219-20).

**E.      The State Lacks Jurisdiction To Apply Its Laws To Indians Hunting, Fishing, And Gathering On Plaintiff Nations' Reservations.**

84.      Oklahoma has no jurisdiction to enforce its fish and game laws against Indians in Indian country, which includes Plaintiff Nations' Reservations under 25 U.S.C. § 1151(a), because it lacks criminal jurisdiction over Indians in Indian country, and the state fish and game laws—set forth in Title 29 of the Oklahoma Statutes and Title 800 of the Oklahoma Administrative Code—impose criminal penalties for their violation.

85.      The Court explained in *McGirt* that "[t]he key question Mr. McGirt faces [is] … : Did he commit his crimes in Indian country," which federal law defines "to include, among other things, 'all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation.'   [18 U.S.C.] § 1151(a)."   591 U.S. at 898-99.   If the Creek Reservation continued to exist, federal jurisdiction over Mr. McGirt's crime would be exclusive as the Major Crimes Act "allow[s] only the federal government to try Indians."   *Id.* at 898.   The Court held that the Creek Reservation continues to exist.   *Id.* at 902-24.   But that did not resolve the case because Oklahoma also asserted a right to exercise criminal jurisdiction over Indians in Indian country, even "accept[ing] for argument's sake that the Creek land is a reservation and thus Indian country for purposes of the Major Crimes Act," relying on three other grounds.   *Id.* at 927.

86.      The State claimed that it had criminal jurisdiction over Indians in Indian country pursuant to the federal statutes that controlled the assignment of criminal cases during the territorial era, pursuant to the Oklahoma Enabling Act, and because unless it had such jurisdiction, a jurisdictional void would exist with respect to minor offenses committed by Indians on Indians. 597 U.S. at 927-31.   In sum, the State asserted that "whether or not the Creek have a reservation,

the State's historic practices have always been correct and it remains free to try individuals like

Mr. McGirt in its own courts." *Id.* at 928.

87.    The Court decided these claims by reviewing the applicable law and reaffirming

the controlling standard:

> "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history." … Chief Justice Marshall, for example, held that Indian Tribes were "distinct political communities, having territorial boundaries, within which their authority is exclusive … which is not only acknowledged, but guarantied by the United States," a power dependent on and subject to no state authority. …    And in many treaties, like those now before us, the federal government promised Indian Tribes the right to continue to govern themselves. *For all these reasons, this Court has long "require[d] a clear expression of the intention of Congress" before the state or federal government may try Indians for conduct on their lands.*

*Id.* at 928-29 (emphasis added) (citations omitted).

88.    The *McGirt* Court then rejected all three of the State's claims to criminal

jurisdiction over Indians in Indian country, holding that "Oklahoma cannot come close to

satisfying this standard." *Id.* at 929.  With respect to the territorial era statutes, the Court held that

> [w]hen Oklahoma won statehood in 1907, the [Major Crimes Act] applied immediately according to its plain terms.  That statute … provided exclusive federal jurisdiction over qualifying crimes committed by Indians in [Indian country] …  By contrast, every one of the statutes the State directs us to merely discusses the assignment of cases among courts in the *Indian Territory*.  They say nothing about the division of responsibilities between federal and state authorities after Oklahoma entered the Union.

*Id.* (citations omitted).  The State's reliance on the Oklahoma Enabling Act failed because that Act

sent state law cases to state court and federal law cases to federal court, and crimes that were

subject to the Major Crimes Act were federal law cases.  *Id.* at 929-30.  The Court also rejected

the State's argument that "[i]f Oklahoma lacks the jurisdiction to try Native Americans it has

historically claimed, that means at the time of its entry into the Union *no one* had the power to try

minor Indian-on-Indian crimes committed in Indian country."  *Id.* at 930-31.  The Court held that

jurisdictional gaps were "hardly foreign in this area of the law," and that Congress had filled many of those gaps by "reauthorizing tribal courts to hear minor crimes in Indian country," by "allow[ing] Indian tribes to consent to state criminal jurisdiction[,] 25 U.S.C. § 1321(a), 1326[,]" and by "expand[ing] state criminal jurisdiction in targeted bills addressing specific States." *Id.* at 931. "But Oklahoma doesn't claim to have complied with the requirements to assume jurisdiction voluntarily over Creek lands. Nor has Congress ever passed a law conferring jurisdiction on Oklahoma." *Id.* at 932. These clear holdings reject Defendants' claims of state criminal jurisdiction over Indians in Indian country.

89.    The *McGirt* Court's application of the well-settled standard for determining whether a state has criminal jurisdiction over Indians in Indian country to reject the State's claim that it has such jurisdiction is binding on Defendants in this case because *McGirt* is a decision of the Supreme Court on a question of federal law. *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 53 (2015).

90.    The *McGirt* decision establishes that the State cannot cite and prosecute Indians for fish and game offenses allegedly committed in Indian country because Congress has never granted the State criminal jurisdiction over Indians in Indian country in Oklahoma, *McGirt*, 591 U.S. at 932, and because the state fish and game laws— set forth in Title 29 of the Oklahoma Statutes and Title 800 of the Oklahoma Administrative Code—impose criminal penalties for fish and game law violations.[10] Defendants are therefore barred from enforcing those laws against the Nations, their members, and other Indians hunting, fishing, and gathering on the Nations' Reservations.

---

[10] *See, e.g.*, *State v. Robertson*, No. CM-2025-136 (Okla. Dist. Ct. filed Nov. 13, 2025) (criminal misdemeanor charge brought by Defendant Cochran against an Indian for hunting without a state license in Indian country); *State v. Smith*, 539 P.2d 754, 754-57 (Okla. Crim. App. 1975) (per curiam); *Hanes v. State*, 973 P.2d 330, 337 (Okla. Crim. App. 1998), *as corrected* (1999); *Magnolia Pipe Line Co. v. State*, 243 P.2d 369, 383 (Okla. Crim. App. 1952); *Kephart v. State*,

91.    Even if *McGirt* were not controlling here, the Tenth Circuit standard is the same and it too is dispositive here: "[U]nless Congress provides an exception to the rule … states possess 'no authority' to prosecute Indians for offenses in Indian country." *Ute VI*, 790 F.3d at 1004 (quoting *Cheyenne-Arapaho*, 618 F.2d at 668; and citing 18 U.S.C. § 1162). "These limits reflect a longstanding federal policy—enforceable against the states under the federal government's plenary and exclusive constitutional authority 'to legislate in respect to Indian tribes'—of 'leaving Indians free from state jurisdiction and control.'" *Ute Indian Tribe v. Lawrence* (*Lawrence II*), 22 F.4th 892, 899-900 (10th Cir. 2022) (quoting *Lawrence I*, 875 F.3d at 541-42).

92.    As Oklahoma lacks criminal jurisdiction over Indians in Indian country, federal and tribal criminal jurisdiction over Indians in Indian country in Oklahoma is exclusive. That jurisdiction includes the Nations' inherent tribal power over crimes by Indians in Indian country. *See* 25 U.S.C. § 1301(2); *Wheeler*, 435 U.S. at 323-24 ("[T]he sovereign power to punish tribal offenders has never been given up by [Indian] Tribe[s] and . . . tribal exercise of that power today is therefore the continued exercise of retained tribal sovereignty."); *see also United States v. Rogers*, 45 U.S. (4 How.) 567, 572-73 (1846) (in enacting the 1834 Non-Intercourse Act, Congress "intended *to leave* [Indians] as regarded their own tribe, *and other tribes also*, to be governed by Indian usages and customs" (emphases added)); *United States v. Quiver*, 241 U.S. 602, 605-06 (1916) ("[I]n accord with the policy reflected by the legislation of Congress and its administration for many years, . . . the relations of the Indians among themselves—the conduct of one toward

---

229 P.2d 224, 226 (Okla. Crim. App. 1951); *State v. Tyler*, 166 P.2d 1015, 1015-17 (Okla. Crim. App. 1946); Okla. Stat. tit. 29, § 3-205.3 (allowing law enforcement officers to "arrest" violators of Title 29); *id.* tit. 22, § 152(D) (setting statute of limitations for "[p]rosecutions for criminal violations of any provision of the Oklahoma Wildlife Conservation Code"); *id.* tit. 29, § 8-104 (providing it is a misdemeanor to violate regulations promulgated by ODWC under Title 29 of the Oklahoma Statutes); Okla. Admin. Code § 800:25-31-3 (same).

another—is to be controlled by the laws and customs of the tribe, save when Congress expressly or clearly directs otherwise[.]").

93.     Congress enacted 25 U.S.C. § 1301(2) to establish that Indian tribes retain inherent sovereign power to exercise criminal jurisdiction over all Indians in Indian country. *See Lara*, 541 U.S. at 197-98, 200-02.[11]  Key to Congress's decision to pass Section 1301(2) was its conclusion that tribes traditionally had exclusive jurisdiction over all Indians in their Indian country, and thus the states lacked such jurisdiction.[12]  Both houses of Congress acknowledged that Section 1301(2) was important because unless tribes could exercise their inherent criminal authority over Indians on reservations, the resources available to prosecute Indian criminal defendants would be significantly reduced, as states lack jurisdiction over crimes committed by Indians on reservations. S. Rep. No. 102-168, at 3 (1991) ("[I]t has long been accepted that states do not have power to exercise criminal jurisdiction over crimes involving Indians on the reservation." (quoting *Duro v. Reina*, 495 U.S. 676, 705 n.3 (1990) (Brennan, J., dissenting))); H.R. Rep. No. 102-61, at 2 (1991)

---

[11] The Supreme Court had held in *Duro v. Reina*, 495 U.S. 676 (1990), that tribes had lost this power, and Congress reversed that holding five months later by passing Section 1301(2). *See* Pub. L. No. 101-511, § 8077(b)-(c), 104 Stat. 1856, 1892-93 (1990).  The plain language of Section 1301(2) therefore forecloses reliance on the Court's finding in *Duro*, 495 U.S. at 695-96, that Indians who are not members of the tribe on whose Indian country they are located are distinguishable from member Indians and subject to state criminal jurisdiction. *See Lara*, 541 U.S. at 200-02, 210; *United States ex rel. Cheyenne River Sioux Tribe v. South Dakota*, 105 F.3d 1552, 1559 (8th Cir. 1997) ("Congress has defined tribal powers of self government to include criminal jurisdiction over 'all Indians' … .").

[12] Section 1301(2) was originally only a temporary measure.  When Congress was considering whether to make Section 1301(2) permanent, it was informed that "[i]n the period from the founding of the Republic until the latter part of the last [*i.e.*, nineteenth] century, … [t]ribes exercised authority over members of other tribes who married into the tribe, were adopted into its families, or otherwise became part of the tribal community voluntarily," as well as "over members of other tribes who voluntarily came to visit or to trade."  *The* Duro *Decision: Criminal Misdemeanor Jurisdiction in Indian Country: Hearing Before the H. Comm. on Interior and Insular Affs.*, 102d Cong. 155 (1991) (statement of Richard Collins, Professor, Univ. of Colo.). Congress made Section 1301(2) permanent later that year.  *See* Pub. L. No. 102-137, 105 Stat. 646 (1991).

("[U]nder 18 U.S.C. 1152 the federal government lacks misdemeanor jurisdiction over crimes committed by one Indian against another Indian, and states generally cannot assert criminal jurisdiction over Indians on reservations.").  Section 1301(2)'s reaffirmation of tribal inherent power over Indians in Indian country, unaccompanied by any express authorization for states to also exercise such power, necessarily makes tribal authority under Section 1301(2) exclusive of state authority.

94.    The State would have no jurisdiction to enforce its fish and game laws against Indians on Plaintiff Nations' Reservations even if those laws were civil in nature.  That is so because "state courts' 'adjudicative authority over Indians for on-reservation conduct is greatly limited by federal law.'"  *Lawrence II*, 22 F.4th at 899 (quoting *Lawrence I*, 875 F.3d at 542). "These limits reflect a longstanding federal policy—enforceable against the states under the federal government's plenary and exclusive constitutional authority 'to legislate in respect to Indian tribes'—of 'leaving Indians free from state jurisdiction and control.'"  *Id.* at 899-900 (quoting *Lawrence I*, 875 F.3d at 541).[13]  "Thus, when a case brought against a tribe or its members 'aris[es] from conduct in Indian country,' state courts lack jurisdiction 'absent clear congressional authorization.'"  *Lawrence II*, 22 F.4th at 900 (quoting *Navajo Nation v. Dalley*, 896 F.3d 1196, 1204 (10th Cir. 2018)).  As there is no such authorization here, the State would have no jurisdiction to enforce any civil laws regulating hunting, fishing, and gathering on Plaintiff Nations' Reservations.

95.    Accordingly, Oklahoma has no jurisdiction to enforce its fish and game laws against Indians in Indian country and therefore may not enforce those laws against Plaintiff

---

[13] "[T]he Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that [the Supreme Court] ha[s] consistently described as 'plenary and exclusive.'"  *Lara*, 541 U.S. at 200 (citations omitted).

Nations, their members, and other Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations under Plaintiff Nations' laws, including members of the Plaintiff Nations doing so under the Reciprocity Agreement.

**F.    Defendants' Interference With The Nations' Federal Rights.**

96.    On October 7, 2025, Defendant Free announced that he had directed Defendant "Rodefeld to implement uniform enforcement of the Oklahoma Wildlife Code in state courts in accordance with applicable state law," that "[t]he Stroble v. Oklahoma Tax Commission case … has provided clear legal confirmation that McGirt is limited to prosecuting crimes under the federal Major Crimes Act only," and that "[a]ll offenses within the Wildlife Code are not within the definition of felonies listed within the Major Crimes Act."  Oct. 7, 2025 ODWC Memo.  This directive ignores the Treaty rights of the Nations and their members to hunt, fish, and gather on their Reservations, *see supra* ¶¶ 26-52, misstates the controlling legal effect of *McGirt*, *see supra* ¶¶ 85-90, and wrongly construes the Oklahoma Supreme Court's decision in *Stroble v. Oklahoma Tax Commission* (*In re Stroble*), 2025 OK 48 (per curiam), to somehow provide authority for the State to enforce its fish and game laws against Indians in Indian country  For these reasons, Defendant Free's directive, and the actions taken pursuant to it at his direction, constitute a continuing violation of federal law.

97.    On October 8, 2025, ODWC issued a public announcement on its website, which was also emailed to people throughout Oklahoma, reaffirming that "ODWC game wardens will continue to enforce the law and will issue citations to anyone in violation of the state's fish and game laws, regardless of tribal citizenship."  Ex. 9, *ODWC Reaffirms Enforcement of Oklahoma's Wildlife Laws*, Okla. Dep't of Wildlife Conservation (Oct. 8, 2025), https://www.wildlifedepartment.com/outdoor-news/odwc-reaffirms-enforcement-oklahomas-wildlife-laws.  This announcement ignores controlling federal law, as set forth in the preceding

paragraph and *supra* ¶¶ 69-95, and the actions it directs constitute a continuing violation of federal law.

98.    On October 30, the Attorney General of Oklahoma announced that "he will not allow Native American hunters to be prosecuted by the state for hunting in Indian Country without a state permit when they are otherwise acting in accord with duly enacted tribal law." Ex. 10, *Drummond to Dismiss Native American Hunting Case*, Off. of Att'y Gen. of Okla. (Oct. 30, 2025), https://oklahoma.gov/oag/news/newsroom/2025/october/drummond-to-dismiss-native-american-hunting-case.html.  He further announced that "his office will take over the case of *State of Oklahoma v Shawn Robertson* and dismiss the charge of hunting without a license" and that "any further cases filed against members of Native American tribes for hunting on tribal land without a license will be taken over by the Attorney General's Office and promptly dismissed."

99.    On November 11, 2025, Matt Gamble, the Senior Manager of Wildlife Conservation for the Choctaw Nation of Oklahoma sent a letter to Defendants Free and Erdman, requesting:

> Confirm[ation] that you have retracted ODWC's policy of enforcing Title 29 of the Oklahoma Statutes and Title 800 of the Oklahoma Administrative Code against members of federally-recognized Indian tribes who are hunting and fishing on Indian Reservations, without regard to whether they are complying with Tribal law. In addition, please confirm you have stopped referring citations, issued by your game wardens to members of federally-recognized Indian tribes for alleged conduct on Indian Reservations, to the Governor or his designee so that those citations may be prosecuted by a special counsel in state court.

Ex. 11, Letter from Matt Gamble, Sr. Mg'r of Wildlife Conservation, Choctaw Nation of Okla., to Wade Free, Director, and Nathan Erdman, Chief of Law Enforcement Div., ODWC at 2 (Nov. 11, 2025).  The letter further explained that

> If I do not receive a response from you by 5 p.m. on Thursday, November 13, I will understand your silence to mean that ODWC's enforcement policy continues to be to enforce Title 29 of the Oklahoma Statutes and Title 800 of the Oklahoma Administrative Code against members of federally-recognized tribes who are

hunting and fishing in Indian Reservations, and that ODWC's current procedural policy is to refer citations issued to members of federally-recognized tribes for conduct in Indian Reservations to the Governor or his designee, so that those citations may be prosecuted by a special counsel in state court.

*Id.* Defendants Free and Erdman never responded, confirming the understanding expressed in Mr. Gamble's letter.

100.    On November 13, 2025, the Attorney General of Oklahoma sent a letter to Defendant Free, requesting

> 1. Confirmation that ODWC has rescinded or will immediately rescind its October 7, 2025, directive and any related enforcement policies regarding tribal members hunting and fishing in Indian Country;
>
> 2. Confirmation that ODWC will instruct all game wardens statewide to cease enforcement of state wildlife laws against tribal members engaged in hunting and fishing activities on Indian reservations;
>
> 3. Confirmation that ODWC will withdraw any pending citations issued to tribal members for hunting or fishing violations on Indian reservations and will notify the Governor's office and any appointed special counsel that such prosecutions should be dismissed;
>
> 4. Confirmation that ODWC will work cooperatively with the Five Tribes to address any legitimate wildlife conservation concerns through government-to-government consultation rather than unilateral enforcement actions; and
>
> 5. A detailed explanation of what circumstances prompted ODWC's October 7 policy change and who directed or authorized that change.

Ex. 12, Letter from Gentner Drummond, Att'y Gen., State of Okla., to Director Wade Free, Okla. Dep't of Wildlife Conservation, at 3 (Nov. 13, 2025).[14]   The Attorney General requested confirmation of the above "in writing no later than 5:00 pm on Monday, November 17, 2025." *Id.* at 2.  ODWC did not provide such a response.

---

[14] https://oklahoma.gov/content/dam/ok/en/oag/news-documents/2025/november/Letter_Director%20Free-OK%20Dept%20of%20Wildlife%2011.13.2025.pdf.

4905-1916-9658, v. 4

101.    As demonstrated by the above-described announcements and actions, Defendants, or those under their direction, have directed ODWC game wardens to enforce state fish and game laws, *see* Okla. Stat. tit. 29; Okla. Admin. Code tit. 800, against Indians on the Plaintiff Nations' Reservations, by: a) requiring Indians to obtain a state license; b) citing Indians for allegedly violating state hunting and fishing laws on Plaintiff Nations' Reservations; c) imposing punishments authorized by state law on Indians who allegedly violate state hunting and fishing laws on Plaintiff Nations' Reservations; d) referring citations of Indians for conduct on Plaintiff Nations' Reservations to state prosecutors and state courts for prosecution; e) threatening to do any and all of the above against Indians who do not comply with state hunting and fishing laws on Plaintiff Nations' Reservations; and f) engaging in enforcement actions to carry out the actions and threats discussed in subparagraphs a-e.  They are doing so currently and will continue to do so unless enjoined by this Court.  *See, e.g.*, *supra* ¶¶ 9-14, 96-100.

102.    ODWC game wardens are following these directives throughout the Nations' Reservations.  *See supra* ¶¶ 22-23; *infra* ¶ 105.

103.    Defendants Free, Rodefeld, and Erdman have not retracted, withdrawn, or modified their previously announced intention and directive to enforce the state fish and game laws against Indians in Indian country.  As a result of their failure to do so, Defendants Free, Rodefeld, and Erdman continue to direct the exercise of jurisdiction over Indians in Indian country.

104.    In response to the Attorney General's announcement described *supra* ¶ 98, Defendant Stitt took action to ensure that Indians would be prosecuted in state courts if they do not comply with state law while hunting, fishing, or gathering in Indian country.  Defendant Stitt purported to exercise his authority under Okla. Stat. tit. 74, § 6, to employ special counsel to prosecute Indians for their conduct in Indian country.  He did so by employing Defendant Cochran

Case 4:25-cv-00630-CVE-JFJ    Document 2 Filed in USDC ND/OK on 11/18/25    Page 49 of 59

to accept referrals of citations of Indians in Indian country for alleged violations of state fish and game laws and to prosecute Indians in state court for their alleged violations of state law. Defendant Stitt did this in an attempt to prevent the Attorney General from taking control over and dismissing prosecutions of Indians for their conduct in Indian country. Pursuant to his employment by Defendant Stitt as special counsel, Defendant Cochran is actually accepting referrals of citations against Indians for conduct in Indian country, including Plaintiff Nations' Reservations, and he is initiating and carrying out prosecutions of Indians for hunting, fishing, or gathering on Plaintiff Nations' Reservations in state court or is threatening to do so imminently.

105.    Defendants' actions were and are taken under color of state law, under which they claim authority to enforce state law and exercise state jurisdiction over Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations. These actions demonstrate that Defendants intend to continue to cite, arrest, and charge Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations with violations of state law, notwithstanding that Plaintiff Nations have Treaty rights to hunt, fish, and gather on their Reservations, to exercise jurisdiction over and apply their laws to all Plaintiff Nations' members and other Indians authorized by Plaintiff Nations to hunt, fish, and gather on their Reservations, and to be free from state interference in the exercise of those rights.

106.    Defendants have no right to impose licensing requirements, cite, arrest, charge, prosecute, punish, fine, or otherwise exercise jurisdiction over Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations for alleged violations of state law, nor do they have the right to rely on state law to seize property of Indians engaged in such activities, nor do they have the right to direct others under their authority to do so. Nor do the Oklahoma state courts have jurisdiction to adjudicate charges arising from any such exercises of state authority. Any

4905-1916-9658, v. 4

such citation, arrest, charge, seizure, fine, licensure, prosecution, adjudication, or punishment deprives the Nations of rights held under federal law, which bars the exercise of state jurisdiction over and the application of state law to the hunting, fishing, and gathering activities of Plaintiff Nations' members and other Indians on Plaintiff Nations' Reservations, and violates Plaintiff Nations' exclusive right to criminally punish and civilly regulate Indians' on-reservation hunting, fishing, and gathering activities, and therefore constitutes a continuing violation of federal law.

107. Unless enjoined, Defendants' actual and threatened actions will deprive Plaintiff Nations and their members of their Treaty right to hunt, fish, and gather within the boundaries of the Nations' Reservations in accordance with the laws of the Nations, and their right to be free from state interference in the exercise of those rights, which are secured to the Plaintiff Nations and their respective members under their treaties with the United States, their inherent sovereign authority, by statute, 25 U.S.C. § 1301(2), and under federal common law.

108. As a result of the actual and threatened enforcement of state law by Defendants against Plaintiff Nations' members and other Indians exercising their federal rights to hunt, fish, and gather on the Nations' Reservations under the Nations' laws, Plaintiff Nations' members, and other Indians engaged in such activities risk arrest, incarceration, fines, and seizure of their personal property. Plaintiff Nations' members and other Indians are currently being cited by ODWC game wardens, pursuant to which they are or will be ordered to appear in state court and pay fines for alleged violations of state laws. Plaintiff Nations' members and other Indians are currently being made by ODWC game wardens to purchase state licenses or pay administrative fines in the field to avoid state prosecution. Such actual and threatened actions by the Defendants have and will continue to coerce Plaintiff Nations' members and other Indians to forgo, in whole or in part, the exercise of their federal rights to hunt, fish, and gather on the Nations' Reservations.

109.    Defendants' actual and threatened actions will also nullify Plaintiff Nations' rights to regulate all Indians hunting, fishing, and gathering within Reservation boundaries under their own laws, and to criminally punish them when they violate those laws, through proceedings conducted in their own courts, which rights are secured to the Plaintiff Nations by their Treaties with the United States, by statute, 25 U.S.C. § 1301(2), and federal common law. The Defendants' efforts to interfere with these federal rights invades the Plaintiff Nations' sovereignty, which "constitute[s] [an] irreparable injury." *Ute VI*, 790 F.3d at 1005-06 (quoting *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006); and citing *Prairie Band*, 253 F.3d at 1250-51).

110.    The Defendants' threatened actions constitute a continuing violation of federal law, which is actionable under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908).

111.    Plaintiff Nations and their members have no adequate remedy at law because the damages that have been or will be sustained are not susceptible to monetary determination and because the recovery of such damages from the State of Oklahoma is barred by state sovereign immunity; the rights of the Plaintiff Nations and their members under their Treaties are unique and should be specifically protected; and in the case of criminal arrests and prosecution threatened by Defendants, the Nations and their members have no remedy at all except at the risk of suffering fines, imprisonment, and confiscation of property involving a multiplicity of legal proceedings.

## V.    CAUSES OF ACTION

### Count 1

### Plaintiff Nations' Claim for Declaratory Judgment against Defendants

112.    Plaintiff Nations incorporate by reference and restate all allegations of paragraphs 1 through 112 as if fully set forth herein.

113.    This cause of action is brought pursuant to and in accord with the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, to seek a declaration of the rights and other legal

obligations and relations of the parties named hereinunder pursuant to the laws of the United States and for such further necessary and proper relief as may be granted.

114.     There exists an actual case and controversy between Plaintiff Nations and Defendants arising from Defendants' ongoing and unlawful attempts to exercise state jurisdiction and apply state law to Plaintiff Nations' and their members' exercise of their right to hunt, fish, and gather on Reservation lands free from state interference, and to other Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations in accordance with and subject to the laws of the Nations, including members of one Plaintiff Nation doing so on another Plaintiff Nation's Reservation under the Reciprocity Agreement.

115.     "[U]nder *Ex parte Young*, … a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief." *Muscogee (Creek) Nation*, 669 F.3d at 1166 (citing *Verizon Md.*, 535 U.S. at 645).  And under the federal common law, federal courts have jurisdiction to issue injunctions to bar unlawful exercises of state jurisdiction in Indian country.  *See supra* ¶ 15; *Lawrence II*, 22 F.4th at 907-10.

116.     Defendants' ongoing and unlawful actual and threatened exercise of state jurisdiction and application of state law to Plaintiff Nations' and their members' hunting, fishing, and gathering activities on Plaintiff Nations' Reservations, including members of one Plaintiff Nation doing so on another Plaintiff Nation's Reservation under the Reciprocity Agreement, deprives them of rights held under Plaintiff Nations' Treaties with the United States and Plaintiff Nations' inherent sovereign authority, and constitutes a continuing violation of federal law.

117.     Plaintiff Nations seek to have this Court declare that: (a) Plaintiff Nations and their members have the right to hunt, fish, and gather natural resources on their Reservations in

accordance with and subject to Plaintiff Nations' laws, free from interference by Defendants' threatened and actual application of state jurisdiction and state law to the exercise of said hunting, fishing, and gathering rights, and that those rights are held under Plaintiff Nations' Treaties with the United States and inherent sovereign authority, have never been abrogated, and have continuing force and effect on their Reservations; (b) each Plaintiff Nation has the right, held under its Treaties and inherent sovereign authority, and by federal statute, *see* 25 U.S.C. § 1301(2), to permit members of the other Plaintiff Nations to hunt, fish, and gather on its Reservation subject to its laws and in accordance with the Reciprocity Agreement, free from interference by Defendants through the threatened or actual application of state jurisdiction and state law to said hunting, fishing, and gathering activities; (c) each Plaintiff Nation has the right, held under its Treaties and inherent sovereign authority, and by federal statute, *see* 25 U.S.C. § 1301(2), to permit other Indians to hunt, fish, and gather on its Reservation subject to its laws, free from interference by Defendants through the threatened or actual application of state jurisdiction and state law to said hunting, fishing, and gathering; (d) Plaintiff Nations have jurisdiction, which is exclusive of the State, over all Plaintiff Nations' members and other Indians hunting, fishing, and gathering activities on Plaintiff Nations' Reservations, which includes their right to prosecute criminal and civil violations of Plaintiff Nations' laws in their own courts, and which is held under Plaintiff Nations' Treaties with the United States, their inherent sovereign authority, and by statute, *see* 25 U.S.C. § 1301(2), which have never been abrogated and which have continuing force and effect on their Reservations.

118.    Plaintiff Nations seek to have this Court declare that: Defendants' ongoing actual and threatened exercise of state jurisdiction over and application of state law to Plaintiff Nations, their members, and other Indians hunting, fishing, and gathering activities on Plaintiff Nations'

Reservations deprives Plaintiff Nations, their members, and other Indians of rights held under federal law and therefore violates federal law because (a) Defendants have no authority to require an Indian exercising a treaty right to hunt, fish, and gather on Plaintiff Nations' Reservations to obtain a state license to engage in such activity; and (b) Plaintiff Nations' Treaties, inherent sovereign authority, and rights under 25 U.S.C. § 1301(2) preempt the exercise of state jurisdiction and the application of state law to (i) their members hunting, fishing, and gathering on their own Reservation; (ii) members of the Plaintiff Nations hunting, fishing, and gathering on Plaintiff Nations' Reservations under Plaintiff Nations' laws and the Reciprocity Agreement; and (iii) other Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations under Plaintiff Nations' laws.

119.    Plaintiff Nations seek to have this Court declare that: Defendants' ongoing actual and threatened exercise of state jurisdiction over and application of state law to Plaintiff Nations, their members, and other Indians hunting, fishing, and gathering activities on Plaintiff Nations' Reservations under Plaintiff Nations' laws violates federal law because the State of Oklahoma lacks criminal jurisdiction over Indians in Indian country and state law imposes criminal penalties for fish and game violations.

## Count 2

### Plaintiff Nations' and Their Members' Claim for Injunctive Relief Against Defendants

120.    Plaintiff Nations incorporate by reference and restate all allegations of paragraphs 1 through 120 as if fully set forth herein.

121.    In furtherance of Plaintiff Nations' request for declaratory relief, as recited *supra* ¶¶ 113-119, Plaintiff Nations, on their own behalf and as *parens patriae*, seek to have this Court enjoin Defendants Wade Free, Director of the ODWC, Nathan Erdman, ODWC Chief of Law Enforcement Division, J. Kevin Stitt, Governor of Oklahoma, and Russell Cochran, special

counsel employed by Defendant Stitt, all in their official capacities, and their agents and delegates, from: (a) applying or enforcing state fish and game laws and regulations, namely Okla. Stat. tit. 29 and Okla. Admin. Code tit. 800, against Plaintiff Nations and their members hunting, fishing, and gathering on Plaintiff Nations' Reservations in the exercise of their Treaty rights and in accordance with the laws of Plaintiff Nations; (b) applying or enforcing state fish and game laws and regulations against Plaintiff Nations' members hunting, fishing, and gathering on Plaintiff Nations' Reservations under the laws of Plaintiff Nations and the Reciprocity Agreement; (c) applying or enforcing state fish and game laws and regulations against Plaintiff Nations' members and other Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations in accordance with the laws of Plaintiff Nations; (d) interfering with Plaintiff Nations' enforcement of their laws over Plaintiff Nation members and all other Indians' hunting, fishing, and gathering activities on Plaintiff Nations' Reservations in accordance with Plaintiff Nations' laws, and (e) interfering with Plaintiff Nations' prosecution of violations of such laws in Plaintiff Nations' courts.

## VI.    CLAIMS FOR RELIEF

Wherefore Plaintiff Nations and their members pray for a judgment granting the relief as follows:

1.    Declaring that each Plaintiff Nation and its members have the right, held under Plaintiff Nation's Treaties, inherent sovereign authority, and under federal common law, to hunt, fish, and gather on Plaintiff Nation's Reservation free from state interference, and that those rights have never been abrogated and have continuing force and effect on each Plaintiff Nation's Reservation.

2.    Declaring, specifically, that each Plaintiff Nation has the right, held under its Treaties and inherent sovereign authority, by federal statute, *see* 25 U.S.C. § 1301(2), and under

federal common law, to permit members of the other Plaintiff Nations to hunt, fish, and gather on its Reservation subject to its laws and in accordance with the Reciprocity Agreement.

3.     Declaring, specifically, that each Plaintiff Nation has the right, held under its Treaties and inherent sovereign authority, by federal statute, *see* 25 U.S.C. § 1301(2), and under federal common law, to permit other Indians to hunt, fish, and gather on its Reservation subject to its laws.

4.     Declaring, specifically, that each Plaintiff Nation has the right, held under its Treaties and inherent sovereign authority, by federal statute, *see* 25 U.S.C. § 1301(2), and under federal common law, to regulate its members, members of the other Plaintiff Nations, and other Indians engaged in hunting, fishing and gathering on its Reservation, and to be free from interference arising from Defendants' actual and threatened exercise of state jurisdiction over and application of state law to the exercise of these federal rights by Plaintiff Nations, their members, and other Indians.

5.     Declaring, specifically, that Defendants, directly or through their agents, designees, or appointees, may not enforce state fish and game laws, including Okla. Stat. tit. 29 and Okla. Admin. Code tit. 800, nor may they exercise state court jurisdiction to enforce such laws and regulations, against Plaintiff Nations, Plaintiff Nations' members, and other Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations in accordance with Plaintiff Nations' laws, including Plaintiff Nations' members doing so pursuant to the Reciprocity Agreement.

6.     Enjoining Defendants, directly or through their agents, designees, or appointees, from: from: (a) applying or enforcing state fish and game laws and regulations, namely Okla. Stat. tit. 29 and Okla. Admin. Code tit. 800, against Plaintiff Nations and their members hunting, fishing, and gathering on Plaintiff Nations' Reservations in the exercise of their Treaty rights and

in accordance with the laws of Plaintiff Nations; (b) applying or enforcing state fish and game laws and regulations against Plaintiff Nations' members  hunting, fishing, and gathering on Plaintiff Nations' Reservations under the laws of Plaintiff Nations, including Plaintiff Nations' members doing so under the Reciprocity Agreement, through any means including continuation of ongoing prosecutions, *see, e.g.*, *State v. Robertson*, No. CM-2025-136 (Okla. Dist. Ct. filed Nov. 13, 2025); *State v. Shepherd*, No. WL-2025-03 (Okla. Dist. Ct. filed Nov. 13, 2025); (c) applying or enforcing state fish and game laws and regulations against Plaintiff Nations' members and all other Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations in accordance with the laws of Plaintiff Nations; (d) interfering with Plaintiff Nations' enforcement of their laws over Plaintiff Nation members and other Indians' hunting, fishing, and gathering activities on Plaintiff Nations' Reservations in accordance with Plaintiff Nations' laws, including Plaintiff Nations' members doing so under the Reciprocity Agreement, and (e) interfering with Plaintiff Nations' prosecution of violations of such laws in Plaintiff Nations' courts.

7.      Awarding such further injunctive relief as may be necessary to enforce and protect the rights declared by the court in its judgment.

8.      Awarding reasonable attorneys' fees, costs, and expenses incurred in this litigation.

9.      For such other relief as is just and equitable.

Dated:  November 18, 2025                    Respectfully submitted,

                                     By:  */s/ Michael Burrage*
                                          _____
                                          Michael Burrage, OBA No. 1350
                                          WHITTEN BURRAGE
                                          512 N. Broadway Ave., Suite 300
                                          Oklahoma City, OK 73102
                                          Tel: 405-516-7800
                                          E-mail:  mburrage@whittenburragelaw.com

                                          *Counsel for the Chickasaw Nation and Choctaw*
                                           *Nation of Oklahoma*

4905-1916-9658, v. 4

/s/ Frank S. Holleman

Frank S. Holleman, DC Bar No. 1011376
Douglas B. L. Endreson, DC Bar No. 461999, *pro hac vice forthcoming*
Anne DeLong, DC Bar No. 90031783, *pro hac vice forthcoming*
SONOSKY, CHAMBERS, SACHSE,
  ENDRESON & PERRY, LLP
1425 K St NW, Suite 600
Washington, DC 20005
Tel: 202-682-0240
E-mail: fholleman@sonosky.com
         dendreso@sonosky.com
         adelong@sonosky.com

*Counsel for the Cherokee, Chickasaw, and Choctaw Nations*

Chad Harsha, OBA No. 31579
Attorney General
CHEROKEE NATION
OFFICE OF ATTORNEY GENERAL
P.O. Box 1533
Tahlequah, OK 74465
Tel: 918-453-5369
E-mail: chad-harsha@cherokee.org

*Counsel for the Cherokee Nation*

Stephen H. Greetham, OBA No. 21510, *pro hac vice forthcoming*
GREETHAM LAW, P.L.L.C.
621 Greenwood Road
Chapel Hill, NC 27514-5921
Tel: 984-261-7240
E-mail: sgreetham@greethamlaw.net

*Counsel for the Cherokee and Chickasaw Nations*

Kaycie Sheppard, OBA No. 21356, *pro hac vice forthcoming*
*Chief Executive Counsel*
THE CHICKASAW NATION
OFFICE OF EXECUTIVE COUNSEL
2021 Arlington St.
Ada, OK 74820
Tel: 580-310-7925
E-mail: kaycie.sheppard@chickasaw.net

*Counsel for the Chickasaw Nation*

Brian Danker, OBA No. 16638
Senior Executive Officer
DIVISION OF LEGAL & COMPLIANCE
CHOCTAW NATION OF OKLAHOMA
1802 Chukka Hina Dr.
Durant, OK 74701
Tel: 580-642-7423
E-mail: bdanker@choctawnation.com

*Counsel for the Choctaw Nation of Oklahoma*

4905-1916-9658, v. 4