# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) THE CHEROKEE NATION, a federally recognized Indian Tribe, on its own behalf and as *parens patriae*,<br>(2) THE CHICKASAW NATION, a federally recognized Indian Tribe, on its own behalf and as *parens patriae*, and<br>(3) THE CHOCTAW NATION OF OKLAHOMA, a federally recognized Indian Tribe, on its own behalf and as *parens patriae*,<br><br>    Plaintiffs,<br><br>v.<br><br>(1) WADE FREE, in his official capacity as Director, Oklahoma Department of Wildlife Conservation,<br>(2) NELS RODEFELD, in his official capacity as Assistant Director, Oklahoma Department of Wildlife Conservation,<br>(3) NATHAN ERDMAN, in his official capacity as Chief of Law Enforcement Division, Oklahoma Department of Wildlife Conservation,<br>(4) J. KEVIN STITT, in his official capacity as Governor of the State of Oklahoma, and<br>(5) RUSSELL COCHRAN, in his official capacity as special counsel employed by the Governor,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No.  4:25-cv-00630-CVE-JFJ<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

JURISDICTION AND STANDING ............................................................................. 2

STATEMENT OF FACTS ....................................................................................... 2

STANDARD OF REVIEW ...................................................................................... 8

SUMMARY OF ARGUMENT ................................................................................. 8

ARGUMENT ...................................................................................................... 9

I.     The Nations Have A Substantial Likelihood Of Success On The Merits. .......................... 9

       A.     Each Nation Holds Treaty Rights to Hunt on Its Reservation Under its
              Laws, Free from State Interference, And To Permit Each Others' Members
              to do so Under the Reciprocity Agreement ............................................. 10

              1.     The Nations have Treaty rights to hunt and to regulate
                     Indians hunting on their Reservations. ......................................... 10

              2.     The Nations also have inherent sovereign authority to
                     regulate Indians hunting on their Reservations. ............................. 13

       B.     Federal Law Bars Defendants from Interfering with Indians Hunting in
              Indian Country. ............................................................................ 15

              1.     The Nations' Treaty rights preempt Defendants'
                     interference with the exercise of those rights. ............................... 15

              2.     The State also lacks jurisdiction over Indians hunting,
                     fishing, and gathering in Indian country. ..................................... 17

II.    Plaintiffs Will Be Irreparably Harmed If Temporary Injunctive Relief Is Denied. ........... 21

III.   Any Injury To Defendants From A TRO Would Not Outweigh The Irreparable
       Harm To The Nations. ............................................................................. 24

IV.    The Public Interest Would Be Served By The Requested Relief. ............................... 25

CONCLUSION ................................................................................................... 25

4925-1671-0778, v. 5

# TABLE OF AUTHORITIES

## CASES

*Antoine v. Washington*,
420 U.S. 194 (1975)...................................................................................15, 17

*Atl. & Pac. R.R. v. Mingus*,
165 U.S. 413 (1897)................................................................................................11

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*,
562 F.3d 1067 (10th Cir. 2009) ..........................................................................8

*Bosse v. State*,
2021 OK CR 30, 499 P.3d 771 .............................................................................4

*Brown v. Davenport*,
596 U.S. 118 (2022)............................................................................................20

*Chamber of Com. of U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) ..........................................................................25

*Choctaw Nation v. Oklahoma*,
397 U.S. 620 (1970)............................................................................................11

*Colorado v. U.S. EPA*,
989 F.3d 874 (10th Cir. 2021) ............................................................................8

*Dick v. United States*,
208 U.S. 340 (1908)...................................................................................15, 21

*DT Energy Grp. v. Hirschfield*,
912 F.3d 1263 (10th Cir. 2018) ..........................................................................8

*Ex parte Crow Dog*,
109 U.S. 556 (1883)............................................................................9, 17, 19

*Fisher v. Dist. Ct.*,
424 U.S. 382 (1976) (per curiam) ......................................................................14

*Free the Nipple-Fort Collins v. City of Fort Collins*,
916 F.3d 792 (10th Cir. 2019) ..........................................................................24

*Haaland v. Brackeen*,
599 U.S. 255 (2023)............................................................................................21

*Herrera v. Wyoming*,
587 U.S. 329 (2019)...................................................................................12, 16

*Hooper v. City of Tulsa*,
71 F.4th 1270 (10th Cir. 2023) ............................................................................2

*Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Okla. Tax Comm'n*,
829 F.2d 967 (10th Cir. 1987) ...................................................................13, 20

ii

*Kan. Hosp. Ass'n v. Whiteman*,
  835 F. Supp. 1548 (D. Kan. 1993) ............................................................22

*La. Mun. Police Emps.' Ret. Sys. v. Cont'l Res., Inc.*,
  886 F. Supp. 2d 1255 (W.D. Okla. 2012) ..................................................24

*LaFavre v. Kansas ex rel. Stovall*,
  6 F. App'x 799 (10th Cir. 2001) ...............................................................22

*McClanahan v. Ariz. State Tax Comm'n*,
  411 U.S. 164 (1973) ..................................................................................13

*McGirt v. Oklahoma*,
  591 U.S. 894 (2020) ........................................................................... *passim*

*Menominee Tribe v. United States*,
  391 U.S. 404 (1968) ..................................................................................11

*Merrion v. Jicarilla Apache Tribe*,
  455 U.S. 130 (1982) ..................................................................................13

*Mesa Partners II v. Unocal Corp.*,
  607 F. Supp. 624 (W.D. Okla. 1985) .........................................................24

*Minnesota v. Mille Lacs Band*,
  526 U.S. 172 (1999) ......................................................................12, 13, 16

*Montana v. Blackfeet Tribe*,
  471 U.S. 759 (1985) ..................................................................................21

*Montana v. United States*,
  450 U.S. 544 (1981) ..................................................................................13

*Morris v. Hitchcock*,
  194 U.S. 384 (1904) ..................................................................................10

*Muscogee (Creek) Nation v. Kunzweiler*,
  No. 25-cv-75-GKF-JFJ, 2025 WL 3124450
  (N.D. Okla. Nov. 7, 2025) ..........................................................8, 18, 19, 20, 21

*Muscogee (Creek) Nation v. City of Henryetta*,
  No. 6:25-cv-00227-JAR
  (E.D. Okla. Nov. 18, 2025) ...................................................................19, 20

*N. Arapahoe Tribe v. Hodel*,
  808 F.2d 741 (10th Cir. 1987) ...................................................................11

*New Mexico v. Mescalero Apache Tribe*,
  462 U.S. 324 (1983) ..................................................................................13

*Okla. Tax Comm'n v. Chickasaw Nation*,
  515 U.S. 450 (1995) ...............................................................................3, 10

*Oklahoma v. Castro-Huerta*,
  597 U.S. 629 (2022) ...........................................................................4, 20, 21

4925-1671-0778, v. 5

*Oliphant v. Suquamish Indian Tribe*,
    435 U.S. 191 (1978).................................................................................................10

*Prairie Band of Potawatomi Indians v. Pierce*,
    253 F.3d 1234 (10th Cir. 2001) .........................................................2, 9, 21, 22, 25

*Pryor v. Sch. Dist. No. 1*,
    99 F.4th 1243 (10th Cir. 2024) ...............................................................................8

*Puyallup Tribe v. Dep't of Game*,
    391 U.S. 392 (1968)................................................................................................17

*Puyallup Tribe, Inc. v. Dep't of Game*,
    433 U.S. 165 (1977)................................................................................................17

*Reprod. Servs. v. Keating*,
    35 F. Supp. 2d 1332 (N.D. Okla. 1998).................................................................25

*Ross v. Neff*,
    905 F.2d 1349 (10th Cir. 1990) ........................................................................ 19-20

*Sac & Fox Nation v. LaFaver*,
    905 F. Supp. 904 (D. Kan. 1995) ..........................................................................25

*Schrier v. Univ. of Colo.*,
    427 F.3d 1253 (10th Cir. 2005) ...............................................................................8

*Seminole Tribe v. Florida*,
    517 U.S. 44 (1996)..................................................................................................21

*Seneca-Cayuga Tribe v. Oklahoma ex rel. Thompson*,
    874 F.2d 709 (10th Cir. 1989) .........................................................................23, 25

*Sizemore v. State*,
    2021 OK CR 6, 485 P.3d 867 ..................................................................................4

*Spears v. State*,
    2021 OK CR 7, 485 P.3d 873 ..................................................................................4

*State ex rel. Matloff v. Wallace*,
    2021 OK CR 21, 497 P.3d 686 ................................................................................4

*State v. Robertson*,
    No. CM-2025-136 (Okla. Dist. Ct. filed Nov. 13, 2025).......................................20

*State v. Smith*,
    539 P.2d 754 (Okla. Crim. App. 1975) (per curiam)..............................................20

*Stroble v. Oklahoma Tax Comm'n*,
    No. 25-382 (U.S. docketed Oct. 1, 2025) ..............................................................18

*Stroble v. Oklahoma Tax Commission* (*In re Stroble*),
    2025 OK 48 (per curiam)...................................................................................7, 18

*Talton v. Mayes*,
    163 U.S. 376 (1896)...........................................................................................11, 14

iv

*Timpanogos Tribe v. Conway,*
    286 F.3d 1195 (10th Cir. 2002) ................................................................... 11

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ................................................................................ 2

*Tulee v. Washington,*
    315 U.S. 681 (1942) .............................................................................. 16

*United States v. Baker,*
    894 F.2d 1144 (10th Cir. 1990) ................................................................ 14

*United States v. Dion,*
    476 U.S. 734 (1986) .......................................................................... 11, 12

*United States v. Forty-Three Gallons of Whiskey,*
    93 U.S. 188 (1876) ............................................................................... 15

*United States v. Fox,*
    573 F.3d 1050 (10th Cir. 2009) ................................................................ 12

*United States v. Kagama,*
    118 U.S. 375 (1886) .......................................................................... 13, 18

*United States v. Lara,*
    541 U.S. 193 (2004) .......................................................................... 14, 21

*United States v. Wheeler,*
    435 U.S. 313 (1978) .............................................................................. 14

*United States v. Winans,*
    198 U.S. 371 (1905) .............................................................................. 11

*Ute Indian Tribe v. Lawrence (Lawrence II),*
    22 F.4th 892 (10th Cir. 2022) .................................................................. 21

*Ute Indian Tribe v. Lawrence (Lawrence I),*
    875 F.3d 539 (10th Cir. 2017) ............................................................... 2, 21

*Ute Indian Tribe v. Utah (Ute VI),*
    790 F.3d 1000 (10th Cir. 2015) ................................................. 2, 10, 19, 23, 24

*Wash. Dep't of Licensing v. Cougar Den, Inc.,*
    586 U.S. 347 (2019) ............................................................... 9, 15, 16, 21

*Washington v. Washington State Commercial Passenger Fishing Vessel Association,*
    443 U.S. 658 (1979) ........................................................................ 15, 16, 17

*White Mountain Apache Tribe v. Bracker,*
    448 U.S. 136 (1980) .............................................................................. 13

*Williams v. Lee,*
    358 U.S. 217 (1959) .......................................................................... 13, 16, 23

*Winnebago Tribe v. Stovall,*
    216 F. Supp. 2d 1226 (D. Kan. 2002),
    *aff'd,* 341 F.3d 1202 (10th Cir. 2003) ........................................................ 23

v

*Wyandotte Nation v. Sebelius*,
  443 F.3d 1247 (10th Cir. 2006) .................................................9, 23, 25

## CONSTITUTIONS, STATUTES AND REGULATIONS

U.S. Const. art. VI, cl. 2.................................................................9, 15

Okla. Constitution, art. VI, § 2................................................................6

18 U.S.C. § 1151(a) ...............................................................................14

18 U.S.C. § 1153 .....................................................................................18

18 U.S.C. § 1162 .....................................................................................19

18 U.S.C. § 1162(b) ...............................................................................13

18 U.S.C. § 1165 .....................................................................................13

18 U.S.C. § 3243 .....................................................................................19

25 U.S.C. § 232 .......................................................................................19

25 U.S.C. § 1301(2) ...........................................................................14, 19

25 U.S.C. § 1301(4) ...........................................................................14, 19

25 U.S.C. § 1321(a) ................................................................................19

25 U.S.C. § 1321(b) ................................................................................13

25 U.S.C. § 1322(b) ................................................................................13

25 U.S.C. § 1326 .....................................................................................19

28 U.S.C. § 1331 ......................................................................................2

28 U.S.C. § 1362 ......................................................................................2

89 Fed. Reg. 99899 (Dec. 11, 2024) .......................................................2

Treaty of Dancing Rabbit Creek, Sep. 27, 1830, 7 Stat. 333

  art. 2 .................................................................................................2, 10

  art. 3 .....................................................................................................2

  art. 4 .................................................................................................3, 10

1837 Treaty of Doaksville, Jan. 17, 1837, 11 Stat. 573

  art. 1 .................................................................................................3, 10

1855 Treaty with the Choctaw and Chickasaw, June 22, 1855, 11 Stat. 611

  art. 1 .......................................................................................................3

  art. 2 .......................................................................................................3

  art. 3 .......................................................................................................3

  art. 7 .......................................................................................................3

4925-1671-0778, v. 5

art. 9 ...........................................................................................................3

1866 Treaty with the Choctaw and Chickasaw, Apr. 28, 1866, 14 Stat. 769

    art. 3 ...........................................................................................................3

    art. 7 ...........................................................................................................3

    art. 10 .........................................................................................................3

    art. 45 .........................................................................................................3

1828 Cherokee Treaty, May 6, 1828, 7 Stat. 311

    pmbl. ..........................................................................................................3

    art. 1 ...........................................................................................................3

    art. 2 ...........................................................................................................3

Treaty of New Echota, Dec. 29, 1835, 7 Stat. 478

    art 2 ............................................................................................................3

    art. 5 .......................................................................................................4, 11

1846 Treaty with the Cherokee, Aug. 6, 1846, 9 Stat. 871

    art. 1 ...........................................................................................................4

    art. 2 .........................................................................................................11

1866 Treaty with the Cherokee, July 19, 1866, 14 Stat. 799

    art. 16 .........................................................................................................4

    art. 17 .........................................................................................................4

    art. 21 .........................................................................................................4

    art. 31 .........................................................................................................4

Act of March 3, 1893, ch. 209, § 10, 27 Stat. 612 ...........................................4

Act of June 30, 1948, ch. 759, 62 Stat. 1161,
*repealed by* Pub. L. 115-301, 132 Stat. 4395 (2018) ...............................19

Act of May 31, 1946, ch. 279, 60 Stat. 229 ..................................................19

Enabling Act, ch. 335, § 1, 34 Stat. 267 (1906) ............................................13

Okla. Stat. tit. 29

    § 3-105(A)(2) ............................................................................................6

    § 3-105(A)(6) ............................................................................................6

    § 8-104 ....................................................................................................20

Okla. Stat. tit. 74, § 6 .....................................................................................7

Okla. Admin. Code § 800:25-31-3 ................................................................20

21 Cherokee Nation Code § 1835(A) ..............................................................5

vii

Cherokee Nation Hunting and Fishing Code, tit. 29, ch.1 ...........................................4

    § 103(C) ...........................................................................................4

    § 104(B)(4)........................................................................................5

    § 106................................................................................................4

    § 107................................................................................................4

    § 111-113 .........................................................................................5

Chickasaw Nation Wildlife Conservation Act, tit. 11, ch. 1-4 ...................................4

    § 11-104 ...........................................................................................5

    § 11-201 ...........................................................................................4

    § 11-301(2)(c) ...................................................................................4

    § 11-302 ...........................................................................................5

    § 11-401 ...........................................................................................4

Choctaw Nation Fish, Game, and Animals Code, tit. 110, §§ 1-37 ...........................4

    § 2(4) ...............................................................................................4

    § 3....................................................................................................4

    § 3(D) ..............................................................................................4

    § 5....................................................................................................4

    § 6(G) ..............................................................................................4

    § 7....................................................................................................4

    § 7(B) ..............................................................................................4

    § 13-19 .............................................................................................4

    § 22..................................................................................................4

    § 26-27 .............................................................................................4

    § 33..................................................................................................4

**INTERGOVERNMENTAL AGREEMENTS**

Five Tribes Wildlife Management Reciprocity Agreement

    art. 2.A. ...........................................................................................15

    art. 2.C. ...........................................................................................6

    art. 2.B. ...........................................................................................15

    art. 2.E. ...........................................................................................6

    art. 2.F. .........................................................................................6, 15

    art. 2.G. ...........................................................................................15

State Addendum, Addition of State Agency to Deputation Agreement
for Law Enforcement in the Choctaw Nation, Okla. Dep't of Wildlife
Conservation (Mar. 2, 2021) ............................................................................5

State Addendum, Addition of State Agency to Deputation Agreement
for Law Enforcement in the Chickasaw Nation, Okla. Dep't of Wildlife
Conservation (Jan. 15, 2021) .........................................................................5, 6

State Addendum, Addition of State to Deputation Agreement
for Law Enforcement in the Cherokee Nation, Okla. Dep't of
Wildlife Conservation (Sep. 18, 2020) ...............................................................6

## OTHER AUTHORITIES

*Drummond to Dismiss Native American Hunting Case*,
Okla. Att'y Gen. (Oct. 30, 2025) .........................................................................7

*Meet the Staff*, Okla. Dep't of Wildlife Conservation .................................................6

*ODWC Reaffirms Enforcement of Oklahoma's Wildlife Laws*,
Okla. Dep't of Wildlife Conservation (Oct. 8, 2025) .........................................1, 7

Entry of Appearance, *State v. Robertson*,
No. CM-2025-136 (Okla. Dist. Ct. filed Nov. 13, 2025)..........................................7

Gov. J. Kevin Stitt's Not. of Appointment of Special Counsel,
*State v. Shepherd*, No. WL-2025-02
(Okla. Dist. Ct. filed Nov. 7, 2025) .....................................................................7

Plaintiffs Cherokee Nation, Chickasaw Nation, and Choctaw Nation of Oklahoma (the "Nations"), on their own behalf and as *parens patriae* on behalf of their members, seek a temporary restraining order and preliminary injunction to protect their Treaty rights to hunt on their Reservations and to permit the Nations' members to hunt on their Reservations under the Five Tribes Wildlife Management Reciprocity Agreement ("Reciprocity Agreement"), free from state interference.[1]  The Defendants, Wade Free, Director of the Oklahoma Department of Wildlife Conservation ("ODWC"); Nels Rodefeld, Assistant Director of ODWC; Nathan Erdman, Chief of Law Enforcement Division for ODWC; J. Kevin Stitt, Governor of Oklahoma; and Russell Cochran, special counsel employed by Defendant Stitt, each in his official capacity, refuse to recognize these rights and are implementing ODWC's announcement that it "will issue citations to anyone in violation of the state's fish and wildlife laws, regardless of tribal citizenship."  Ex. 2, Dixon Decl., Attach. (ODWC, *ODWC Reaffirms Enforcement of Oklahoma's Wildlife Laws* (Oct. 8, 2025) ("ODWC Oct. 8 Notice")).  This action is the only means available to the Nations to avoid the hardships—loss of the right to hunt for subsistence during the 2025 deer rifle season, which is the most significant of the year, *see infra* at 22, and actual and threatened arrest, detention, prosecution, and punishment—that Defendants seek to impose on Nation members exercising their federal rights.  Temporary and preliminary relief is critical to protect Nation members' right to hunt as, under the law of the State and the Nations, the deer rifle season begins Friday, November 22.  *See* Ex. 3, Harvey Suppl. Decl. ¶¶ 8-9.

---

[1] Plaintiff Nations, as well as the Muscogee (Creek) Nation and the Seminole Nation of Oklahoma, entered into the Reciprocity Agreement on July 11, 2024.  *See* Ex. 1, Gamble Suppl. Decl. Ex. B. The Nations' Motion only seeks relief as to rights held by Plaintiff Nations and their members.

## JURISDICTION AND STANDING

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1362 because it arises under federal law, *see Ute Indian Tribe v. Lawrence* (*Lawrence I*), 875 F.3d 539, 544 (10th Cir. 2017), and the Nations are federally recognized Indian tribes, *see* 89 Fed. Reg. 99899, 99901 (Dec. 11, 2024). The Nations have standing as "[they] suffered an injury in fact that is concrete, particularized, and actual or imminent," that "was likely caused by [the Defendants]" and "would likely be redressed by judicial relief." *Hooper v. City of Tulsa*, 71 F.4th 1270, 1277 (10th Cir. 2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). Defendants' actual and threatened enforcement of state law and exercise of state jurisdiction over Indians hunting on the Nations' Reservations, *see supra* at 1 and *infra* at 7-8, injures the Nations' members by depriving them of their Treaty right to hunt for subsistence purposes and by issuing citations that impose fines and threaten other punishments for exercising their Treaty rights, and injures the Nations by supplanting their regulation of Nation members' on-reservation hunting with state law and by prosecuting Nation members in state court for on-Reservation conduct, which is "itself an infringement on tribal sovereignty" and constitutes irreparable harm, *Ute Indian Tribe v. Utah* (*Ute VI*), 790 F.3d 1000, 1005 (10th Cir. 2015); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001). Defendants caused these injuries, which will be redressed by an injunction and declaration halting their unlawful conduct.

## STATEMENT OF FACTS

Under the Treaty of Dancing Rabbit Creek, Sep. 27, 1830, 7 Stat. 333 ("1830 Treaty"), the Choctaw Nation "agree[d] to remove beyond the Mississippi River," *id.* art. 3, to a new homeland to be granted in fee and held as long as "they shall exist as a nation and live on it," with explicitly-defined boundaries, *id.* art. 2, which established the Choctaw Reservation. Within those boundaries the Nation was guaranteed "the jurisdiction and government of all the persons and

4925-1671-0778, v. 5

property that may be within their limits west, so that no Territory or State shall ever have a right to pass laws for the government of the Choctaw Nation." *Id*. art. 4.

The Choctaw and Chickasaw Nations then entered the 1837 Treaty of Doaksville, Jan. 17, 1837, 11 Stat. 573 ("1837 Treaty"), with the United States under which the Chickasaw Nation holds "all the rights and privileges of the Choctaws" under the 1830 Treaty within an expressly-defined "district within the limits of [the 1830 Treaty Territory]," which established the Chickasaw Reservation. *Id.* art. 1; *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 465 n.15 (1995). By the 1855 Treaty with the Choctaw and Chickasaw, June 22, 1855, 11 Stat. 611 ("1855 Treaty"), the boundaries of the Choctaw and Chickasaw Reservations were modified, *id.* arts. 1-3, their rights of self-government were modified and otherwise reaffirmed, *id.* art. 7, and the Choctaw and Chickasaw Nations agreed to lease to the United States their lands "west of the ninety-eighth degree of west longitude." *Id.* art. 9. By the 1866 Treaty with the Choctaw & Chickasaw, Treaty, Apr. 28, 1866, 14 Stat. 769, the Choctaw and Chickasaw Nations "cede[d] to the United States the territory west of the 98 degrees west longitude," *id.* art. 3. In addition, the Choctaw and Chickasaw Nations' rights of self-government, *see id.* art. 7, and all pre-existing Treaty rights not inconsistent with the 1866 Choctaw & Chickasaw Treaty were reaffirmed, *id*. arts. 10, 45.

The Cherokee Nation Reservation was established by the Cherokee Treaty of 1828, May 6, 1828, 7 Stat. 311 ("1828 Treaty") and the Treaty of New Echota, Dec. 29, 1835, 7 Stat. 478 ("1835 Treaty"). The 1828 Treaty promised a "*permanent* home" to "the Cherokee nation of Indians," *id.* pmbl.; *see id.* arts. 1-2. That promise was reiterated in the 1835 Treaty which guaranteed the Cherokee Nation the 1828 Treaty homeland, *id.* art 2, and "the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their

people or such persons as have connected themselves with them," and promised that their lands would "in no future time without their consent, be included within the territorial limits *or jurisdiction* of any State of Territory," *id.* art. 5. This established the Nation's Reservation and its possession and authority over that Reservation, which were reaffirmed in the Cherokee Treaty of 1846, art. 1, Aug. 6, 1846, 9 Stat. 871 ("1846 Treaty"), and the 1866 Treaty with the Cherokee, art. 31, July 19, 1866, 14 Stat. 799 ("1866 Cherokee Treaty").[2]

Each Nation's Reservation exists and is Indian country. *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 632-34 (2022) (citing *State ex rel. Matloff v. Wallace*, 2021 OK CR 21, ¶ 15, 497 P.3d 686, 689).[3] And each Nation's members hunt, fish, and gather on their Reservations under their Nation's laws.[4] They hunt for subsistence, Ex. 4, Gamble Decl. ¶¶ 13-14; Ex. 5, Berst Decl. ¶ 14; Ex. 6, Soap Decl. ¶ 2; Ex. 7, Robertson Decl. ¶ 2; Ex. 8, Shepherd Decl. ¶¶ 8-9, and as a family tradition and a vital part of their cultural identity, *see* Ex. 9, Lokosh Decl. ¶¶ 4-8; Ex. 10, Thompson Decl. ¶¶ 5-11; Soap Decl. ¶ 2; Shepherd Decl. ¶ 10; Berst Decl. ¶ 12; Gamble Decl. ¶ 15.

Each Nation's code requires licenses, establishes seasons, sets bag limits, and requires that tags be used to report the harvest of particular species. *See* 29 Cherokee HFC §§ 103(C), 106, 107; Chickasaw WCA §§ 11-201, 11-301(2)(c), 11-401; 110 Choctaw FGA §§ 2(4), 5, 13-19, 22, 26-27, 33. Each Nation requires the landowner's consent to hunt on privately-owned lands. *See* 21 Cherokee Nation Code § 1835(A); Chickasaw WCA § 11-104; 110 Choctaw FGA §§ 6(G),

---

[2] The Cherokee Nation Reservation boundaries were modified in the latter treaty, *see id*. arts. 16, 17, 21, and the Act of March 3, 1893, ch. 209, § 10, 27 Stat. 612, 640-43.

[3] *See Spears v. State*, 2021 OK CR 7, 485 P.3d 873, 875-77; *Sizemore v. State*, 2021 OK CR 6, 485 P.3d 867, 869-71; *Bosse v. State*, 2021 OK CR 30, ¶¶ 7-9, 12, 499 P.3d 771, 774.

[4] *See* Cherokee Nation Hunting and Fishing Code ("Cherokee HFC"), tit. 29, ch.1; Chickasaw Nation Wildlife Conservation Act ("Chickasaw WCA"), tit. 11, ch. 1-4; Choctaw Nation Fish, Game, and Animals Code ("Choctaw FGA"), tit. 110, §§ 1-37.

4

7(B).  The Nations' codes protect the environment and wildlife within their Reservations.  Ex. 11, Justice Decl. ¶¶ 4-5; Ex. 12, Baker Decl. ¶¶ 3-4; Berst Decl. ¶¶ 4-6, 9-11.  The Nations base their codes, seasons, and bag limits on those of the State, and communicated closely with ODWC when developing their codes to eliminate friction between the state and tribal codes and ensure protection of the health and abundance of game species.  Justice Decl. ¶¶ 5, 10; Baker Decl. ¶¶ 5-6; Berst Decl. ¶¶ 5-6.[5]  The Nations require members to check in animals they harvest with the licensing Nation, using an online system similar to the State's, to ensure that bag limits and seasons are being respected.  *See*, *e.g.*, Ex. 13, Harvey Decl. ¶¶ 7-8; Dixon Decl. ¶¶ 4-5.[6]

Each Nation enforces its code through its own law enforcement officers and game wardens, and prosecutes code violations in its tribal court, *see* 29 Cherokee HFC §§ 104(B)(4), 111-113; Chickasaw WCA § 11-302; 110 Choctaw FGA § 3, 3(D), 7.  The Nations' wildlife enforcement teams have extensive knowledge of law enforcement and conservation practices from decades in the field, including working for ODWC.  *See, e.g.*, Harvey Decl. ¶¶ 2-5; Ex. 14, Henry Decl. ¶¶ 2-4.  Each Nation has also cross-deputized ODWC game wardens so that they may enforce each Nation's conservation code on its Reservation and cite Indian offenders *into tribal court.*[7]

---

[5] ODWC included the Choctaw Nation's bear harvest in its own 2024-25 big game report.  *See* ODWC, *Oklahoma 2024-25 Big Game Harvest Report* 21 (2025), https://www.wildlifedepartment.com/outdoorok/ooj/2024-25-big-game-harvest-report ("Choctaw Nation wildlife authorities conducted bear check-in for tribal members, accounting for seven (all archery) of the total 77 bears harvested.").

[6] The Nations also operate programs to track and improve the health of species on the Reservation, often with the support of and collaboration with state and federal agencies.  *See* Justice Decl. ¶ ¶7-10; Baker Decl. ¶¶ 6-10, 12; Berst Decl. ¶¶ 9-11; Gamble Decl. ¶¶ 8-11.

[7] *See* State Addendum, Addition of State Agency to Deputation Agreement for Law Enforcement in the Choctaw Nation, Okla. Dep't of Wildlife Conservation (Mar. 2, 2021), https://www.sos.ok.gov/documents/filelog/94012.pdf; State Addendum, Addition of State Agency to Deputation Agreement for Law Enforcement in the Chickasaw Nation, Okla. Dep't of Wildlife Conservation (Jan. 15, 2021), https://www.sos.ok.gov/documents/filelog/93919.pdf; State Addendum, Addition of State to Deputation Agreement for Law Enforcement in the Cherokee

Under the Reciprocity Agreement, the Nations' members may hunt on each other's Reservations—which are contiguous—subject to the law of the Nation on whose Reservation they are hunting, *id.* art. 2.F, and to a single bag limit that applies wherever they hunt. *Id.* art. 2.E. The Reciprocity Agreement provides that each Nation will limit its members' total harvest to one bag limit, "regardless of where such harvests occur," *id.* The Reciprocity Agreement also requires that each signatory Nations annually "report to each other signatory Nation basic harvest data collected from its members or citizens pursuant to its laws." *Id.* art. 2.C.

Defendants are state officials sued in their official capacities. Defendant Free is responsible for the enforcement of the state game and fish laws and has the "specific power[] and dut[y] ... [t]o make a complaint and cause proceedings to be commenced against any person for violation of any of the laws for the conservation of wildlife with the sanction of the district attorney of the county in which such proceedings are brought." Okla. Stat. tit. 29, § 3-105(A)(6). Defendant Rodefeld assists Defendant Free in enforcing state fish and game laws. *See id.* § 3-105(A)(2); *Meet the Staff*, ODWC.[8] Defendant Erdman, as directed by Defendant Free, *see* Okla. Stat. tit. 29, § 3-105(A)(2), shares responsibility for the enforcement of state game and fish laws and oversees the game wardens stationed in all counties of Oklahoma, *see Meet the Staff*. Defendant Stitt is Governor of the State. He asserts authority under state law to direct the enforcement of state law, *see* Okla. Constitution, art. VI, § 2, and to employ counsel pursuant to Okla. Stat. tit. 74, § 6, to prosecute Indians for conduct in Indian country that does not comply with the state fish and game laws.

---

Nation, Okla. Dep't of Wildlife Conservation (Sep. 18, 2020), https://www.sos.ok.gov/documents/filelog/93715.pdf.

[8] https://www.wildlifedepartment.com/about/meet-the-staff (last visited Nov. 18, 2025).

4925-1671-0778, v. 5

On October 8, 2025, ODWC announced its view that the Oklahoma Supreme Court's decision in *Stroble v. Oklahoma Tax Commission* (*In re Stroble*), 2025 OK 48 (per curiam), "has provided clear legal confirmation that McGirt is limited to prosecuting crimes under the federal Major Crimes Act only," and stated that "ODWC game wardens will continue to enforce the law and will issue citations to anyone in violation of the state's fish and game laws, regardless of tribal citizenship." ODWC Oct. 8 Notice. On October 30, the Oklahoma Attorney General announced that he "will not allow Native American hunters to be prosecuted by the state for hunting in Indian Country without a state permit when they are otherwise acting in accord with duly enacted tribal law," *Drummond to Dismiss Native American Hunting Case*, Okla. Att'y Gen. (Oct. 30, 2025),[9] and that his office would take over and promptly dismiss any "cases filed against members of Native American tribes for hunting on tribal land without a license," *id.* In response, Defendant Stitt, asserting authority under Okla. Stat. tit. 74, § 6,[10] has employed Defendant Cochran as special counsel to accept referrals of citations of Indians in Indian country from ODWC game wardens and to prosecute them in state court, *see* Entry of Appearance, *State v. Robertson*, No. CM-2025-136 (Okla. Dist. Ct. filed Nov. 13, 2025).[11] ODWC game wardens have stopped referring citations to the Nations for prosecution. *See* Harvey Suppl. Dec. ¶¶ 4-5. And Defendants continue to direct that state fish and game laws be enforced on the Nations' Reservations without regard to Indian status, as ODWC has refused to rescind that policy. Gamble Suppl. Decl. ¶¶ 6-11 & Ex. B.

---

[9]    https://oklahoma.gov/oag/news/newsroom/2025/october/drummond-to-dismiss-native-american-hunting-case.html

[10] He additionally asserts his authority is exclusive of the Attorney General's power to take over prosecutions, *see* Ex. 15, Turpin Decl. Ex. A (Gov. J. Kevin Stitt's Not. of Appointment of Special Counsel, *State v. Shepherd*, No. WL-2025-02 (Okla. Dist. Ct. filed Nov. 7, 2025)).

[11]  https://www.oscn.net/dockets/GetDocument.aspx?ct=pushmataha&bc=1063625816&cn=CM-2025-136&fmt=pdf

4925-1671-0778, v. 5

## STANDARD OF REVIEW

A movant for a temporary restraining order ("TRO") must show: "(1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *DT Energy Grp. v. Hirschfield*, 912 F.3d 1263, 1270 (10th Cir. 2018).[12]

## SUMMARY OF ARGUMENT

The Nations satisfy each element of the four-part test for temporary relief.  They have a substantial likelihood of success on the merits.  The Nations and their members have Treaty rights to hunt on their Reservations free of state interference and the Nations have Treaty and inherent rights to regulate each other's members hunting on their Reservations under the Reciprocity

---

[12] This motion is neither "disfavored" nor subject to the "heightened standard of proof" for "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits," *Muscogee (Creek) Nation v. Kunzweiler*, No. 25-cv-75-GKF-JFJ, 2025 WL 3124450, at *1 (N.D. Okla. Nov. 7, 2025) (citing *Colorado v. U.S. EPA*, 989 F.3d 874, 883-84 (10th Cir. 2021)).  The injunctive relief sought by the Nations would preserve the status quo.  Prior to the issuance of ODWC's Oct. 8 Notice, the Nations and their members were exercising their Treaty rights to hunt, fish, and gather on their Reservations under Tribal law, including under the Reciprocity Agreement, free from state interference.  Gamble Suppl. Decl. ¶ 13; Berst Decl. ¶ 12; Lokosh Decl. ¶ 12; Ex. 16, Shepherd Suppl. Decl. ¶ 6.  "An injunction disrupts the status quo when it changes the last peaceable uncontested status existing between the parties before the dispute developed." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070-71 (10th Cir. 2009) (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005)).  No such change is sought here.  Nor are the Nations seeking a mandatory injunction.  "An injunction is mandatory when it requires defendants to do something they were not doing during the most recent peaceable status quo—that is, the last uncontested period preceding the injunction." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1255 (10th Cir. 2024) (citations omitted).  The Nations seek a temporary restraining order to *stop* Defendants from taking actions they were not taking before ODWC's Oct. 8 Notice.  Finally, the instant motion concerns the Nations' and their members' right to hunt on their Reservations and so does not seek "all the relief that [the Nations] could recover at the conclusion of a full trial on the merits," *Colorado*, 989 F.3d at 884.

Agreement free of state interference.  Defendants' refusal to recognize those rights and their actual and threatened actions in furtherance of that position violates federal law, as the Nations' Treaties are "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and "a state law that burdens a treaty-protected right is pre-empted by the treaty," *Wash. Dep't of Licensing v. Cougar Den, Inc.*, 586 U.S. 347, 367 (2019).  In addition, Defendants lack jurisdiction to enforce state fish and game laws against Indians on the Nations' Reservations as those state laws are criminal in nature, and *McGirt v. Oklahoma* establishes that the State lacks criminal jurisdiction over Indians in Indian country, 591 U.S. 894, 929, 932 (2020) (quoting *Ex parte Crow Dog*, 109 U.S. 556, 572 (1883)).

Defendants' actual and threatened actions invade the Nations' sovereignty, which "constitute[s] [an] irreparable injury," *id.* at 1005-06 (quoting *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006); and citing *Prairie Band*, 253 F.3d at 1250-51)), and deny Nation members their right to hunt for subsistence purposes, which is a loss that cannot be undone and for which the only remedy is injunctive relief.  Defendants will suffer no injury from a TRO because their actions are ultra vires, and any injury they may claim to suffer would be outweighed by the injuries to the Nations' sovereignty that injunctive relief will halt.  Finally, public policy supports tribal self-government and enjoining ultra vires actions.

## ARGUMENT

### I.    The Nations Have A Substantial Likelihood Of Success On The Merits.

The Nations have a substantial likelihood of success on the merits because they hold treaty rights to hunt on their Reservations and to regulate each other's members hunting on their Reservations under the Reciprocity Agreement, and those rights preempt inconsistent state law.  In addition, Defendants lack jurisdiction to enforce the state fish and game laws against Indians on the Nations' Reservations because those laws impose criminal penalties for violations, and

9

Oklahoma lacks criminal jurisdiction over Indians on Indian reservations because Congress has never granted it such jurisdiction, *see McGirt*, 591 U.S. at 929, 932; *Ute VI*, 790 F.3d at 1006-07.

> **A.    Each Nation Holds Treaty Rights to Hunt on Its Reservation Under its Laws, Free from State Interference, And To Permit Each Others' Members to do so Under the Reciprocity Agreement.**

>> **1.    The Nations have Treaty rights to hunt and to regulate Indians hunting on their Reservations.**

The 1830 Treaty secured a new homeland for the Choctaw Nation for as long as "they shall exist as a nation and live on it," *id* art. 2, and "the jurisdiction and government of all the persons and property … , so that no Territory or State shall ever have a right to pass laws for the government of the Choctaw Nation of Red People and their descendants." *Id.* art. 4.  The Chickasaw Nation holds these same rights under the 1837 Treaty.[13]  As the Supreme Court explained in *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 197-98 (1978), "the broad terms of th[e] governmental guarantee" set forth in Article 4 of the 1830 Treaty excludes only non-Indians from those Nations' jurisdiction.  In addition, the 1855 and 1866 Choctaw and Chickasaw Treaties reserve the Nations' "right … to control the presence within the territory assigned to [them] of persons who might otherwise be regarded as intruders," *Morris v. Hitchcock*, 194 U.S. 384, 389 (1904), and "under the authority of these treaties," the Nations can "exercise[] the power to attach conditions to the presence within its borders of persons who might otherwise not be entitled to remain within the tribal territory," *id.*, including requiring compliance with tribal licensing and tax laws, *id.* at 393.

On the Cherokee Nation Reservation, the 1835 Treaty "secure[s] to the Cherokee [N]ation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country

---

[13] Article 1 of which secured to it "all the rights and privileges" of the Choctaw Nation under the 1830 Treaty, *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 465 n.15 (1995).

belonging to their people or such persons as have connected themselves with them," excepting therefrom only United States citizens and the army as may travel or reside through the Nation's territory with federal permission. *Id.* art. 5. The 1846 Treaty then provided that "[n]o one shall be punished for any crime or misdemeanor, except on conviction by a jury of his country, and the sentence of a court duly authorized by law to take cognizance of the offense." *Id.* art. 2. The 1866 Cherokee Treaty reaffirmed these terms, *see Talton v. Mayes*, 163 U.S. 376, 379-80 (1896), which protect Indians within the Cherokee Nation Reservation from being prosecuted in court unless jurisdiction is authorized by federal or tribal law.

Under the Nations' Treaties, "[i]n many respects … the Indians were promised virtually complete sovereignty over their new lands." *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 635 (1970) (citing *Atl. & Pac. R.R. v. Mingus*, 165 U.S. 413, 435-36 (1897)). Even apart from the extraordinary breadth of their Treaty rights, the Nations' rights to hunt on their Reservations "are part of the[ir] larger rights of possession" of their Reservations established in the treaties, *N. Arapahoe Tribe v. Hodel*, 808 F.2d 741, 748 (10th Cir. 1987) (citing *United States v. Winans*, 198 U.S. 371, 381 (1905); *Menominee Tribe v. United States*, 391 U.S. 404, 406 & n.2 (1968)), and "need not be expressly mentioned in the treaty" to be recognized. *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1202 (10th Cir. 2002) (quoting *United States v. Dion*, 476 U.S. 734, 738 (1986)). Thus, those Treaties secured new homelands to the Nations and broad rights of self-government on them, including hunting rights, authority over their exercise, and freedom from state interference in those rights.[14]

---

[14] The Nations' members "enjoy a right of user in the tribe's hunting and fishing rights," *United States v. Fox*, 573 F.3d 1050, 1054 (10th Cir. 2009).

The Nations' Treaty rights remain in effect because they have never been abrogated. "Congress 'must clearly express' any intent to abrogate Indian treaty rights," *Herrera v. Wyoming*, 587 U.S. 329, 340 (2019) (quoting *Minnesota v. Mille Lacs Band*, 526 U.S. 172, 202 (1999)), which requires "clear evidence" showing "Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Dion*, 476 U.S. at 739-40. Congress has never expressed such an intention or decision with respect to the Nations' foregoing Treaty rights.

Oklahoma's statehood did not abrogate the Nations' Treaty rights either, as "[t]here is nothing inherent in the nature of reserved treaty rights to suggest that they can be extinguished by *implication* at statehood." *Herrera*, 587 U.S. at 341-42 (quoting *Mille Lacs*, 526 U.S. at 207). Because "States can impose reasonable and nondiscriminatory regulations on an Indian tribe's treaty-based hunting, fishing, and gathering rights on state land when necessary for conservation," *id.* at 339-40 (citations omitted); *see infra* at 16-17, "treaty rights are reconcilable with state sovereignty over natural resources," and "there is no reason to find statehood itself sufficient 'to extinguish Indian treaty rights to hunt, fish, and gather on land within state boundaries,'" *Herrera*, 587 U.S. at 340 (quoting *Mille Lacs*, 526 U.S. at 205). Rather,

> the crucial inquiry for treaty termination analysis is whether Congress has expressly abrogated an Indian treaty right or whether a termination point identified in the treaty itself has been satisfied. Statehood is irrelevant to this analysis unless a statehood Act otherwise demonstrates Congress' clear intent to abrogate a treaty, or statehood appears as a termination point in the treaty.

*Id.* at 341 (citing *Mille Lacs*, 526 U.S. at 207). Congress has not abrogated the Nations' Treaty rights, nor did statehood do so.[15]

---

[15] To the contrary, Section 1 of the Enabling Act, ch. 335, 34 Stat. 267 (1906), provides:

> [N]othing contained in the [Oklahoma] constitution shall be construed to limit or impair the rights of person or property pertaining to the Indians of said Territories

### 2. The Nations also have inherent sovereign authority to regulate Indians hunting on their Reservations.

Each Nation also has inherent sovereign authority over Nation members and other Indians hunting on their Reservations. "The sovereignty retained by tribes includes 'the power of regulating their internal and social relations,'" *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983) (quoting *United States v. Kagama*, 118 U.S. 375, 381-82 (1886)), and the power "to manage the use of [a tribe's] territory and resources by both members and nonmembers," *id.* 335 (1983) (citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137 (1982); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 151 (1980); *Montana v. United States*, 450 U.S. 544 (1981); 18 U.S.C. § 1162(b); 25 U.S.C. §§ 1321(b), 1322(b); 18 U.S.C. § 1165) (footnote omitted).[16] In addition, "'absent governing Acts of Congress,' a State may not act in a manner that 'infringed on the right of reservation Indians to make their own laws and be ruled by them.'" *Mescalero Apache*, 462 U.S. at 332-33 (quoting *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 171-72 (1973), and *Williams v. Lee*, 358 U.S. 217, 219-20 (1959)). On that issue, "[i]t is important to emphasize that concurrent jurisdiction would effectively nullify the [Nations'] authority to control hunting and fishing on the reservation. Concurrent jurisdiction would empower [Oklahoma] wholly to supplant tribal regulations. The State would be able to dictate the terms on which [Nation members] are permitted to utilize the reservation's resources. The Tribe

---

(so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this Act had never been passed.

This is "a general reservation of federal and tribal jurisdiction over 'Indians, their lands, [and] property,' except as extinguished by the tribes or the federal—not state—government." *Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Okla. Tax Comm'n*, 829 F.2d 967, 979 (10th Cir. 1987).

[16] The Nations do not seek to regulate non-Indian hunting, fishing, and gathering in this case.

would thus exercise its authority over the reservation only at the sufferance of the State." *Id.* at 338. In addition, "the exercise of state jurisdiction [over Indians] would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves." *Id.* at 223; *see also Fisher v. Dist. Ct.*, 424 U.S. 382, 387-88 (1976) (per curiam).

Indian tribes also have criminal jurisdiction over all Indians in Indian country. *See* 25 U.S.C. § 1301(2) ("recogniz[ing] and affirm[ing]" "the inherent power of Indian tribes … to exercise criminal jurisdiction over all Indians"); *id.* § 1301(4) (providing "Indian" means any person who would be subject to prosecution under the Major Crimes Act ("MCA") for offenses committed in Indian country); *United States v. Lara*, 541 U.S. 193, 199-200 (2004); *see also United States v. Wheeler*, 435 U.S. 313, 328-29 (1978) (citing *Talton*, 163 U.S. 376). That authority thus extends to all land within the boundaries of the Nations' Reservations. *See* 18 U.S.C. § 1151(a) (defining "Indian country" as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent"); *McGirt*, 591 U.S. at 906 (Section 1151 "expressly contemplates private land ownership within reservation boundaries. Nor … does it matter whether these individual parcels have passed hands to non-Indians."); *see also United States v. Baker*, 894 F.2d 1144, 1149 (10th Cir. 1990).

Each Nation exercises its Treaty right and inherent sovereign authority to regulate on-reservation hunting by Indians under its laws, *see supra* at 4-5, and the Reciprocity Agreement, which expressly authorizes each signatory Nation to apply its laws to each other's members hunting on its Reservation, *id.* at art. 2.A., B., F., and requires each Nation's members be informed they are subject to the law of the Nation on whose Reservation they are hunting, *id.* at 2.G.

B. **Federal Law Bars Defendants from Interfering with Indians Hunting in Indian Country.**

1. **The Nations' Treaty rights preempt Defendants' interference with the exercise of those rights.**

The Nations' Treaties are "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2; *see also United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 196 (1876) ("[T]he Constitution declares a treaty to be the supreme law of the land; …")  By virtue of the Supremacy Clause, treaties are "superior and paramount to the authority of any State within whose limits are Indian tribes."  *Antoine v. Washington*, 420 U.S. 194, 204 (1975) (quoting *Dick v. United States*, 208 U.S. 340, 353 (1908)).  As the Supreme Court made clear in *Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658 (1979), in upholding Treaty fishing rights and the federal regulations implementing those rights: "To the extent that any … State statute imposes any conflicting obligations, the statute is without effect … and must give way to the federal treaties, regulations, and decrees." *Id.* at 691-92.  Simply stated, "a state law that burdens a treaty-protected right is pre-empted by the treaty." *Cougar Den.*, 586 U.S. at 367.

The Nations' Treaty rights therefore preempt state jurisdiction over the Nations and their members hunting on their Reservations, including Nation members hunting on another Nation's Reservation under the terms of the Reciprocity Agreement.[17]  Applying state law would be contrary to the Nations' and their members' Treaty rights because it would deny Nation members

---

[17] In addition, the application of state law to hunting by the Nations and Indians within their Reservations is barred because it would "infringe[] on the right of reservation Indians to make their own laws and be ruled by them," *Williams*, 358 U.S. at 220, which the Nations have exercised in enacting their fish and game codes. *See supra* § I(A)(2).

the right to hunt on their Reservations unless they purchase a state license and conform their activities to the requirements of state fish and game laws, which would apply to their conduct without regard to what the Nations' laws may say.

For starters, the State has no authority to require an Indian exercising a treaty right to obtain a state license. *Tulee v. Washington*, 315 U.S. 681, 685 (1942) ("the state is without power to charge the Yakima [Indians] a fee for fishing" because the state license fee "acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve"); *Cougar Den*, 586 U.S. at 367 (reaffirming *Tulee*'s "holding that the fishing right reserved by the Yakamas in the treaty pre-empted the application to the Yakamas of a state law which prohibited 'catch[ing] ... fish for food' without having purchased a license" (quoting *Tulee*, 315 U.S. at 682 n.1)). That license fees may be "regulatory as well as revenue producing," because they may fund the State's conservation programs, does not authorize their imposition as "their regulatory purpose could be accomplished otherwise" and thus "the imposition of license fees is not indispensable to the effectiveness of a state conservation program." *Tulee*, 315 U.S. at 864.

Nor, in this case, is state law applicable to Indians hunting on the Nations' Reservations under state authority to "impose reasonable and nondiscriminatory regulations on an Indian tribe's treaty-based hunting, fishing, and gathering rights on state land when necessary for conservation." *Herrera*, 587 U.S. at 339-40 (citing *Mille Lacs*, 526 U.S. at 204-05 (citing *Fishing Vessel Ass'n*, 443 U.S. 658, 682; *Antoine*, 420 U.S. at 207-08; *Puyallup Tribe v. Dep't of Game* (*Puyallup I*), 391 U.S. 392, 398 (1968))). *See Fishing Vessel Ass'n*, 443 U.S. at 682 ("Although nontreaty fishermen might be subjected to any reasonable state fishing regulation serving any legitimate purpose, treaty fishermen are immune from all regulation save that required for conservation."); *id.* at 687 n.28 (1979) (recognizing that *Puyallup Tribe, Inc. v. Dep't of Game* (*Puyallup II*), 433

16

U.S. 165 (1977), "approved state regulation of on-reservation fishing in the interest of conservation"). Defendants cannot meet this test, as the Nations' regulation of hunting and fishing is *designed* to protect fish and game species using standards nearly identical to the State's. *See* Berst Decl. ¶¶ 5-8; Justice Decl. ¶ 5; Baker Decl. ¶¶ 5-6. Indeed, the ODWC has not relied on any conservation necessity in asserting jurisdiction over Indians in Indian country. As Defendants have not "demonstrate[d] that [State] regulation is a reasonable and necessary conservation measure, ... and that its application to the Indians is necessary in the interest of conservation," *Antoine*, 420 U.S. at 207 (citations omitted), the Nations' members are immune from such regulation.

> **2.    The State also lacks jurisdiction over Indians hunting, fishing, and gathering in Indian country.**

Defendants are also barred from enforcing state fish and game laws against Indians on the Nations' Reservations because Congress has never granted the State such jurisdiction. The Supreme Court "has long 'require[d] a clear expression of the intention of Congress' before the state … may try Indians for conduct on their lands." *McGirt*, 591 U.S. at 929 (alteration in original) (quoting *Crow Dog*, 109 U.S. at 572). "Oklahoma cannot come close to satisfying this standard" because "Oklahoma doesn't claim to have complied with the requirements to assume jurisdiction voluntarily over [Indian country]. Nor has Congress ever passed a law conferring jurisdiction on Oklahoma." *Id.* at 929, 932.

Despite this clear holding, the district court held in *Kunzweiler* that "*McGirt* does not support a presumptive prohibition against state criminal jurisdiction over nonmember Indians … , as this case does not involve the MCA." 2025 WL 3124450, at *2. Relatedly, in *Stroble*[18] the

---

[18] Which is the subject of a pending petition for certiorari in the United States Supreme Court, *see Stroble v. Okla. Tax Comm'n*, No. 25-382 (U.S. docketed Oct. 1, 2025).

Oklahoma Supreme Court refused to follow *McGirt* in deciding the State's power to tax an Indian in Indian country, holding that the Supreme Court "expressly limited *McGirt* to the narrow issue of criminal jurisdiction under the [MCA]." 2025 OK 48, ¶ 10. These decisions are, respectfully, incorrect.

*McGirt* is not limited to the MCA. To decide that case, the Court had to adjudicate the State's claim that its "historic practices have *always been correct* and it *remains* free to try individuals like Mr. McGirt in its own courts." *McGirt*, 591 U.S. at 928 (emphasis added). To be sure, the Court first held that the Creek Reservation continues to exist, *id.* at 902-24, which should have resolved the case because the Major Crimes Act "allow[s] only the federal government to try Indians," *id.* at 898. But Oklahoma also asserted a right to exercise criminal jurisdiction over Indians in Indian country even "accept[ing] for argument's sake that the Creek land is a reservation and thus 'Indian country' for purposes of the Major Crimes Act," *id.* at 927. The State argued that if it lacked jurisdiction over Indians in Indian country, then "at the time of its entry into the Union *no one* had the power to try minor Indian-on-Indian crimes committed in Indian country." *Id.* at 930-31. That argument was obviously not directed at the MCA, which was enacted in 1885, *see Kagama*, 118 U.S. at 376, and which only applies to the crimes it lists, which are not "minor" crimes, *see* 18 U.S.C. § 1153. To decide that claim, the Court applied the settled law that "'require[s] a clear expression of the intention of Congress' before the state or federal government may try Indians for conduct on their lands," and held that "Oklahoma cannot come close to satisfying this standard." *McGirt*, 591 U.S. at 929 (quoting *Crow Dog*, 109 U.S. at 572).[19] The

---

[19] As this rule does not distinguish between member and nonmember Indians, it is unnecessary to consider the *Kunzweiler* court's rejection of the argument "that Congress recognizes no distinction between member and nonmember Indians for the purposes of state criminal jurisdiction in Indian country," 2025 WL 3124450, at *2, which is incorrect in any event. First, Congress was aware that states generally lack criminal jurisdiction over Indians on Indian reservations when it enacted

Court rejected the State's argument that its jurisdiction over Indians in Indian country was necessary to fill a "jurisdictional gap," as such gaps were not "foreign to this area of the law," and Congress had filled many of them by: "reauthorizing tribal courts to hear minor crimes in Indian country;" "allow[ing] affected Indian tribes to consent to state criminal jurisdiction[,] 25 U.S.C. §§ 1321(a), 1326;" and "expand[ing] state criminal jurisdiction in targeted bills addressing specific States." *Id.* at 931. "But Oklahoma doesn't claim to have complied with the requirements to assume jurisdiction voluntarily over Creek lands. Nor has Congress ever passed a law conferring jurisdiction on Oklahoma." *Id.* at 932. Thus, *McGirt* squarely holds that the State lacks criminal jurisdiction over Indians in Indian country. And this rule stated in *McGirt* "remains the governing law." *Muscogee (Creek) Nation v. City of Henryetta*, No. 6:25-cv-00227-JAR, slip op. at 7-8 (E.D. Okla. Nov. 18, 2025).

Even if *McGirt* did not control the issue, the Tenth Circuit has also made clear that states lack criminal jurisdiction over Indians in Indian country absent congressional consent. In *Ute VI*, Utah sought to prosecute an Indian for "traffic offenses" within Indian country. 790 F.3d at 1005. "This, of course, the State had no business doing" because "*unless Congress provides an exception to the rule … states possess 'no authority' to prosecute Indians for offenses in Indian country.*" *Id*. at 1003-04 (emphasis added) (citation omitted); *see also Ross v. Neff*, 905 F.2d 1349, 1352-53

---

25 U.S.C. § 1301(2). Compl. ¶ 93. Second, Congress has consistently used the term "Indian" in conferring jurisdiction over Indians in Indian country on states, as shown by Public Law 280, which granted certain states criminal "jurisdiction over offenses committed by or against Indians," 18 U.S.C. § 1162, and by enactments that had earlier done so on a state-by-state basis. *See* 18 U.S.C. § 3243 (Kansas); 25 U.S.C. § 232 (New York); Act of June 30, 1948, ch. 759, 62 Stat. 1161 (Iowa), *repealed by* Pub. L. 115-301, 132 Stat. 4395 (2018); Act of May 31, 1946, ch. 279, 60 Stat. 229 (North Dakota). And Congress expressly recognized tribal inherent sovereign authority to exercise criminal jurisdiction over *all* Indians in 25 U.S.C. § 1301(2), by expressly cross-referencing the definition of "Indian" in the MCA, *see id.* § 1301(4); *supra* at 14—a fact *Kunzweiler* did not reckon with, *see* 2025 WL 3124450, at *3.

(10th Cir. 1990) ("Congress has provided, however, for exclusive federal jurisdiction over crimes committed by Indians in Indian country."); *accord Henryetta*, slip op. at 7-8 ("Congress alone defines the reach of state authority in Indian country," and when "Congress has said nothing[,] [u]nder the Supremacy Clause, that silence is a boundary the States may not cross."). These settled rules are dispositive here, since state law imposes criminal penalties for fish and game violations.[20]

Defendants may not rely on *Castro-Huerta* and *Kunzweiler* to establish otherwise. *Castro-Huerta* did not consider state jurisdiction over Indians in Indian country, 597 U.S. at 639 n.2, 650 n.6; *see id.* at 648; *Henryetta*, slip op. at 5 ("What *Castro-Huerta* decided for non-Indian offenders is the only question it answered"), and so *a fortiori* it did not address the issues such consideration would raise.[21] "[R]espect for past judgments also means respecting their limits." *Brown v. Davenport*, 596 U.S. 118, 141 (2022). Thus, *Kunzweiler* was incorrect to hold that *Castro-Huerta* "sets forth the preemption analysis by which issues of a State's criminal jurisdiction in Indian country must be evaluated and decided" with respect to Indians. 2025 WL 3124450, at *2.[22] And

---

[20] *See, e.g.*, *State v. Robertson*, No. CM-2025-136 (Okla. Dist. Ct. filed Nov. 13, 2025) (criminal misdemeanor charge brought by Defendant Cochran against an Indian for hunting without a state license in Indian country); *State v. Smith*, 539 P.2d 754, 754-57 (Okla. Crim. App. 1975) (per curiam); Okla. Stat. tit. 29, § 8-104; (providing it is a misdemeanor to violate regulations promulgated by ODWC under Okla. Stat. tit. 29); Okla. Admin. Code § 800:25-31-3 (same).

[21] *Kunzweiler* thus erred in relying on the *Castro-Huerta* Court's rhetorical statement that "States do not need a permission slip from Congress to exercise their sovereign authority." 2025 WL 3124450, at *2 (quoting *Castro-Huerta*, 597 U.S. at 653). That statement may well apply with respect to non-Indians, but not as to Indians. *See Indian Country, U.S.A.*, 829 F.2d at 978 ("[U]pon Oklahoma's admission to statehood in 1907, federal authority ended with regard to non-Indians [while] federal authority continued with regard to Indians."); *McGirt*, 591 U.S. at 928-29.

[22] *Kunzweiler* also erred in relying on *Castro-Huerta*'s citation to the Tenth Amendment to show that "as a matter of state sovereignty, a State has jurisdiction over all of its territory, including Indian country." 2025 WL 3124450, at *3 (quoting *Castro-Huerta*, 597 U.S. at 636). That statement is not relevant to the different question of state criminal jurisdiction over Indians in Indian country. *See Henryetta*, slip op. at 5. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." It does not reserve power over Indians to the States because "the Constitution vests the Federal Government with exclusive authority over

neither *Castro-Huerta* nor *Kunzweiler* concerned Indian treaty hunting rights, which are protected by special rules, *see supra* at 9, 15, under which "a state law that burdens a treaty-protected right is pre-empted by the treaty," *Cougar Den*, 586 U.S. at 367.

Nor would the State have jurisdiction to enforce state fish and game laws against Indians on the Nations' Reservations even if those state laws were civil. "[S]tate courts' 'adjudicative authority over Indians for on-reservation conduct is greatly limited by federal law.'" *Ute Indian Tribe v. Lawrence* (*Lawrence II*), 22 F.4th 892, 899 (10th Cir. 2022) (quoting *Lawrence I*, 875 F.3d at 542). "These limits reflect a longstanding federal policy—enforceable against the states under the federal government's plenary and exclusive constitutional authority 'to legislate in respect to Indian tribes'—of 'leaving Indians free from state jurisdiction and control.'" *Id.* at 899-900 (quoting *Lawrence I*, 875 F.3d at 541); *see Lara*, 541 U.S. at 200. "Thus, when a case brought against a tribe or its members 'aris[es] from conduct in Indian country,' state courts lack jurisdiction 'absent clear congressional authorization.'" *Lawrence II*, 22 F.4th. at 900 (citation omitted). There is no such authorization here.

## II.    Plaintiffs Will Be Irreparably Harmed If Temporary Injunctive Relief Is Denied.

The irreparable harm factor overwhelmingly supports the Nations. It considers whether: (a) the injury is "certain and great," (b) "the injury can[not] be adequately atoned for in money," and (c) the injury cannot be remedied "following a final determination on the merits." *Prairie Band*, 253 F.3d at 1250 (citations omitted) (alteration in original).

---

relations with Indian tribes." *Montana v. Blackfeet Tribe*, 471 U.S. 759, 764 (1985). "While under the Interstate Commerce Clause, States retain 'some authority' over trade, [the Supreme Court] ha[s] explained that 'virtually all authority over Indian commerce and Indian tribes' lies with the Federal Government." *Haaland v. Brackeen*, 599 U.S. 255, 273 (2023) (quoting *Seminole Tribe v. Florida*, 517 U.S. 44, 62 (1996)). "[S]uch power is superior and paramount to the authority of any State within whose limits are Indian tribes." *Id.* at 273 (quoting *Dick*, 208 U.S. at 353).

4925-1671-0778, v. 5

Nation members are facing irreparable harm because they are being deprived of the right to hunt for subsistence purposes, they are facing threatened and actual citations and criminal prosecutions for exercising rights held under federal law, and some are forced to accept state jurisdiction by purchasing state hunting licenses despite the lack of state jurisdiction over their hunting activities. *See, e.g.* Soap Decl. ¶¶ 4-6; Robertson Decl. ¶¶ 4-6, 8-9; Ex. 17, Robertson Suppl. Decl. ¶¶ 7-9; Shepherd Decl. ¶¶ 3-8; Shepherd Suppl. Decl. ¶¶ 9-12; Dixon Decl. ¶¶ 7, 10-11; Henry Decl. ¶¶ 5, 8; Berst Decl. ¶ 14. Others are refraining from hunting, including for subsistence necessary to provide protein-rich food for the winter months. *See* Gamble Decl. ¶¶ 19-20. That has material effects on their families and livelihoods. To the extent these harms impose monetary damages, the Eleventh Amendment bars a damages remedy against the State to compensate for those losses. *See Prairie Band*, 253 F.3d at 1251; *accord Kan. Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1552 (D. Kan. 1993) (citations omitted) (monetary loss is irreparable where recovery barred by Eleventh Amendment); *LaFavre v. Kansas ex rel. Stovall*, 6 F. App'x 799, 803 (10th Cir. 2001) (*Young* action not available to seek money damages from a State). And the challenged state actions in this case also interfere with the cultural importance of Nation members' hunting, the loss of which cannot be repaired with financial compensation. *See* Shepherd Suppl. Decl. ¶ 5. Additionally, the risk to the Nations' members will expand, as the rifle deer hunting season is about to begin under both tribal and state laws, and it is the largest and most important hunting season for subsistence and other hunters alike. Harvey Suppl. Decl. ¶¶ 8-9.[23]

---

[23] *See Hunting Seasons*, ODWC, https://www.wildlifedepartment.com/hunting/seasons (last accessed Nov. 17, 2025); Cherokee Nation Wildlife Conservation, *2025-2026 Hunting and Fishing Regulations* 1 (2025), https://wildlife.cherokee.org/media/e1lltlod/2025-2026-hunting-and-fishing-regulations.pdf; Chickasaw Nation Fish & Wildlife Serv., *Hunting and Fishing Guide 2025-2026* (2025), https://www.chickasaw.net/getattachment/49242ffb-46a7-4382-80a6-a9af7d261468/Hunting-and-Fishing-Guide-2025-2026.aspx; Choctaw Nation Wildlife

In addition, "[t]he Tenth Circuit has 'repeatedly stated that … an invasion of tribal sovereignty can constitute irreparable injury.'"  *Ute VI*, 790 F.3d at 1005 (quoting *Wyandotte Nation*, 443 F.3d at 1255); *see also Winnebago Tribe v. Stovall*, 216 F. Supp. 2d 1226, 1232-33, 1240 (D. Kan. 2002) (enjoining state from enforcing tax on motor vehicle fuel in regard to transactions between tribes as "issues concern[ing] the scope of tribal sovereignty … can not be measured in dollars"), *aff'd*, 341 F.3d 1202 (10th Cir. 2003).  The application of state law to Nation members' on-Reservation hunting invades the Nations' sovereignty by nullifying the Nations' exclusive right, held by Treaty, to regulate Indians hunting on their Reservations free from state interference, and by subjecting Nation members to prosecution and punishment in a forum—state court—that lacks jurisdiction over them.  These impacts undermine the Nations' ability to make their own laws and be governed by them on their Reservations, the *sine qua non* of tribal sovereignty.  *See Williams*, 358 U.S. at 220.

In *Seneca-Cayuga Tribe v. Oklahoma ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir. 1989), the Tenth Circuit held that state efforts to stop an Indian tribe from conducting gaming authorized by federal law presented "the prospect of significant interference with [the Tribe's] self-government," and that an injunction against such interference "promotes the paramount federal policy that Indians develop independent sources of income and strong self-government."  So too here, especially as the "whole point and purpose" of Defendants' actions is to impose state control over Indians' on-reservation activities, in derogation of tribal sovereignty.  *Ute VI*, 790 F.3d at 1006.  And Defendants are imposing that control, even though they have no jurisdiction, nor any conservation-based justification, to interfere with the Nations' and their members' hunting,

---

Conservation, *Choctaw Nation Hunting & Fishing 2025-2026 Regulations* 6 (2025), https://simplebooklet.com/cndwc2025-2026huntingfishingregulations#page=1.

fishing, and gathering activities.  *See* Robertson Decl. ¶ 8; Soap Decl. ¶ 6; Lokosh Decl. ¶ 10; Berst Decl. ¶ 15; Gamble Decl. ¶ 20; Harvey Decl. ¶ 9.

State prosecution—which Defendants have also threatened and are carrying out—is also irreparable harm.  *Mesa Partners II v. Unocal Corp.*, 607 F. Supp. 624, 630 (W.D. Okla. 1985). The illegal exercise of jurisdiction over the Nations and their members cannot be undone, *see Ute VI*, 790 F.3d at 1005, and the Nations' members cannot seek monetary compensation for its imposition, *see supra* at 22.  Nation members also face the threat of being offered substitute temporary licenses or administrative fines in the field, in lieu of facing criminal prosecution, Henry Decl. ¶¶ 9-12, and being coerced into accepting state authority is likewise irreparable harm.

## III.    Any Injury To Defendants From A TRO Would Not Outweigh The Irreparable Harm To The Nations.

"When balancing the equities among the parties, the Court must consider whether the threatened injury to the movant outweighs the potential harm to the defendants if the injunction is granted." *La. Mun. Police Emps.' Ret. Sys. v. Cont'l Res., Inc.*, 886 F. Supp. 2d 1255, 1268 (W.D. Okla. 2012).  Here, an injunction will not injure Defendants because their actions are ultra vires. *See supra* at Section I; *Ute VI*, 790 F.3d at 1007; *see also Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019).

Even if an injunction would harm Defendants—and it will not—any harm would be de minimis.  The requested relief would simply prevent them from interfering with the Nations' and their members' exercise of Treaty rights on the Nations' Reservations pursuant to laws that protect and preserve Oklahoma wildlife.  Defendants have no valid interest in imposing state authority on those activities because the State has no conservation-based justification, *see supra* at 16-17, and lacks jurisdiction over Indians in Indian country in Oklahoma, *see supra* at 17-21.  The divestiture of tribal sovereignty resulting from Defendants' interference with the Nations' and their members'

on-Reservation activities heavily outweighs any supposed interest the State could conjure. *See Wyandotte Nation*, 443 F.3d at 1256 (barring Kansas from enforcing state gambling laws against a tribal gaming enterprise because "the Tribe is faced with more devastating losses than the State Defendants' temporary inability to enforce its state gaming laws"); *Reprod. Servs. v. Keating*, 35 F. Supp. 2d 1332, 1336 (N.D. Okla. 1998) (State's interest in enforcing a long-dormant criminal law was outweighed by immediate injuries from enforcement of the law).

## IV.    The Public Interest Would Be Served By The Requested Relief.

The fourth prong—whether the public interest would be served by the requested relief—also weighs in favor of temporary relief. Supporting tribal self-government is in the public interest. *Prairie Band*, 253 F.3d at 1253; *see Sac & Fox Nation v. LaFaver*, 905 F. Supp. 904, 907-08 (D. Kan. 1995). And absent a TRO, Defendants will continue to disrupt the exercise of self-government by the Nations on their Reservations by supplanting their regulation of Nation members' on-Reservation hunting with state law, which constitutes "significant interference with [tribal] self-government." *Seneca-Cayuga*, 874 F.2d at 716. In addition, Defendants' actions are ultra vires, and the public interest is served by enjoining ultra vires actions of a state officer. *See Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).

## CONCLUSION

For the foregoing reasons, the Nations respectfully request that the Court grant a temporary restraining order and preliminary injunction enjoining Defendants from interfering with the Nations' and their members' exercise of their federal rights to hunt on their Reservations, including Nation members doing so under the Reciprocity Agreement, and from interfering with the Nations' rights to regulate all Nation members hunting on their Reservations.

4925-1671-0778, v. 5

Dated:  November 18, 2025

Respectfully submitted,

By:  */s/ Michael Burrage*

Michael Burrage, OBA No. 1350
WHITTEN BURRAGE
512 N. Broadway Ave., Suite 300
Oklahoma City, OK 73102
Tel: 405-516-7800
E-mail:  mburrage@whittenburragelaw.com

*Counsel for the Chickasaw Nation and Choctaw Nation of Oklahoma*

*/s/ Frank S. Holleman*

Frank S. Holleman, DC Bar No. 1011376
Douglas B. L. Endreson, DC Bar No. 461999, *pro hac vice forthcoming*
Anne DeLong, DC Bar No. 90031783, *pro hac vice forthcoming*
SONOSKY, CHAMBERS, SACHSE, ENDRESON & PERRY, LLP
1425 K St NW, Suite 600
Washington, DC 20005
Tel: 202-682-0240
E-mail:  fholleman@sonosky.com
        dendreso@sonosky.com
        adelong@sonosky.com

*Counsel for the Cherokee, Chickasaw, and Choctaw Nations*

Chad Harsha, OBA No. 31579
Attorney General
CHEROKEE NATION
OFFICE OF ATTORNEY GENERAL
P.O. Box 1533
Tahlequah, OK 74465
Tel: 918-453-5369
E-mail: chad-harsha@cherokee.org

*Counsel for the Cherokee Nation*

26

Stephen H. Greetham, OBA No. 21510, *pro hac vice forthcoming*
GREETHAM LAW, P.L.L.C.
621 Greenwood Road
Chapel Hill, NC 27514-5921
Tel: 984-261-7240
E-mail: sgreetham@greethamlaw.net

*Counsel for the Cherokee and Chickasaw Nations*

Kaycie Sheppard, OBA No. 21356, *pro hac vice forthcoming*
*Chief Executive Counsel*
THE CHICKASAW NATION
OFFICE OF EXECUTIVE COUNSEL
2021 Arlington St.
Ada, OK 74820
Tel: 580-310-7925
E-mail: kaycie.sheppard@chickasaw.net

*Counsel for the Chickasaw Nation*

Brian Danker, OBA No. 16638
Senior Executive Officer
DIVISION OF LEGAL & COMPLIANCE
CHOCTAW NATION OF OKLAHOMA
1802 Chukka Hina Dr.
Durant, OK 74701
Tel: 580-642-7423
E-mail: bdanker@choctawnation.com

*Counsel for the Choctaw Nation of Oklahoma*

4925-1671-0778, v. 5

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2025, I electronically filed the above and foregoing documents with the Clerk of Court via the ECF System for filing, and I also caused it to be served on Defendants at the following addresses:

Wade Free
Oklahoma Department of Wildlife Conservation
1801 N. Lincoln Blvd.
Oklahoma City, OK 73105

Nels Rodefeld
Oklahoma Department of Wildlife Conservation
1801 N. Lincoln Blvd.
Oklahoma City, OK 73105

Nathan Erdman
Oklahoma Department of Wildlife Conservation
1801 N. Lincoln Blvd.
Oklahoma City, OK 73105

J. Kevin Stitt
Office of the Governor
2300 N. Lincoln Blvd., Suite 212
Oklahoma City, OK 73105

Russell Cochran
7301 Deerberry Lane
Oklahoma City, OK 73150

*/s/ Frank S. Holleman*
Frank S. Holleman

4925-1671-0778, v. 5