# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| THE CHEROKEE NATION, a federally recognized Indian Tribe, on its own behalf and as *parens patriae*;    THE CHICKASAW NATION, a federally recognized Indian Tribe, on its own behalf and as *parens patriae*; and THE CHOCTAW NATION OF OKLAHOMA, a federally recognized Indian Tribe, on its own behalf and as *parens patriae*, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 25-cv-00630-CVE-JFJ |
| WADE FREE, in his official capacity as Director, Oklahoma Department of Wildlife Conservation; NELS RODEFELD, in his official capacity as Assistant Director, Oklahoma Department of Wildlife Conservation; NATHAN ERDMAN, in his official capacity as Chief of Law Enforcement Division, Oklahoma Department of Wildlife Conservation; J. KEVIN STITT, in his official capacity as Governor of the State of Oklahoma; and RUSSELL COCHRAN, in his official Capacity as special counsel employed by the Governor, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' COMPLAINT AND BRIEF IN SUPPORT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

FACTUAL BACKGROUND ........................................................................................................4

ARGUMENT AND AUTHORITIES ...........................................................................................7

  I.  THIS SUIT IS BARRED BY SOVEREIGN IMMUNITY ..................................................... 8

  II.  THE NATIONS' CENTURY-LONG ACQUIESCENCE TO STATE AUTHORITY
     BARS THE RELIEF THEY NOW SEEK UNDER EQUITABLE PRINCIPLES SUCH AS
     LACHES PURSUANT TO *SHERRILL* .............................................................................. 13

  III.  THE NATIONS LACK STANDING TO ASSERT CLAIMS ON BEHALF OF NON-
     PLAINTIFF TRIBES AND/OR NON-MEMBER INDIANS ............................................ 17

  IV.  THE COURT CANNOT ENJOIN ONGOING STATE PROSECUTIONS OF TRIBAL
     MEMBERS UNDER THE YOUNGER ABSTENTION DOCTRINE AND THE ANTI-
     INJUNCTION ACT ......................................................................................................... 22

  V.  THE NATIONS FAIL TO STATE A PLAUSIBLE CLAIM FOR RELIEF ...................... 25

CONCLUSION ..........................................................................................................................27

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982) .......................................................................................20

*ANR Pipeline Co. v. Lafaver,*
    150 F.3d 1178 (10th Cir. 1998) .......................................................................9

*Armstrong v. Maple Leaf Apartments, Ltd.,*
    622 F.2d 466 (10th Cir. 1979) ........................................................................15

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..........................................................................................7

*Aulson v. Blanchard,*
    83 F.3d 1 (1st Cir. 1996) ...................................................................................7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................................7

*Blatchford v. Native Village of Noatak,*
    501 U.S. 775 (1991) ...........................................................................................9

*Brockman v. Wyoming Dep't of Family Services,*
    342 F.3d 1159 (10th Cir. 2003) .......................................................................9

*Brownback v. King,*
    592 U.S. 209 (2021) ...........................................................................................7

*Cheyenne & Arapaho Tribes v. First Bank & Trust Co.,*
    560 F. App'x 699 (10th Cir. 2014) .................................................................25

*Cheyenne-Arapaho Tribes of Oklahoma v. State of Okl.,*
    618 F.2d 665 (10th Cir. 1980) ........................................................................25

*City of Sherrill, New York v. Oneida Indian Nation of New York,*
    544 U.S. 197 (2005) ...................................................................................passim

*D.L. v. Unified Sch. Dist. No. 497,*
    392 F.3d 1223 (10th Cir. 2004) .....................................................................24

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) .........................................................................................18

*Dodger's Bar & Grill, Inc. v. Johnson Cnty. Bd. of Cnty. Comm'rs,*
    32 F.3d 1436 (10th Cir. 1994) ..........................................................................8

*Elephant Butte Irr. Dist. of New Mexico v. Dep't of Interior,*
    160 F.3d 602 (10th Cir. 1998) .........................................................................9

*Ex parte Young,*
    209 U.S. 123 (1908) ...........................................................................2, 9, 11, 26

*Firemen v. Chicago,* R. I. & P. R. Co.,
    393 U.S. 129 (1968) ...........................................................................................8

*Graff v. Aberdeen Enterprizes, II, Inc.,*
    65 F.4th 500 (10th Cir. 2023)...............................................................................23

*Herrera v. Wyoming,*
    587 U.S. 329 (2019) ...............................................................................................4

*Hill v. Kemp,*
    478 F.3d 1236 (10th Cir. 2007)..............................................................................9

*Hughes v. Oklahoma,*
    441 U.S. 322 (1979) ......................................................................................4, 8, 24

*Idaho v. Coeur d'Alene Tribe of Idaho,*
    521 U.S. 261 (1997) ......................................................................................passim

*J.B. ex rel. Hart v. Valdez,*
    186 F.3d 1280 (10th Cir. 1999)......................................................................23, 24

*Jicarilla Apache Tribe v. Andrus,*
    687 F.2d 1324 (10th Cir. 1982) ............................................................................15

*Kleppe v. New Mexico,*
    426 U.S. 529 (1976) ..........................................................................................8, 24

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...............................................................................................7

*Matter of Stroble,*
    2025 OK 48, __ P.3d __ .......................................................................................15

*McGirt v. Oklahoma,*
    591 U.S. 894 (2020)...........................................................................1, 14, 15, 17

*Mitchum v. Foster,*
    407 U.S. 225 (1972) ..............................................................................................24

*Moore v. Sims,*
    442 U.S. 415 (1979) ..............................................................................................23

*Muscogee (Creek) Nation v. Kunzweiler,*
    25-CV-75-GKF-JFJ, 2025 WL 3124450 (N.D. Okla. Nov. 7, 2025) ...............21

*Muscogee (Creek) Nation v. Rollin,*
    119 F.4th 881 (11th Cir. 2024)..............................................................................10

*N. Arapahoe Tribe v. Hodel,*
    808 F.2d 741 (10th Cir. 1987)................................................................................4

*N. Mill St., LLC v. City of Aspen,*
    6 F.4th 1216 (10th Cir. 2021)................................................................................19

*Neitzke v. Williams,*
    490 U.S. 319 (1989)................................................................................................8

*Nevada v. Hicks,*
    533 U.S. 353, 361 (2001) .......................................................................................1

*Nielander v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan.,*
    582 F.3d 1155 (10th Cir. 2009)........................................................................13

*Oklahoma v. Castro-Huerta,*
    597 U.S. 629 (2022)..............................................................................passim

*Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe,*
    473 U.S. 753 (1985)....................................................................................4

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984)....................................................................................7, 9

*Petrella v. Brownback,*
    697 F.3d 1285 (10th Cir. 2012)....................................................................19

*Ponca Tribe of Indians of Oklahoma v. Continental Carbon Co.,*
    CIV-05-445-C, 2008 WL 11338469 (W.D. Okla. Nov. 21, 2008).........................20

*Quapaw Tribe of Oklahoma v. Blue Tee Corp.,*
    653 F. Supp. 2d 1166 (N.D. Okla. 2009)....................................................15, 20

*Satsky v. Paramount Commc'ns, Inc.,*
    7 F.3d 1464 (10th Cir. 1993)........................................................................19

*Seminole Tribe of Florida v. Florida,*
    517 U.S. 44 (1996).....................................................................................8

*Shields Law Grp., LLC v. Stueve Siegel Hanson LLP,*
    95 F.4th 1251 (10th Cir. 2024)....................................................................18

*Sprint Commc'ns, Inc. v. Jacobs,*
    571 U.S. 69 (2013)....................................................................................22

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College,*
    600 U.S. 181 (2023)..................................................................................20

*Summers v. Earth Island Institute,*
    555 U.S. 488 (2009)..................................................................................19

*Thiebaut v. Colorado Springs Utils.,*
    455 F. App'x 795 (10th Cir. 2011)................................................................20

*Thlopthlocco Tribal Town v. Stidham,*
    762 F.3d 1226 (10th Cir. 2014)....................................................................21

*Timpanogos Tribe v. Conway,*
    286 F.3d 1195 (10th Cir. 2002)..................................................................9, 12

*Torres v. Lynch,*
    578 U.S. 452 (2016)....................................................................................8

*Trump v. CASA, Inc.,*
    606 U.S. 831, 838 (2025)............................................................................21

*Verizon Maryland v. Public Service Commission of Maryland,*
    535 U.S. 635 (2002)....................................................................................9

*Warth v. Seldin,*
  422 U.S. 490 (1975) .................................................................................................. 19, 20

*Washington v. Confederated Tribes of Colville Indian Reservation,*
  447 U.S. 134 (1980) .................................................................................................. 21, 26

*Weitzel v. Div. of Occupational & Prof'l Licensing,*
  240 F.3d 871 (10th Cir. 2001) ........................................................................................ 25

*Winn v. Cook,*
  945 F.3d 1253 (10th Cir. 2019) .................................................................................. 23, 24

*Wyoming v. United States,*
  279 F.3d 1214 (10th Cir. 2002) ........................................................................................ 8

*Younger v. Harris,*
  401 U.S. 37 (1971) .................................................................................................... 13, 22

**Statutes**

18 U.S.C. § 1165 ................................................................................................................ 1

28 U.S.C. § 2283 .............................................................................................................. 22

29 O.S. §§ 1-101 *et seq.* .................................................................................................... 5

29 O.S. § 3-105 .................................................................................................................. 5

29 O.S. § 4-101(D) ............................................................................................................ 6

29 O.S. § 4-110 ............................................................................................................. 6, 16

29 O.S. § 4-110(B)(4) ................................................................................................... 6, 25

29 O.S. § 4-112 ............................................................................................................. 6, 16

29 O.S. § 4-112(B)(5) ................................................................................................... 6, 25

29 O.S. § 5-202(A) ............................................................................................................ 6

44 Stat. 240 ....................................................................................................................... 15

**Rules**

Fed.R.Civ.P. 12(b)(1) ............................................................................................... 4, 7, 8, 27

Fed.R.Civ.P. 12(b)(6) ................................................................................................... passim

**Other Authorities**

Okla. Admin. Code § 800:3-1-21 ....................................................................................... 6

Okla. Const. art. II, § 36 .................................................................................................... 6

Okla. Const. art. XXVI, § 1 ............................................................................................... 5

Okla. Const. art. XXVI, § 4 ............................................................................................... 5

S.B. 2, 1909 O.S.L. ch. 44 (Mar. 8, 1909) .................................................................... 5, 16

Defendants Wade Free, Nels Rodefeld, Nathan Erdman, J. Kevin Stitt, and Russell Cochran, all sued in their official capacities as officers of the State of Oklahoma (collectively, the "State"), file this Joint Motion to Dismiss the Complaint of Plaintiffs, the Cherokee Nation, the Chickasaw Nation, and the Choctaw Nation of Oklahoma (collectively, the "Nations") (Doc. 2), along with the following Brief in Support.

## **INTRODUCTION**

This lawsuit represents the latest effort by the Nations to challenge the State's regulatory, civil, and criminal authority across virtually every aspect of its affairs by seeking to expand the reach of *McGirt v. Oklahoma*, 591 U.S. 894 (2020), well beyond the United States Supreme Court's express holding. Indeed, purposefully using the misleading and undefined term "Reservation" throughout their filings,[1] the Nations generally ask the Court to find that the definition of "Indian country," as defined in 18 U.S.C. § 1165 and construed under *McGirt*, is determinative of *any* question regarding the appropriate intersection of State and tribal jurisdiction – with the State's authority to regulate Indians, for *any* purpose – ending at the outer boundary of Indian country *unless Congress has expressly stated otherwise*. But that is simply not the law. "State sovereignty does not end at a reservation's border." *Nevada v. Hicks*, 533 U.S. 353, 361 (2001).

And as the U.S. Supreme Court subsequently held in *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022), the presumption is exactly the opposite: "[A]s a matter of state sovereignty, a State has jurisdiction over all of its territory, including Indian country," and "the default is that States have criminal jurisdiction in Indian country unless that jurisdiction is *preempted*." *Id.* at 636, 638, 653

---

[1] By contrast, the State distinguishes between "fee lands" and "trust lands" in its filings in an attempt to provide clarity to the Court's analysis. Even still, courts often use imprecise language. Fee lands are sometimes referred to as "off-reservation," "unrestricted," "fee-patented lands," or "non-Indian lands." Trust lands are sometimes referred to as "on-reservation," "restricted," "tribal lands," or "Indian lands." But regardless of terminology, the specific nature of the land at issue, including ownership and occupancy, is critical to this analysis.

(emphasis in original). Thus, "States do not need a permission slip from Congress to exercise their sovereign authority." *Id.* at 653. Accordingly, contrary to the Nations' position that State jurisdiction in Indian country must be expressly authorized by Congress, a State's jurisdiction in Indian country is presumed and may be preempted only: "(i) by federal law under ordinary principles of federal preemption, or (ii) when the exercise of state jurisdiction would unlawfully infringe on tribal self-government." *Id.* at 638.

Founded on this faulty premise, the Nations filed this action on their own behalf and as *parens patriae* on behalf of their members seeking broad declaratory and injunctive relief that would categorically bar Oklahoma officials, including the Governor, the Executive Director and Assistant Director of the Oklahoma Department of Wildlife Conservations, the Chief Game Warden, a Special Prosecutor, and all their agents, from enforcing *any* state wildlife laws and regulations against tribal members *anywhere* within Indian country – even on fee lands historically and presently managed by the State. Doc. 2, ¶ 1. The Nations sued each of the Defendants in his official capacity under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908). *Id.*, ¶ 3. The Nations seek a declaratory judgment that all tribal members hold a special right to hunt and fish free of the State's regulations and enforcement authority anywhere within Indian country. *Id.*, ¶ 4(a-c). And further, the Nations seek an order enjoining the State from enforcing its wildlife laws and regulations against any tribal members hunting or fishing within Indian country, including "demands that they obtain a state license, threatened and actual citation, arrest, detention, seizure of personal property, and prosecution, trial, and punishment in state court." *Id.*, ¶ 5(a-c).

Multiple independent legal grounds foreclose this suit. ***First***, the Nations' claims are barred by the State's sovereign immunity under the Eleventh Amendment, which has not been waived or abrogated. The claims do not fit within the narrow *Ex parte Young* exception because, as in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268-69 (1997), the suit "is the functional equivalent of a quiet

title action which implicates special sovereignty interests" since, if the declaratory and injunctive relief sought by the Nations were granted, "substantially all benefits of ownership and control would shift from the State to the [Nations]."

**_Second_**, the Nations' claims are barred by equitable principles, including the doctrine of laches, as articulated in _City of Sherrill, New York v. Oneida Indian Nation of New York_, 544 U.S. 197 (2005). After acquiescing to the State's uninterrupted and near-exclusive regulation of hunting and fishing within its borders for purposes of wildlife conservation for over a century, during which time the State created "justifiable expectations" as to its jurisdiction and regulatory authority, the Nations should be precluded from now seeking to revive their long-dormant claims to any special right to hunt and fish free from any State regulation.

**_Third_**, the Nations lack Article III standing to assert claims on behalf of, or involving the Indian country of, non-Plaintiff tribes (including the Muscogee (Creek) Nation and the Seminole Nation) and/or as _parents patriae_ on behalf of non-member Indians.

**_Fourth_**, the _Younger_ abstention doctrine and the Anti-Injunction Act bar the Nations from seeking, as _parens patriae_ for their members, to enjoin ongoing state prosecutions of tribal members for violations of the State's wildlife code and regulations, including two pending state court proceedings filed against Shawn Robertson and Kodie Shepherd, which the Nations explicitly ask the Court to enjoin in the Complaint (Doc. 2 at p. 57, ¶ 6(b)).

**_Fifth_**, the Nations fail to plead a cognizable cause of action entitling the State to dismissal under Rule 12(b)(6). For the same reasons articulated in the State's Response to the Motion for Temporary Injunction ("Response Brief"), the Nations cannot show that the State's regulatory authority over hunting and fishing in the State has been preempted by federal law or that the enforcement of State wildlife laws or regulations unlawfully infringes on the Nations' inherent sovereignty. No treaty applicable here expressly reserves _any_ hunting and fishing rights to the Nations

(or their members) as required by *Castro-Huerta*, 597 U.S. at 654. And no decision of the U.S. Supreme Court has ever recognized such implicit rights on fee lands under a theory of inherent tribal sovereignty. *See also N. Arapahoe Tribe v. Hodel*, 808 F.2d 741, 748 (10th Cir. 1987) (tribes' implied rights to hunt and fish are "rights of possession" that are "derived from their status as occupants of the land"). To the contrary, the Supreme Court has expressly rejected the position that tribal members hold "a special right, nonexclusive but free of state regulation" on alienated lands no longer held in trust for the tribe. *See Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 763-64 (1985). Even if the Nations could establish some implicit treaty-based hunting and fishing rights based on possession or occupancy, those rights vanish when the land is alienated.

The defects in the Complaint, individually and cumulatively, are not curable. The Nations' Complaint should be dismissed in its entirety under Rules 12(b)(1) and 12(b)(6).

## FACTUAL BACKGROUND

Since statehood, the State of Oklahoma has exercised undivided criminal and civil jurisdiction in a non-discriminatory manner over all persons within its borders, to include many aspects of the affairs of its citizenry, Indian and non-Indian alike. This includes protecting and conserving the State's wildlife and other natural resources consistent with the inherent authority the Supreme Court has repeatedly affirmed States have to protect and conserve wild animal life within their borders. *See Hughes v. Oklahoma*, 441 U.S. 322, 338–39 (1979). And for over a century, ODWC has maintained a comprehensive regulatory scheme over wildlife conservation, hunting, and fishing activities on all fee lands located within its borders, including those occurring in nearly half the State now known as "Indian country," without regard to tribal citizenship. *See Herrera v. Wyoming*, 587 U.S. 329, 339-40 (2019) (holding that a State may "impose reasonable and nondiscriminatory regulations on an Indian tribe's treaty-based hunting, fishing, and gathering rights on state land when necessary for conservation").

By the turn of the twentieth century, Oklahoma had already experienced dramatic losses in many native wildlife species.[2] In response to these early declines and the need for coordinated management, just two years after statehood, Oklahoma created what is now the ODWC (then known as the Game and Fish Department). *See* OKLA. DEP'T OF WILDLIFE CONSERVATION, About the ODWC, https://www.wildlifedepartment.com/about (last visited Dec. 18, 2025). Since at least 1909, the State has maintained a comprehensive regulatory system governing hunting, possession, sale, and transportation of wildlife, including restrictions on methods of take, seasons, bag limits, and conduct on public and private lands. *See* S.B. 2, 1909 O.S.L. ch. 44 (Mar. 8, 1909). Even at that time, it was "unlawful to kill or capture, or attempt to kill and capture, any game bird or game animal at night" and "unlawful to hunt within the State of Oklahoma without a proper license, except as herein provided." *Id.* at §§ 3517, 3528.

The conservation of Oklahoma's wildlife, and the right to responsibly hunt and fish, was so important to the people of Oklahoma that, in 1955, Oklahoma voters made the ODWC and its Commission a *constitutional body*, specifically tasked with "the control, management, restoration, conservation and regulation of the bird, fish, game and wildlife resources of the State, including the purchase or other acquisition of property for said purposes, and for the administration of the laws pertaining thereto …" OKLA. CONST. art. XXVI, §§ 1, 4 (added by Laws 1955, SJR 22, Section 1, State Question 374, Legislative Referendum 115, adopted at election held July 3, 1956). In 1974, the Legislature enacted the "Oklahoma Wildlife Conservation Code," 29 O.S. §§ 1-101 *et seq.* (the "Code"), conferring certain powers and duties on its Director, 29 O.S. § 3-105, including one requiring all

---

[2] As the Oklahoma Historical Society explains, "Oklahoma had already lost several of its wildlife species, including the grizzly bear (*Ursus arctos*), gray wolf (*Canis lupus*), passenger pigeon (*Ectopistes migratorius*), Eskimo curlew (*Numenius borealis*), Carolina parakeet (*Conuropsis carolinensis*), ivory-billed woodpecker (*Campephilus principalis*), elk (*Cervus elaphus*), and American bison (*Bison bison*)." OKLA. HISTORICAL SOCIETY, *The Encyclopedia of Oklahoma History and Culture: Endangered Species*, https://tinyurl.com/ms9dueka (last visited Dec. 9, 2025).

hunters to carry State licenses, 29 O.S. § 4-101(D). And in 2008, Oklahoma voters directly added

Article II, Section 36 to the Oklahoma Constitution, providing in relevant part:

> <u>All citizens of this state</u> shall have a right to hunt, fish, trap, and harvest game and fish, subject only to reasonable regulation as prescribed by the Legislature and the Wildlife Conservation Commission. *The Wildlife Conservation Commission <u>shall</u> have power and authority to approve methods, practices and procedures for hunting, trapping, fishing and the taking of game and fish.*

OKLA. CONST. art. II, § 36 (added by State Question No. 742, Legislative Referendum No. 345, Nov.

4, 2008) (emphasis added). That language unequivocally applies to all citizens, and there is no carveout

for Indians and/or "Indian country."

Under the Code, the State requires everyone from the age of 18 to 65 to obtain an annual State

license to hunt and/or fish within Oklahoma, subject to certain exemptions. *See* 29 O.S. § 4-112

(hunting); § 4-110 (fishing). One of the exemptions to the licensing requirement is for hunting and

fishing by owners or tenants "on land owned or leased by them." 29 O.S. § 4-112(B)(5) (hunting); 29

O.S. § 4-110(B)(4) (fishing). The Code also provides that "no person may hunt or take by any means

or method upon the land of another without the consent of the owner, lessee or occupant of such

land." 29 O.S. § 5-202(A). The State also regulates methods of take, seasons, and bag limits, for

purposes of conservation. For example, ODWC regulations make it "unlawful to place and/or hunt

over bait on lands owned or managed" by ODWC. OKLA. ADMIN. CODE § 800:3-1-21.

The Nations contend that the State is violating their treaty rights and/or inherent sovereignty

by enforcing State hunting and fishing regulations against tribal members. But the conduct at issue is

occurring on fee lands, including wildlife management areas owned or managed by the State, not on

the Nations' trust lands. *See* Doc. 2, ¶ 21(a) (hunting on fee land by someone other than its owner);

¶ 21(b) (hunting on the Hugo Wildlife Management Area, which is managed by ODWC); ¶ 21 (hunting

on the Chickasaw National Recreation Area, a unit of the National Park System located in south-

central Oklahoma, on which ODWC manages hunting and related activities in cooperation with the National Park Service).

## ARGUMENT AND AUTHORITIES

The Nations' claims are subject to dismissal under FED.R.CIV.P. 12(b)(1) and 12(b)(6). To survive a motion to dismiss under FED.R.CIV.P. 12(b)(1), "a plaintiff must plausibly allege all jurisdictional elements." *Brownback v. King*, 592 U.S. 209, 217 (2021). In addition, a plaintiff bears the burden of overcoming any threshold jurisdictional requirements, including Article III standing. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) ("the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing these [standing] elements."). After all, "a court cannot issue a ruling on the merits 'when it has no jurisdiction' because 'to do so is, by very definition, for a court to act ultra vires.'" *Brownback*, 592 U.S. at 218 (citation omitted).

To survive dismissal under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* FED.R CIV.P. 12(b)(6). While courts must view a complaint in a light most favorable to the nonmoving party, drawing all reasonable inferences therefrom, courts need not accept as true "labels and conclusions," legal characterizations, unwarranted deductions of fact, or "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678-679 (citation omitted). In other words, a court need not "swallow the plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996).

When a complaint presents a question of law and "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," the complaint "must be

dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (citation omitted). Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law . . . ." *Id.* at 326; *see also Wyoming v. United States*, 279 F.3d 1214, 1222 (10th Cir. 2002). Here, dismissal is required under Rule 12(b)(1) because this Court lacks subject matter jurisdiction to decide the merits of the Nations' suit and/or under Rule 12(b)(6) because the Nations cannot assert a set of facts that would entitle them to plausible relief.

## I.    THIS SUIT IS BARRED BY SOVEREIGN IMMUNITY.

It is so well-established to be beyond dispute that "the States, vested as they are with general police power, require no specific grant of authority in the Federal Constitution to legislate with respect to matters traditionally within the scope of the police power," including "the authority to provide for the public health, safety, and morals." *Dodger's Bar & Grill, Inc. v. Johnson Cnty. Bd. of Cnty. Comm'rs*, 32 F.3d 1436, 1441 (10th Cir. 1994) (citations omitted); *see also Torres v. Lynch*, 578 U.S. 452, 457-58 (2016) ("State legislatures, exercising their plenary police powers, are not limited to Congress's enumerated powers; and so States have no reason to tie their substantive offenses to those grants of authority."). The Supreme Court has likewise "long recognized the States' interests in conservation and protection of wild animals as legitimate local purposes similar to the States' interests in protecting the health and safety of their citizens." *Hughes* 441 U.S. at 337 (citing *Firemen v. Chicago*, R. I. & P. R. Co., 393 U.S. 129 (1968)); *see also Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976) ("Unquestionably the States have broad trustee and police powers over wild animals within their jurisdiction.").

Consistent with the Eleventh Amendment, "each State is a sovereign entity in our federal system" and "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996). Indian tribes and their members are bound by the Eleventh Amendment to the same degree as individuals. *See Blatchford v.*

*Native Village of Noatak*, 501 U.S. 775, 779-782 (1991); *Coeur d'Alene*, 521 U.S. at 268-69. Sovereign immunity "is a threshold jurisdictional issue," limiting the Court's authority under Article III to hear a claim. *Brockman v. Wyoming Dep't of Family Services*, 342 F.3d 1159, 1163 (10th Cir. 2003); *see also Pennhurst State Sch. & Hosp.*, 465 U.S. at 98 ("In short, the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III.").

The Nations contend their suit is permissible under the *Ex parte Young* exception (Doc. 2, ¶ 3). While the "Eleventh Amendment generally bars suits against a state in federal court commenced by citizens of that state or citizens of another state," a party may file "suit against a state official in federal court seeking only prospective, equitable relief for violations of federal law." *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1205 (10th Cir. 2002). The Tenth Circuit has held that the district court must conduct "the 'straightforward [or so one might hope] inquiry' whether the relief requested is 'properly' characterized as prospective or is indeed the functional equivalent of impermissible retrospective relief." *Hill v. Kemp*, 478 F.3d 1236, 1259 (10th Cir. 2007) (quoting *Verizon Maryland v. Public Service Commission of Maryland*, 535 U.S. 635 (2002)). This test was described in the Supreme Court's decision in *Coeur d'Alene*, was clarified in *Verizon Maryland*, and currently requires the court to determine "whether the relief sought by [plaintiff] is prospective, not just in how it is captioned but also in its substance." *Id.*[3] In sum, the *Ex parte Young* exception does not apply to suits that are the equivalent of actions to quiet title and implicate special sovereignty interests. *Coeur d'Alene*, 521 U.S. at 281-88.

---

[3] The decision in *Coeur d'Alene* involved a splintered opinion. Justice Kennedy announced the judgment of the Court and delivered the opinion with respect to Parts I, II-A, and III, joined by Justice O'Connor's partial concurrence. Soon after it was issued, the Tenth Circuit adopted a "four-part framework" for applying the *Ex parte Young* doctrine, consistent with *Coeur d'Alene*, which as the fourth and final step considered "whether the suit rises to the level of implicating 'special sovereignty interests.'" *Timpanogos Tribe*, 286 F.3d at 1205 (citing *Elephant Butte Irr. Dist. of New Mexico v. Dep't of Interior*, 160 F.3d 602, 609 (10th Cir. 1998)). And the Tenth Circuit applied the *Coeur d'Alene* "special sovereignty interest" test in *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1193 (10th Cir. 1998), finding that the power to tax of the State of Kansas represented such an interest. After the Supreme Court revisited the issue in *Verizon Maryland*, the Tenth Circuit in *Hill*, 478 F.3d at 1259, recognized that this

In *Coeur d'Alene*, the tribe alleged an ongoing violation of its property rights in contravention of federal law, originally seeking to quiet title and for broad declaratory and injunctive relief very similar to that which is sought by the Nations here:

> The suit named the State of Idaho, various state agencies, and numerous state officials in their individual capacities. In addition to its title claims, the Tribe further sought a declaratory judgment to establish its entitlement to the exclusive use and occupancy and the right to quiet enjoyment of the submerged lands as well as a declaration of the invalidity of all Idaho statutes, ordinances, regulations, customs, or usages which purport to regulate, authorize, use, or affect in any way the submerged lands. Finally, it sought a preliminary and permanent injunction prohibiting defendants from regulating, permitting, or taking any action in violation of the Tribe's rights of exclusive use and occupancy, quiet enjoyment, and other ownership interest in the submerged lands ….

521 U.S. at 265. The district court dismissed the claims against the State and its agencies as barred by the Eleventh Amendment, as well as the claims to quiet title and for declaratory judgment against State officials, but permitted the claim for injunctive relief against State officials to proceed. *Id.*, at 265-66. The Ninth Circuit reversed, in part, holding that both the declaratory and injunctive relief claims could proceed against State officials to preclude continuing violations of federal law. *Id.* The Supreme Court reversed in part, finding that "this suit … falls on the Eleventh Amendment side of the line, and Idaho's sovereign immunity controls." *Id.*, at 281.

According to the Court, "[t]o interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle, reaffirmed … in *Seminole Tribe,* that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction." *Id.* at 270. A majority of the Court found that "this case

---

fourth step had been abrogated, but found that the court must be satisfied that the relief sought is prospective in both name and substance. To be clear, "[t]he Supreme Court did not overrule *Coeur d'Alene* by failing to mention that exception [for suits that are the equivalent of actions to quiet title and implicate special sovereignty interests] in *Verizon Maryland.*" *Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 890 (11th Cir. 2024).

is unusual in that the Tribe's suit is the functional equivalent of a quiet title action which implicates special sovereignty interests." *Id.* If the declaratory and injunctive relief sought by the tribe were granted, enjoining the State from "regulating, permitting, or taking any action in violation of the Tribe's rights of exclusive use and occupancy," then "substantially all benefits of ownership and control would shift from the State to the Tribe." *Id.*, at 282.

> This is especially troubling when coupled with the far-reaching and invasive relief the Tribe seeks, relief with consequences going well beyond the typical stakes in a real property quiet title action. The suit seeks, in effect, a determination that the lands in question are not even within the regulatory jurisdiction of the State. The requested injunctive relief would bar the State's principal officers from exercising their governmental powers and authority over the disputed lands and waters. The suit would diminish, even extinguish, the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory. To pass this off as a judgment causing little or no offense to Idaho's sovereign authority and its standing in the Union would be to ignore the realities of the relief the Tribe demands.

*Id.* (emphasis added). Indeed, in her concurrence, which resulted in the Court's opinion and judgment, Justice O'Connor rejected any reformulation of the *Ex parte Young* test, but held that "[w]here a plaintiff seeks to divest the State of all regulatory power over [certain] lands—in effect, to invoke a federal court's jurisdiction to quiet title to sovereign lands—it simply cannot be said that the suit is not a suit against the State." *Coeur d'Alene*, 521 U.S. at 296 (O'Connor, J., concurring). Thus, because the tribe's suit was the functional equivalent of an action to quiet title, it was barred by the Eleventh Amendment and not saved by the *Ex parte Young* exception.

Although the Nations here do not expressly seek to "quiet title" to the alienated fee lands found in "Indian country," which now represent 43% of Oklahoma and most of the eastern half of the State, the requested declaratory and injunctive relief is nearly identical to that ultimately sought by the tribe in *Coeur d'Alene*, which the Court found effectively sought to divest the State of all regulatory power over sovereign fee lands and, therefore, was the "functional equivalent" of a quiet title action. Specifically, the Nations seek to enjoin the State from:

> applying or enforcing, or threatening to apply or enforce, state laws against Plaintiff Nations and their members engaged in hunting, fishing, and gathering on Plaintiff Nations' Reservations in the exercise of their Treaty rights and under Plaintiff Nations' laws, by means that include demands that they obtain a state license, threatened and actual citation, arrest, detention, seizure of Plaintiff Nations' members' personal property, continuation of ongoing and initiation of new state court proceedings, and prosecution, trial, and punishment in state court.

Doc. 2, ¶ 5(a); *cf. Coeur d'Alene*, 521 U.S. at 265. In that regard, this case is distinguishable from *Timpanogos Tribe*, where the Tenth Circuit found that the tribe was not barred from suing the State of Utah under the Eleventh Amendment, since unlike the plaintiff in *Coeur d'Alene*, the tribe there sought "nothing more than prospective, non-monetary, injunctive relief as to its hunting, fishing, and gathering rights within the **_Indian-controlled lands_** of the Uintah Valley Reservation." 286 F.3d at 1199, 1205-06 (emphasis added).

The Nation's suit here clearly implicates the State's special sovereignty interests. Regardless of how it is styled, the lawsuit—*in substance*—seeks to reclaim exclusive wildlife jurisdiction over fee lands that have been within State control for more than a century. It is not limited to hunting, fishing, and gathering rights within "*Indian-controlled lands*." Instead, the Nations seek to enjoin the State from enforcing its regulations throughout 43% of Oklahoma, the vast majority of which are fee lands. The effect of this lawsuit would burden the State's police power and shift that power away from the State. Just as in *Coeur d'Alene*, this "troubling" relief would "diminish, even extinguish, the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory" since statehood and "substantially all benefits of ownership and control would shift from the State to the [Nations]." 521 U.S. at 282. Under these circumstances, "it simply cannot be said that the suit is not a suit against the State." *Id.*, at 296 (O'Connor, J., concurring). Like *Coeur d'Alene,* "this suit … falls on the Eleventh Amendment side of the line, and [Oklahoma's] sovereign immunity controls." *Id.*, at 281. Accordingly, this suit must be dismissed in its entirety because it is barred by the State's sovereign immunity.

Additionally, this suit challenges the very act of prosecution, which is squarely foreclosed by absolute prosecutorial immunity. *Compare* Doc. 2 at ¶ 5 (seeking injunctive relief that prohibits the State from "applying or enforcing, or threatening to apply or enforce, state laws" including "continuation of ongoing and initiation of new state court proceedings, and prosecution, trial, and punishment in state court"), *with Nielander v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan.*, 582 F.3d 1155, 1164 (10th Cir. 2009). As the Tenth Circuit has made clear: "[p]rosecutors are entitled to absolute immunity for their decisions to prosecute, their investigatory or evidence-gathering actions, their evaluation of evidence, their determination of whether probable cause exists, and their determination of what information to show the court." *Nielander*, 582 F.3d at 1164; *see also Younger v. Harris*, 401 U.S. 37, 46 (1971) ("No citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts. The imminence of such a prosecution even though alleged to be unauthorized and hence unlawful is not alone ground for relief in equity . . . ." (citation omitted)). That absolute prosecutorial immunity does not allow courts or litigants to second-guess prosecutorial decisions—even if those decisions are ultimately dismissed for jurisdictional reasons. Thus, any and all claims against the Special Prosecutor must be dismissed for this independent reason.

## II. THE NATIONS' CENTURY-LONG ACQUIESCENCE TO STATE AUTHORITY BARS THE RELIEF THEY NOW SEEK UNDER EQUITABLE PRINCIPLES SUCH AS LACHES PURSUANT TO *SHERRILL*.

Even assuming *arguendo* that tribal sovereignty might once have been asserted to contest the State's jurisdiction in the field of wildlife conservation, that authority has long since gone unclaimed in this field and is now barred by equitable principles as articulated in *Sherrill,* 544 U.S. at 197. According to the Supreme Court, "long acquiescence may have controlling effect on the exercise of dominion and sovereignty over territory," and "[w]hen a party belatedly asserts a right to present and future sovereign control over territory, longstanding observances and settled expectations are prime considerations." *Id.* at 218. Indeed, "[t]he longstanding assumption of jurisdiction by the State over an

area that is over 90% non-Indian, both in population and in land use" creates "justifiable expectations." *Id.* at 215 & n.9. Equitable constraints on asserting stale claims, such as the doctrine of laches, "have deep roots in our law, and [the U.S. Supreme] Court has recognized this prescription [i.e., that the passage of time can preclude relief] in various guises." *Id.* at 217 (citation omitted). Indeed, in downplaying the serious concerns raised by the State about the potential unintended consequences of its decision on civil and regulatory law, the majority in *McGirt* made clear that nothing in that decision precluded the State from asserting equitable defenses and procedural bars against future suits by Indian tribes such as this one. *See* 591 U.S. at 935-36 (2020) ("Many other legal doctrines—procedural bars, res judicata, statutes of repose, and laches, to name a few—are designed to protect those who have reasonably labored under a mistaken understanding of the law.").

In *Sherrill*, the Oneida Indian Nation purchased parcels on the open market in 1997 and 1998 within the boundaries of a former reservation and asserted that those parcels were exempt from local property taxation because the tribe's purchases had "reunited" fee title and aboriginal title. 544 U.S. at 202. The Supreme Court rejected that attempt to revive dormant territorial sovereignty, holding that equitable considerations, including laches, foreclosed the tribe's claim that its late-20th-century purchases restored sovereign dominion:

> Given the longstanding, distinctly non-Indian character of the area and its inhabitants, the regulatory authority constantly exercised by New York State and its counties and towns, and the Oneidas' long delay in seeking judicial relief against parties other than the United States, we hold that the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue. The Oneidas long ago relinquished the reins of government and cannot regain them through open-market purchases from current titleholders.

*Id.* at 202–03. Or, as the Court later summarized in even sharper terms: "We now reject the unification theory of [the Oneida] and the United States and hold that 'standards of federal Indian law and federal equity practice' preclude the Tribe from rekindling embers of sovereignty that long ago grew cold." *Id.* at 214.

Under *Sherrill*, "'disruptive,' forward-looking claims, a category exemplified by possessory land claims, are subject to equitable defenses, including laches." *Quapaw Tribe of Oklahoma v. Blue Tee Corp.*, 653 F. Supp. 2d 1166, 1192 (N.D. Okla. 2009) (quoting *Sherrill*, 544 U.S. at 217).[4] Laches is applicable where the court finds, in its discretion: "(a) unreasonable delay in bringing suit by the party against whom the defense is asserted and (b) prejudice to the party asserting the defense as a result of this delay." *Jicarilla Apache*, 687 F.2d at 1337-38 (applying the doctrine of laches to bar claims brought by Indian tribe after a delay of four to six years). Specifically, laches and related equitable principles bar a tribe's claims where there exists:

 (1) "longstanding, distinctly non-Indian character of the [disputed land] and its inhabitants"; (2) "regulatory authority constantly exercised by [the] State and its counties and towns"; and (3) a "long delay," usually of decades or more, in seeking relief.

*United States v. Osage Wind, LLC*, No. 14-CV-704-GKF-JFJ, 2021 WL 3774685, at *12 (N.D. Okla. Aug. 25, 2021).

Each of those three elements is present here. <u>*First*</u>, as in *Sherrill*, the vast majority of the lands within the former reservation boundaries (95% or more) are fee lands alienated many years ago that are not owned by, or held in trust for, the Nations. *See McGirt*, 591 U.S. at 938 (C.J. Roberts, dissenting) ("fee lands … make up more than 95% of the Creek Nation's former territory"); *Matter of Stroble*, 2025 OK 48, ¶ 1, __ P.3d __ (recognizing that "[a]lmost all (around 95%) of this property is fee land, meaning it is not restricted or held in trust").[5]

---

[4] Laches is an equitable doctrine that bars untimely claims. The Tenth Circuit has found that Congress made the Oklahoma state statutes of limitations, as well as the parallel doctrine of laches, applicable to Indians of the Five Civilized Tribes by the Act of April 12, 1926, 44 Stat. 240. *See Armstrong v. Maple Leaf Apartments, Ltd.*, 622 F.2d 466, 472 (10th Cir. 1979) (affirming dismissal of Indian's claims on grounds of laches). "Laches may be found … where a party, having knowledge of the relevant facts, acquiesces for an unreasonable length of time in the assertion of a right adverse to his own. A party must exercise reasonable diligence in protecting his rights." *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1337-38 (10th Cir. 1982) (citations omitted).

[5] Although the Chief Justice was referring specifically to the Creek Nation territory in his dissent, the State has no reason to believe the relative percentages of trust land and fee land within the

_Second_, as demonstrated above, the State has constantly regulated hunting and fishing by all citizens, uniformly applying its wildlife laws and regulations under its Constitution and implementing statutes on all non-trust fee lands for more than a century. The State passed its first wildlife conservation laws regulating hunting and fishing in 1909. _See_ S.B. 2, 1909 O.S.L. ch. 44 (Mar. 8, 1909). The Oklahoma Legislature enacted the Code in 1974. The Code requires everyone from the age of 18 to 65 to obtain an annual State license to hunt and/or fish within Oklahoma, subject to certain exemptions. _See_ 29 O.S. § 4-112 (hunting); § 4-110 (fishing). The State also regulates methods of take, seasons, and bag limits, for purposes of conservation. For example, ODWC regulations make it "unlawful to place and/or hunt over bait on lands owned or managed" by ODWC. OKLA. ADMIN. CODE § 800:3-1-21. Violations of the Code and ODWC regulations can be punished by fines and/or prosecuted as misdemeanor offenses.

_Third_, until very recently, the Nations freely acquiesced in the State's longstanding exercise of regulatory authority over hunting and fishing on all non-trust fee lands. For more than 50 years, the State's regulatory framework has included a requirement that all persons not subject to an exemption have a State license. In fact, when it first adopted its own hunting and fishing laws nearly 20 years ago, the Cherokee Nation included an express warning to tribal members that a **_State_** license was required to hunt or fish beyond the Nation's trust lands:

> [I]t is possible that you may be stopped, or even cited, for hunting **off of trust or restricted land** using only your Cherokee Nation license. If you are in full compliance with Cherokee Nation regulations and you receive such a citation, notify the Cherokee Nation Office of the Attorney General or Marshal Service at (918) 456-9224. The Nation may or may not attempt to assert its hunting/fishing rights in your case as a defense. UNTIL THERE IS A FORMAL AGREEMENT WITH THE STATE, **YOU MAY BE SUBJECT TO FINES AND/OR OTHER PENALTIES FOR HUNTING ON STATE LAND WITHOUT A STATE LICENSE**.

---

territories of any of the Nation Plaintiffs is meaningfully different, and indeed, the percentage of fee lands may be even greater than 95%.

Ex. 1, Cherokee Hunting and Fishing Code, at 4 (emphasis added). It is only since *McGirt*, nearly two decades later, that the Cherokee Nation—and the other Plaintiff Nations—began to interfere with the State's enforcement of the Code and its wildlife regulations on fee lands within Indian country. Each of the Nations has recently adopted and/or updated its own wildlife codes and regulations. Doc. 2, ¶¶ 59-60. And the Nations first entered into the Reciprocity Agreement, along with two other tribes, in July 2024. Doc. 2-2. The Nations delayed **another <u>five</u> years** after *McGirt* was issued to bring the current lawsuit.

The logic applied in *Sherrill* applies with no less force here. Under *Sherrill*, "standards of federal Indian law and federal equity practice" preclude the Nations from suddenly "rekindling embers of sovereignty that long ago grew cold" in order to invalidate long-settled state regulatory authority over its own lands. 544 U.S. at 214. Here, the Nations seek to upend a century of undisputed State regulation by asking this Court to strip Oklahoma of its authority to apply its neutral wildlife laws to tribal members on fee lands long ago alienated. They do so only after statehood, after generations of non-tribal settlement and infrastructure development, and after decades in which Oklahoma alone has borne the legal and fiscal responsibility of wildlife conservation over these areas. That type of belated effort to "unilaterally revive" territorial sovereignty over non-tribal lands is exactly what *Sherrill* forbids. 544 U.S. at 202-03, 214.

The Court should find that the Nations are barred from now claiming, after decades of acquiescence, that Oklahoma's conservation laws do not apply to tribal members on fee lands by equitable principles, such as laches, as articulated by the U.S. Supreme Court in *Sherrill*.

## III.    THE NATIONS LACK STANDING TO ASSERT CLAIMS ON BEHALF OF NON-PLAINTIFF TRIBES AND/OR NON-MEMBER INDIANS.

The Nations seek sweeping equitable relief not only for themselves, but "as *parens patriae* on behalf of their members" that would categorically bar the State from enforcing its conservation and wildlife laws anywhere in "Indian Country," presumably including Plaintiff Nations' members hunting

and fishing on lands within the Indian country of non-Plaintiff tribes (*i.e.*, the Muscogee (Creek) Nation and the Seminole Nation). *See* Doc. 2 at ¶¶ 1, 84, 95, 119, 121, p. 56, ¶ 6 ("including Plaintiff Nations' members doing so under the Reciprocity Agreement"). Furthermore, they repeatedly assert the alleged interests or injuries of "other Indians[,]" (*i.e.*, members of other tribes), using the phrase "other Indians" over 40 times in the Complaint. *See, e.g., id.* at ¶¶ 1, 4(c), 20, 25, 32, 37, 43, 48, 51, 57, 75–77, 81, 90, 95, 108, 114, 118–19 pp. 56–57, ¶ 6 (seeking to enjoin State enforcement against "all other Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations"). In sum, the Nations seek a universal injunction that would enjoin the State from equally enforcing its hunting and fishing laws "against Plaintiff Nations' members and other Indians hunting, fishing, and gathering on Plaintiff Nations' Reservations" among other things. *Id.* at ¶ 121; *see also id.* at ¶ 5, p. 56, ¶ 6. The Nations do not have standing to assert: **(1)** claims on behalf of, or involving the Indian country of, non-Plaintiff tribes; and/or **(2)** claims as *parents patriae* on behalf of non-member Indians (including, for example, Cherokee citizens hunting within Choctaw Indian country, or Creek citizens hunting within the Indian country of any of the Plaintiff Nations).

"Article III of the U.S. Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Shields Law Grp., LLC v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1279 (10th Cir. 2024). Article III standing is a jurisdictional threshold requirement that must be satisfied at the outset of a case. *Id.* "To establish the 'irreducible constitutional minimum' of standing," a party must make three showings: "'(1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id.*, at 1280. Importantly, it is the plaintiff's burden to establish standing as to each claim asserted. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("We

have insisted, for instance, that 'a plaintiff must demonstrate standing separately for each form of relief sought.'") (citation omitted).

An injury alleged must be "concrete and particularized," and the threat of that injury must be "actual and imminent, not conjectural or hypothetical." *Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012) (quoting *Summers v. Earth Island Institute,* 555 U.S. 488, 493 (2009). To be concrete, an injury must be real harm to a legally protected interest, not abstract. *N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1229 (10th Cir. 2021). An injury is particularized only if it affects a party in a personal and individual way. *Id.* Each of the three Nations lacks standing to assert claims against the State for conduct that is occurring on lands beyond the boundaries of their own Indian country, or on the Indian country of any non-Plaintiff tribe. Whatever treaty-based or inherent sovereign rights the Nations contend they have, they certainly do not reach beyond the boundaries of what is now understood to be their Indian country. The Nations cannot create a "case or controversy" against the State by agreeing among themselves, and other non-Plaintiff tribes, to enforce their respective regulations against non-member Indians.

Nor can the Nations assert claims on behalf of non-member Indians. As a general matter, legal rights and interests cannot be asserted vicariously. The Supreme Court explained decades ago that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The Nations cannot invoke a *parens patriae* exception to standing to overcome this jurisdictional defect. According to the Tenth Circuit, "*parens patriae* standing has been explained on the ground that the plaintiff state is not merely advancing the rights of individual injured citizens, but has an additional sovereign or quasi-sovereign interest . . . ." *Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1469 (10th Cir. 1993) (citation and internal marks omitted).

*Parens patriae* standing requires the following elements: "(1) the State must have 'alleged injury to a sufficiently substantial segment of its population;' (2) the State 'must articulate an interest apart from the interests of particular private parties;' and (3) the state 'must express a quasi-sovereign interest.'" *Quapaw Tribe*, 653 F. Supp. 2d at 1178 (N.D. Okla. 2009); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982); *Thiebaut v. Colorado Springs Utils.*, 455 F. App'x 795, 800 (10th Cir. 2011).[6] As this Court has instructed, "the Tribe's alleged quasi-sovereign interest must be clear enough for the Court to ascertain whether the Tribe is attempting to assert the private claims of its citizens, or the Court must dismiss some or all of the Tribe's claims for lack of standing under Article III." *Quapaw Tribe*, 653 F. Supp. 2d at 1178. Indeed, the *parens patriae* standing exception established in *Snapp* "has been narrowly construed." *Id.* At a minimum, the governmental entity does not have standing to "assert the rights of private individuals'" and "must show that all or a substantial portion of its members have suffered an injury." *Id.* at 1179–80 (citation omitted).

Measured against this framework, the Tribes' *parens patriae* theory unequivocally fails as to non-member Indians.[7] To be sure, "other Indians," who are not members of the Nations, are the functional equivalent of private individuals for this standing analysis. Indeed, as the Supreme Court has held on multiple occasions, "[f]or most practical purposes," non-member Indians "stand on the same footing

---

[6] Along similar lines, the Tribes cannot establish traditional associational standing, which requires a plaintiff show that "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [they] seek[] to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 199 (2023) (internal quotation marks omitted). The Tribes' asserted injuries are exactly the sort of claim "requires the participation of individual members in the lawsuit." *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975); *see also Ponca Tribe of Indians of Oklahoma v. Continental Carbon Co.*, CIV-05-445-C, 2008 WL 11338469, at *6 (W.D. Okla. Nov. 21, 2008) (unpublished) (calling this third prong "insurmountable" where "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof.").

[7] The State does not concede that the Nations have standing to bring suit as *parens patriae* on behalf of their own members under the standards set forth in *Quapaw Tribe*.

as non-Indians resident on the reservation." *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 161 (1980); *see also Thlopthlocco Tribal Town v. Stidham*, 762 F.3d 1226, 1234 (10th Cir. 2014) (emphasis added) (holding that when a Supreme Court decision "refers to 'non-Indians,' the logic of the opinion applies to non-members of a tribe, including other independent Indian tribes"). As an example, the Choctaw Nation cannot plausibly argue it is entitled to assert the interests of the Muscogee (Creek) Nation (or its members) against the State, simply because the Muscogee (Creek) Nation is a party to the so-called Reciprocity Agreement. Such a notion would no doubt be offensive to the very concept of tribal sovereignty upon which the Nations rely so heavily. Indians are not a monolithic group upon as to whom any tribal entity can assert a *parens patriae* interest.[8] To the extent the Nations seek indiscriminate relief on behalf of "other Indians" (*i.e.*, non-member Indians), dismissal is not only warranted but required.

Finally, an injunction applied to non-Plaintiff tribes or their lands, or to non-member Indians, as sought by the Nations here would exceed this Court's authority under the Supreme Court's recent prohibition against the issuance of a "universal injunction" (*i.e.*, one which "prohibits the Government from enforcing the law against *anyone*, anywhere"). *Trump v. CASA, Inc.*, 606 U.S. 831, 838 n.1 (2025) (emphasis in original). According to the Supreme Court, a universal injunction "falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Id.*, at 847 (2025). Accordingly, the Court found, district courts should properly issue more limited "injunctions prohibiting executive officials from enforcing a challenged law or policy ***only*** *against the plaintiffs in the lawsuit*." *Id.*, at 837 (emphasis added).

---

[8] The absence of the Muscogee (Creek) Nation is noteworthy given its numerous collateral challenges to the State's criminal jurisdiction in federal district courts, some of which have resulted in unfavorable rulings against them. *See, e.g., Muscogee (Creek) Nation v. Kunzweiler*, 25-CV-75-GKF-JFJ, 2025 WL 3124450, at *2 (N.D. Okla. Nov. 7, 2025). But surely the exclusion of the Muscogee (Creek) Nation here reflects something more than a strategic effort to avoid inconvenient preclusion implications.

Because both Article III and the traditional equity jurisdiction of district courts properly limit injunctive relief to the parties and injuries actually before the Court, the Nations lack standing to assert claims for, or obtain relief on behalf of, other non-Plaintiff tribes (or involving those tribes' Indian country) and/or as *parens patriae* on behalf of any non-member Indians. Any such claims or requests for relief should be dismissed.

## IV. THE COURT CANNOT ENJOIN ONGOING STATE PROSECUTIONS OF TRIBAL MEMBERS UNDER THE YOUNGER ABSTENTION DOCTRINE AND THE ANTI-INJUNCTION ACT.

The Nations specifically ask the Court to issue a universal injunction that would halt the "continuation of ongoing prosecutions" in state courts, including those involving individual tribal members such as Robertson and Shepherd (who are not named as parties to the suit), as well as the filing of any new state court cases involving Indians hunting in violation of State laws. Doc. 2 at p. 57, ¶ 6. Congress has made clear through the Anti-Injunction Act that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. This provision reflects the "fundamental policy against federal interference with state criminal prosecutions[.]" *Younger*, 401 U.S. at 46. As *Younger* explained, "the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Id.* at 45. Indeed, "[o]rdinarily, there should be no interference with such officers; primarily they are charged with the duty of prosecuting offenders against the laws of the state, and must decide when and how this is to be done." *Id.* To put it even more bluntly: "[w]hen there is a parallel, pending state criminal proceeding, federal courts **must** refrain from enjoining the state prosecution." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013) (emphasis added).

Under the *Younger* abstention doctrine, federal courts *must* abstain from exercising jurisdiction to interfere with state proceedings when:

(1) [T]here is an ongoing state criminal, civil, or administrative proceeding,

(2) [T]he state court provides an adequate forum to hear the claims raised in the federal complaint, and

(3) [T]he state proceedings involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies.

*Winn v. Cook*, 945 F.3d 1253, 1258 (10th Cir. 2019). If those three criteria are met, "*Younger* abstention is not discretionary" and so "claims for declaratory relief and injunctive relief are subject to outright dismissal." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1291 (10th Cir. 1999); *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 523 (10th Cir. 2023).

All three elements are met here. <u>*First*</u>, in their Complaint, the Nations expressly ask the Court to enjoin the State and halt the "continuation of ongoing [State] prosecutions" against tribal members, including two who were cited for, and eventually prosecuted for, violations of State wildlife laws and regulations that occurred on non-tribal fee lands managed by the State (*State v. Robertson* and *State v. Shepherd*). *See* Doc. 2 at p. 57, ¶ 6(b); *see also* ¶¶ 20, 22(b), (c).

<u>*Second*</u>, the Nations cannot carry their burden to show that Oklahoma courts provide no adequate forum to hear their claims brought as *parens patriae* for individual tribal members. *See Moore v. Sims*, 442 U.S. 415, 433 (1979) (suggesting a plaintiff bears the burden to establish "that state procedural law bar[s] presentation of its claims."). "[U]nless state law clearly bars the interposition of the federal statutory and constitutional claims," a plaintiff typically has "an adequate opportunity to raise federal claims in state court." *Winn*, 945 F.3d at 1258. State proceedings fail to offer an adequate opportunity to raise federal issues "'only if 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issues before it.'" *Moore*, 442 U.S. at 433 (internal citations omitted).

Oklahoma state courts are fully capable of adjudicating the federal issues raised by the Nations, including in wildlife and conservation contexts such as the prosecutions against Robertson and

Shepherd, which Oklahoma has been adjudicating since statehood. Indeed, both *McGirt v. Oklahoma* and *Oklahoma v. Castro-Huerta* arose through individual state court criminal proceedings, definitively evidencing the adequacy of the same. Here, the Nations—asserting derivative claims to stay ongoing prosecutions against their members for hunting on State-managed lands without a license as *parens patriae*—do not have any legally distinct claims arising from their powers of self-government that would be implicated by the State's licensing requirements as applied on fee lands. *See D.L. v. Unified Sch. Dist. No. 497*, 392 F.3d 1223, 1230 (10th Cir. 2004) ([W]hen in essence only one claim is at stake and the legally distinct party to the federal proceeding is merely an alter ego of a party in state court, *Younger* applies."). The individual tribal members can assert defenses that the State's wildlife laws do not apply to them in state court.

    *Third*, state proceedings for violations of the wildlife code and regulations, such as those brought against Robertson and Shepherd here, unquestionably involve "important state interests." *Winn*, 945 F.3d at 1258. As the Court found in *Castro-Huerta*, "[t]he State has a strong sovereign interest in ensuring public safety and criminal justice within its territory." 597 U.S. at 651. In this context, Oklahoma's sovereign interests broadly include the right to protect and conserve wild animal life within their borders. *See Hughes*, 441 U.S. at 337; *Kleppe*, 426 U.S. at 545.

    None of the exceptions to the application of *Younger* are present here. *See J.B.*, 186 F.3d at 1291; *Mitchum v. Foster*, 407 U.S. 225, 230-31 (1972) (Injunctive intervention in state criminal proceedings is permissible only if (1) irreparable injury is "both great and immediate," (2) the state law is "flagrantly and patently violative of express constitutional prohibitions, or (3) Plaintiff could show "bad faith, harassment, or . . . other unusual circumstances that would call for equitable relief."). The State wildlife prosecutions against Robertson and Shepherd enforce longstanding, facially neutral conservation statutes on lands that are being managed by the States. There is nothing "flagrantly and patently violative of express constitutional prohibitions" about Oklahoma's requirement that all

hunters on those lands comply with generally applicable licensing and game laws—as they have required for over a hundred years. The Nations' disagreement with Oklahoma's jurisdictional theory does not transform ordinary law enforcement into "bad faith" or "harassment." Nor can the Nations identify any suspect classification, retaliation for constitutional activity, or "unjustified and oppressive use of multiple prosecutions" of tribal members. *Weitzel v. Div. of Occupational & Prof'l Licensing*, 240 F.3d 871, 877 (10th Cir. 2001).

As to ongoing state prosecutions of tribal members for violations of the State's wildlife code and regulations, such as those against Robertson and Shepherd that the Nations seek to enjoin here (Doc. 2 at p. 57), *Younger* abstention plainly bars the Nations' claims and requires dismissal.

## V.    THE NATIONS FAIL TO STATE A PLAUSIBLE CLAIM FOR RELIEF.

Even beyond the numerous issues identified above, the Nations' Complaint is subject to dismissal under Rule 12(B)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted.[9] In order to analyze the Nations' claims, it is first important to understand what they are not.

- The State does not enforce its wildlife laws or regulations against member Indians hunting and fishing "on land held as Indian allotments [or] on land held in trust by the United States for the" Nation, pursuant to *Cheyenne-Arapaho Tribes of Oklahoma v. State of Okl.*, 618 F.2d 665, 669 (10th Cir. 1980).

- The State does not require owners or tenants to obtain a State license to hunt or fish "on land owned or leased by them." *See* 29 O.S. § 4-112(B)(5) (hunting); 29 O.S. § 4-110(B)(4) (fishing).

- The Nations have no right to regulate hunting or fishing by non-Indians beyond their tribal trust lands – and do not claim otherwise here. *See* Doc. 3, at 13 n.16. Non-member Indians are the functional equivalent of private individuals "[f]or

---

[9] Declaratory judgment and injunctive relief – the two "Causes of Action" asserted by the Nations (Doc. 2, ¶¶ 112-121) – are remedies, not causes of action. The Tenth Circuit has made clear that "reliance on the Declaratory Judgment Act" is "misplaced," because "that act involves procedural remedies; it does not confer any 'substantive rights' or create a cause of action." *Cheyenne & Arapaho Tribes v. First Bank & Trust Co.*, 560 F. App'x 699, 708 (10th Cir. 2014) (unpublished). Without a substantive right creating a cause of action, declaratory and injunctive relief cannot issue.

most practical purposes" and "stand on the same footing as non-Indians resident on the reservation" under *Colville*, 447 U.S. at 161.

- The Nations lack standing to assert claims on behalf of, or involving the Indian country of, non-Plaintiff tribes or as *parents patriae* on behalf of non-member Indians. *See supra*, Proposition III.

- The only relief the Nations can seek here, if any, under the *Ex parte Young* exception as clarified in *Coeur d'Alene*, is prospective, equitable relief for violations of federal law that is not the "functional equivalent" of a quiet title suit that would shift benefits of ownership and control from the State to the Tribe. *See supra*, Proposition I. This does not include the authority to enjoin ongoing State prosecutions. *See supra*, Proposition IV.

Properly limited and defined, therefore, the Court should consider only whether the Nations are entitled to prospective injunctive relief that would create a system of concurrent, tribal citizenship-based regulation over hunting and fishing on fee lands within the three Plaintiff Nations' Indian country.

As to these fee lands, the Nations have not asserted a claim upon which relief can be granted. The history of Oklahoma reflects an appropriate exercise of State jurisdiction over hunting and wildlife on fee lands within its borders. Accordingly, under the framework confirmed in *Castro-Huerta*, the only remaining question for the Court is whether the State's jurisdiction in Indian country is "preempted (i) by federal law under ordinary principles of federal preemption, or (ii) [because] the exercise of state jurisdiction would unlawfully infringe on tribal self-government." 597 U.S. at 638. It is not.

*First*, State jurisdiction is not preempted by federal law or any express or implied treaty rights. *See* Response Brief, Section II.B. *Second*, the exercise of State jurisdiction over wildlife conservation on non-trust fee lands would not unlawfully infringe on the Nations' tribal self-government. *See id.*, Section II.C. *Third*, the State does not require a permission slip from Congress to exercise jurisdiction over all Oklahoman, including tribal members, who violate the State's wildlife laws or regulations on fee lands. *See id.*, Section II.D.

The binding authorities set forth in the State's Response Brief and briefly summarized above clearly preclude the Nation's claims here. Tribal members do not hold a special right to hunt and fish on fee lands free of State wildlife regulations, such as licensing requirements. And tribal members do not enjoy immunity from citation or prosecution in state courts for violation of the State's wildlife laws and regulations. Because the relief requested is barred by Supreme Court precedent, the Nations fail to state a plausible claim for relief, and their Complaint should be dismissed.

## **CONCLUSION**

For these many reasons, Defendants Wade Free, Director of ODWC, Nels Rodefeld, Assistant Director of ODWC, Nathan Erdman, Chief of Law Enforcement of ODWC, J. Kevin Stitt, Governor of the State of Oklahoma, and Russell Cochran, Special Counsel for the State of Oklahoma, all in their official capacities, respectfully request the Court dismiss the Complaint in its entirety under Rules 12(b)(1) and 12(b)(6).

Dated: December 19, 2025

*s/Phillip G. Whaley*
Phillip G. Whaley, OBA #13371
Grant M. Lucky, OBA #17398
Patrick R. Pearce, Jr., OBA #18802
RYAN WHALEY
400 North Walnut Avenue
Oklahoma City, OK 73104
(405) 239-6040
(405) 239-6766 FAX
pwhaley@ryanwhaley.com
glucky@ryanwhaley.com
rpearce@ryanwhaley.com

*Attorneys for Defendants*
*Wade Free, in his official capacity as Director,*
*Oklahoma Department of Wildlife Conservation*
*Nels Rodefeld, in his official capacity as Assistant*
*Director, Oklahoma Department of Wildlife*
*Conservation*
*Nathan Erdman, in his official capacity as Chief*
*of Law Enforcement Division, Oklahoma*
*Department of Wildlife Conservation*

*s/Audrey A. Weaver*
(*Signed by Filing Attorney with Permission*)
Audrey A. Weaver, OBA #33258
Senior Litigation Counsel
Office of Governor J. Kevin Stitt
200 N. Lincoln Blvd., Suite 212
Oklahoma City, OK  73105
(405) 522-0425
audrey.weaver@gov.ok.gov

*Attorney for Defendants*
*J. Kevin Stitt, in his official capacity as*
*Governor of the State of Oklahoma*
*Russell Cochran, in his official capacity as*
*special prosecutor employed by the Governor*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 19, 2025, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants.

<u>*s/Phillip G. Whaley*</u>
Phillip G. Whaley