# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| THE CHEROKEE NATION, a federally recognized Indian Tribe, on its own behalf and as *parens patriae*; THE CHICKASAW NATION, a federally recognized Indian Tribe, on its own behalf and as *parens patriae*; and THE CHOCTAW NATION OF OKLAHOMA, a federally recognized Indian Tribe, on its own behalf and as *parens patriae*, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 25-cv-00630-CVE-JFJ |
| WADE FREE, in his official capacity as Director, Oklahoma Department of Wildlife Conservation; NELS RODEFELD, in his official capacity as Assistant Director, Oklahoma Department of Wildlife Conservation; NATHAN ERDMAN, in his official capacity as Chief of Law Enforcement Division, Oklahoma Department of Wildlife Conservation; J. KEVIN STITT, in his official capacity as Governor of the State of Oklahoma; and RUSSELL COCHRAN, in his official Capacity as special counsel employed by the Governor, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' JOINT REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT AND AUTHORITIES ................................................................................. 2

   I.  THIS SUIT IS BARRED BY SOVEREIGN IMMUNITY ................................. 2

   II.  THE NATIONS' CENTURY-LONG ACQUIESCENCE TO STATE AUTHORITY BARS THE RELIEF THEY NOW SEEK UNDER EQUITABLE PRINCIPLES SUCH AS LACHES PURSUANT TO *SHERRILL* ................................. 4

   III.  THE NATIONS LACK STANDING TO ASSERT CLAIMS ON BEHALF OF NON-PLAINTIFF TRIBES AND/OR NON-MEMBER INDIANS .......................... 8

   IV.  THE COURT CANNOT ENJOIN ONGOING STATE PROSECUTIONS OF TRIBAL MEMBERS UNDER THE YOUNGER ABSTENTION DOCTRINE AND THE ANTI-INJUNCTION ACT ................................................................................. 9

   V.  THE NATIONS FAIL TO STATE A PLAUSIBLE CLAIM FOR RELIEF ........ 12

CONCLUSION .................................................................................................................. 19

# TABLE OF AUTHORITIES

## Cases

*Agua Caliente Band of Cahuilla Indians v. Hardin,*
 223 F.3d 1041 (9th Cir. 2000)...........................................................................3

*Am. Humanist Ass'n, Inc. v. Douglas Cnty. Sch. Dist. RE-1,*
 859 F.3d 1243 (10th Cir. 2017)..........................................................................8

*Amoorpour Tr. of Amoorpour Family Tr. v. Kirkham,*
 2023 OK 120, 543 P.3d 677.................................................................................3

*Baldwin v. Fish & Game Comm'n of Montana,*
 436 U.S. 371 (1978)..........................................................................................10

*Bennett v. Medtronic, Inc.,*
 285 F.3d 801 (9th Cir. 2002), *as amended on denial of reh'g* (May 15, 2002) ...........11

*Cayuga Indian Nation of N.Y. v. Pataki,*
 413 F.3d 266 (2d Cir. 2005) ...............................................................................5

*Cayuga Indian Nation v. Fox,*
 544 F. Supp. 542 (N.D.N.Y. 1982) ....................................................................11

*Cheyenne & Arapaho Tribes v. First Bank & Tr. Co.,*
 560 Fed. Appx. 699 (10th Cir. 2014) .................................................................11

*Chick Kam Choo v. Exxon Corp.,*
 486 U.S. 140 (1988)..........................................................................................10

*City of Sherrill, New York v. Oneida Indian Nation of New York,*
 544 U.S. 197 (2005).................................................................................4, 5, 6, 7

*Colorado Outfitters Ass'n v. Hickenlooper,*
 823 F.3d 537 (10th Cir. 2016).............................................................................8

*D.L. v. Unified Sch. Dist. No. 497,*
 392 F.3d 1223 (10th Cir. 2004)...........................................................................9

*DaimlerChrysler Corp. v. Cuno,*
 547 U.S. 332 (2006)............................................................................................8

*Ex parte Young,*
 209 U.S. 123 (1908).......................................................................................2, 4

*Herrera v. Wyoming,*
 587 U.S. 329 (2019)..........................................................................................18

*Idaho v. Coeur d'Alene Tribe of Idaho,*
   521 U.S. 261 (1997) ................................................................ 2, 3, 4

*Indep. Sch. Dist. No. 9 of Tulsa Cnty. v. Glass,*
   1982 OK 2, 639 P.2d 1233 .......................................................... 10

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wis.,*
   740 F. Supp. 1400 (W.D. Wis. 1990) ............................................ 3

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wis.,*
   760 F.2d 177 (7th Cir. 1985) ....................................................... 18

*Lacano Investments, LLC v. Balash,*
   765 F.3d 1068 (9th Cir. 2014) .................................................... 2, 3

*McGirt v. Oklahoma,*
   591 U.S. 894 (2020) ........................................................... 6, 10, 12

*Menominee Tribe of Indians v. U.S.,*
   388 F.2d 998 (Ct. Cl. 1967) ..................................................... 15, 16

*Menominee Tribe of Indians v. United States,*
   391 U.S. 404 (1968) .................................................................. 15

*Mille Lacs Band of Chippewa Indians v. State of Minn.,*
   952 F. Supp. 1362 (D. Minn. 1997), *aff'd,* 124 F.3d 904 (8th Cir. 1997), *aff'd sub nom. Minnesota v.*
   *Mille Lacs Band of Chippewa Indians,* 526 U.S. 172 (1999) ................... 3, 4, 13, 18

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
   526 U.S. 172 (1999) .................................................................. 16

*Montana v. United States,*
   450 U.S. 544 (1981) ............................................................. 13, 17

*Murphy v. Royal,*
   875 F.3d 896 (10th Cir. 2017), *aff'd sub nom. Sharp v. Murphy,* 591 U.S. 977 (2020) .................... 15

*Muscogee (Creek) Nation v. Rollin,*
   119 F.4th 881 (11th Cir. 2024) ..................................................... 2

*Nevada v. Hicks,*
   533 U.S. 353 (2001) .................................................................. 15

*New Mexico v. Mescalero Apache Tribe,*
   462 U.S. 324 (1983) ............................................................... 1, 13

*Oglala Sioux Tribe v. C & W Enterprises, Inc.,*
   607 F. Supp. 2d 1069 (D.S.D. 2009) ............................................. 11

*Oklahoma v. Castro-Huerta,*
   597 U.S. 629 (2022) ................................................................................... 10, 12, 14, 15

*Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe,*
   473 U.S. 753(1985) ...........................................................................................................17

*Ottawa Tribe of Oklahoma v. Ohio Dep't of Nat. Res.,*
   541 F. Supp. 971 (N.D. Ohio 2008), *aff'd sub nom. Ottawa Tribe of Oklahoma v. Logan,* 577 F.3d
   634 (6th Cir. 2009)........................................................................................................ 6, 7

*Pueblo of Pojoaque v. Biedscheid,*
   689 F. Supp. 3d 1033 (D.N.M. 2023) .............................................................................11

*Puyallup Tribe v. Dep't of Game of Wash.,*
   391 U.S. 392 (1968) ................................................................................................... 16, 18

*Puyallup Tribe, Inc. v. Dep't of Game of State of Wash.,*
   433 U.S. 165 (1977) ...........................................................................................................17

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
   490 U.S. 477 (1989) .............................................................................................................2

*State v. McCormack,*
   812 P.2d 483 (Wash. 1991) ..............................................................................................19

*State v. Wagner,*
   524 P.3d 564 (Or. App. 2022) ..........................................................................................19

*Thiebaut v. Colorado Springs Utilities,*
   455 Fed. Appx. 795 (10th Cir. 2011) ...............................................................................8

*Town of Chester, N.Y. v. Laroe Estates, Inc.,*
   581 U.S. 433 (2017) .............................................................................................................8

*United States v. Ballard,*
   No. 24-CV-0626-CVE-SH, 2026 WL 125927 (N.D. Okla. Jan. 16, 2026) ................... 9, 11

*United States v. Osage Wind, LLC,*
   No. 14-CV-704-GKF-JFJ, 2021 WL 377468 (N.D. Okla. Aug. 25, 2021) ..........................5

*United States v. Washington,*
   157 F.3d 630 (9th Cir. 1998) .............................................................................................6

*United States v. Washington,*
   853 F.3d 946 (9th Cir. 2017) .............................................................................................7

*United States v. Williams,*
   898 F.2d 727 (9th Cir. 1990) ...........................................................................................19

*Ute Indian Tribe of the Uintah & Ouray Reservation v. Lawrence,*
    22 F.4th 892 (10th Cir. 2022)................................................................................11

*Vendo Co. v. Lektro-Vend Corp.,*
    433 U.S. 623 (1977) ................................................................................10

*Virginia Office for Prot. & Advocacy v. Stewart,*
    563 U.S. 247 (2011) ................................................................................2

*W. Mohegan Tribe & Nation v. Orange Cnty.,*
    395 F.3d 18 (2d Cir. 2004) ................................................................................4

*White Mountain Apache Tribe v. Bracker,*
    448 U.S. 136 (1980) ................................................................................13, 16

*Wolfchild v. Redwood Cnty.,*
    91 F. Supp. 3d 1093 (D. Minn. 2015), *aff'd,* 824 F.3d 761 (8th Cir. 2016) ...........................5

*Yankton Sioux Tribe v. United States,*
    272 U.S. 351 (1926) ................................................................................5

*Younger v. Harris,*
    401 U.S. 37 (1971) ................................................................................9, 11

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................................2, 19

Fed. R. Civ. P. 12(b)(6) ................................................................................2, 19

**Other Authorities**

2025 OK AG 19 ................................................................................14

Defendants Wade Free, Nels Rodefeld, Nathan Erdman, J. Kevin Stitt, and Russell Cochran, all sued in their official capacities as officers of the State of Oklahoma (collectively, the "State"), file this Joint Reply Brief in Support of their Motion to Dismiss ("Motion") (Doc. 47).

## INTRODUCTION

In their Response (Doc. 66), Plaintiff Nations make explicit what their Complaint and Motion for Preliminary Injunction implied: they seek to wholly supplant the State's regulatory authority and jurisdiction over wildlife conservation activities in eastern Oklahoma. They insist that land ownership and possession is irrelevant. Doc. 66, at 3 n.3, 4 (suggesting that the Nations respect the rights of owners to "exclude others," but failing to recognize that the referenced portions of the Complaint refer only to "private" landowners, not the State). They contend there is "no 'important state interest'" in wildlife conservation. *Id.* at 7-8. They ask this Court to rewrite treaties that are completely silent on hunting and fishing to grant sweeping tribal rights untethered to land ownership or possession—a broader reading than courts have given to any treaties elsewhere in the United States (even those expressly granting usufructuary rights). *Id.* at 24-31. They seek to have this Court ignore more than 100 years of history, arguing that upending the State's exercise of police power over hunting and fishing within its borders since statehood would not be "disruptive." *Id.* at 15. And, after initially hitching their legal arguments to the U.S. Supreme Court's decision in *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983), which involved virtually all trust lands rather than fee lands (as in eastern Oklahoma), the Nations now retreat, asking this Court only to "rely on the principles *Mescalero Apache* affirms, ***not its facts***." *Id.* at 43 (emphasis added).

When the United States entered into treaties with each of the three Nations in the 1800s granting to them land in what would later become Oklahoma, which allowed the tribes to uniquely possess the lands in fee but were silent as to hunting or fishing, no implied rights were created independent of such ownership and possession. And since the early 1900s, and for more than 100

1

years, the State of Oklahoma, Oklahoma's tribes, and buyers and sellers of fee land in eastern Oklahoma—Indian and non-Indian alike—have understood what should be obvious: the alienation of those lands also conveyed with them any hunting and fishing rights appurtenant thereto. The Nations' attempt here to reclaim a long-abandoned special right to hunt and fish on alienated fee lands free of State regulation is the functional equivalent of a quiet title action barred by sovereign immunity and equitable principles, including laches, and otherwise without merit. For the reasons set forth in the State's Motion and herein, the Nations' claims are barred and/or their request for relief is contrary to law, and the Complaint should be dismissed in its entirety under Rules 12(b)(1) and 12(b)(6).

## ARGUMENT AND AUTHORITIES

## I.    THIS SUIT IS BARRED BY SOVEREIGN IMMUNITY.

In response to the State's contention that the Nations' suit is barred by sovereign immunity because it "seeks to divest the State of all regulatory power over" fee lands in nearly half of Oklahoma under *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 289 (1997), the Nations incorrectly respond that *Coeur d'Alene* is no longer controlling. *See Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 257 (2011) (continuing to recognize the viability of *Coeur d'Alene* where a suit is the functional equivalent of a quiet title action). And while the Supreme Court has since made clear that *Coeur d'Alene* is a "narrow exception" to *Ex parte Young*, 209 U.S. 123 (1908), lower courts "must follow its precedent that has 'direct application in a case' even if it 'appears to rest on reasons rejected in some other line of decisions'" and "should not infer anything from dicta or silence." *Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 889 (11th Cir. 2024) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)). Indeed, where as here the plaintiff is a federally recognized tribe, the suit is "especially troubling" in its impact on state sovereignty. *Lacano Investments, LLC v. Balash*, 765 F.3d 1068, 1075 (9th Cir. 2014) (quoting *Coeur d'Alene*, 521 U.S. at 282).

Applying the "functional equivalent" test of *Coeur d'Alene* requires the Court to compare the relief sought by plaintiffs to a quiet title action. *Lacano*, 765 F.3d at 1074; *see also Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1048 (9th Cir. 2000) ("[T]he question posed by *Coeur d'Alene* is not whether a suit implicates a core area of sovereignty, but rather whether the relief requested would be so much of a *divestiture* of the state's sovereignty as to render the suit as one *against the state itself*." (emphasis in original)). The purpose of a "quiet title action is to determine the actual owner of a property and put any adverse claims to rest." *Amoorpour Tr. of Amoorpour Family Tr. v. Kirkham*, 2023 OK 120, ¶ 38, 543 P.3d 677, 685. This suit seeks declaratory and injunctive relief that would prohibit the State from "applying or enforcing state fish and game laws and regulations" against Indians in eastern Oklahoma. Doc. 2 at 56-57. Thus, as to fee lands, long ago alienated and which are not held by or in trust for the tribes, the Nations claim to hold a superior right of ownership—one that supersedes even the right of the State to impose regulatory restrictions on access to or use of lands it owns, leases, or manages by Indians, including non-member Indians. Although the focus on this suit is the regulation of hunting and fishing, the Nations offer no limiting principle to their sweeping theory derived from implied rights. *See* Doc. 2, ¶¶ 27-49 (emphasizing the "extraordinary breadth" of their treaty rights, particularly as to "self-government and jurisdiction over all persons and property").

The Nations contend that this suit is not the functional equivalent of a quiet title action because they "respect owners' rights to exclude others," *i.e.*, they purport to exercise their treaty rights only with the landowner's consent. Doc. 66 at 4. But if tribe members "have a right to hunt on private lands, they cannot be limited to hunting on only those private lands whose owners consent," and "the issue of consent is a red herring." *See Mille Lacs Band of Chippewa Indians v. State of Minn.*, 952 F. Supp. 1362, 1378 (D. Minn. 1997), *aff'd,* 124 F.3d 904 (8th Cir. 1997), *aff'd sub nom. Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) (quoting *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wis.*, 740 F. Supp. 1400, 1420 (W.D. Wis. 1990), an earlier related decision). Indeed,

as the district court in *Mille Lacs Band* held, "the treaty rights at issue … may only be exercised on lands, public or private, open to the general public for hunting, fishing and gathering by operation of state law." *Id*. In other words, the Nations' claimed treaty rights, if conditioned on "consent," are not really "exclusive" treaty rights at all.

Thus, this argument regarding consent is a red herring and proves the inverse. What the Nations effectively seek is to strip the State of its own jurisdiction to enforce State laws on lands made open to the public by the State, including those it owns, leases, or co-manages with the federal government—just as the tribe did in *Coeur d'Alene*. Indeed, the Nations reject even the Oklahoma Attorney General's conclusion that the State is permitted to exercise regulatory authority over Indians hunting and fishing on ***State lands***. If the State is divested of regulatory authority to require licenses and State hunter training, regulate the size and type of harvests, establish hunting seasons, prevent baiting, require that harvests be reported to the State, and restrict the weapons that can be used to hunt, that is tantamount to a loss of title or possession on such fee lands. *See, e.g.*, *W. Mohegan Tribe & Nation v. Orange Cnty.*, 395 F.3d 18, 23 (2d Cir. 2004) (holding that a tribe's claim of hunting and fishing rights exclusive of State jurisdiction was "fundamentally inconsistent with the State of New York's exercise of fee title over the contested areas."). Certainly, the State manages wildlife in the public trust, and the Nations do not argue otherwise. So, this suit, if successful, would effectively divest the State of its police power in half of Oklahoma as in *Coeur d'Alene*—the functional equivalent of a quiet title action, which is not authorized by the *Ex parte Young* fiction.

## II.    THE NATIONS' CENTURY-LONG ACQUIESCENCE TO STATE AUTHORITY BARS THE RELIEF THEY NOW SEEK UNDER EQUITABLE PRINCIPLES SUCH AS LACHES PURSUANT TO *SHERRILL*.

The U.S. Supreme Court's seminal holding in *City of Sherrill, New York v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), "is not narrowly limited to claims identical to that brought by the [tribe], seeking a revival of sovereignty, but rather, … these equitable defenses apply to 'disruptive'

Indian land claims more generally." *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 274 (2d Cir. 2005). It cannot be seriously disputed that the Nations' claims here would be highly disruptive— notwithstanding their conclusory assertions otherwise—as they expressly seek to reclaim long-alienated fee lands and deprive Oklahoma of regulatory jurisdiction that the State has validly exercised over hunting and fishing within its borders since statehood.

In *Cayuga Indian Nation*, the Court held that a "possessory land claim," such as this one, should be dismissed as barred by laches under the *Sherrill* framework, in consideration of factors such as the following:

> [1] "[G]enerations have passed during which non-Indians have owned and developed the area that once composed the Tribe's historic reservation," [2] "at least since the middle years of the 19th century, most of the [Tribe] have resided elsewhere," [3] "the longstanding, distinctly non-Indian character of the area and its inhabitants," [4] "the distance from 1805 to the present day," [5] "the [Tribe's] long delay in seeking equitable relief against New York or its local units," and [6] "developments in [the area] spanning several generations."

413 F.3d 274 (quoting *Sherrill*, 544 U.S. at 202-03, 218-21); *see also Yankton Sioux Tribe v. United States*, 272 U.S. 351, 357 (1926) ("It is impossible ... to rescind the cession and restore the Indians to their former rights because the lands have been opened to settlement and large portions of them are now in the possession of innumerable innocent purchasers ....")); *Wolfchild v. Redwood Cnty.*, 91 F. Supp. 3d 1093, 1103 (D. Minn. 2015), *aff'd,* 824 F.3d 761 (8th Cir. 2016) (finding tribe's claims to be equitably barred under *Sherrill* and its principle that "'standards of federal Indian law and federal equity practice' preclude the Tribe from rekindling embers of sovereignty that long ago grew cold").

In their Response, the Nations essentially acknowledge the existence of the first two factors critical to the *Sherrill*/laches analysis established by the Court in *United States v. Osage Wind, LLC*, No. 14-CV-704-GKF-JFJ, 2021 WL 3774685, at *12 (N.D. Okla. Aug. 25, 2021), and challenge only the third element—the length of delay. *See* Doc. 66 at 12-14. According to the Nations, they did not delay in bringing suit because: (1) the U.S. Supreme Court's decision in *McGirt v. Oklahoma*, 591 U.S. 894

(2020), was only issued in 2020; and (2) the State did not claim the right to exercise jurisdiction over hunting and fishing by Indians until October 2025. Neither position is credible.

First, *McGirt* addressed only whether the State was properly exercising criminal jurisdiction over major crimes committed in Indian country. It said nothing about the State's exercise of regulatory jurisdiction over hunting and fishing. Second, the Nations consented to such regulatory jurisdiction since statehood—as evidenced by several of the affidavits submitted by tribal members in support of their request for injunctive relief confirming that, until recently, they obtained State licenses to hunt or fish beyond trust lands (*see, e.g.*, Docs. 3-9 and 3-10). And the Nations themselves recognized the State's authority to require licenses, as evidenced by the Cherokee code (*see* Doc. 46-7 at 4), and compacts entered between the State and various of the Nations, whereby the Nations agreed to purchase discounted State licenses for their members (*see* Doc. 46 at 11 n.5). It is only the conduct of the tribes and tribal members that has changed, and therefore, the Nations' reliance on *McGirt* to suggest that it is the State that recently altered its legal position, or to preclude the application of *Sherrill*, is entirely without merit.

Alternatively, the Nations argue that laches is inapplicable to claims based upon treaty rights. Doc. 66 at 13. But to the extent the Nations rely on cases such as *United States v. Washington*, 157 F.3d 630 (9th Cir. 1998), which included specific treaty language preserving the rights of a tribe to fish at "usual and accustomed" locations, such authority is easily distinguished. Here, there is no specific grant of hunting and fishing rights found in any of the treaties. Any implied rights are necessarily tied to occupancy and possession. On this point, the case of *Ottawa Tribe of Oklahoma v. Ohio Dep't of Nat. Res.*, 541 F. Supp. 2d 971 (N.D. Ohio 2008), *aff'd sub nom. Ottawa Tribe of Oklahoma v. Logan*, 577 F.3d 634 (6th Cir. 2009), is particularly instructive. There, the Ottawa Tribe sought to "reclaim" hunting and fishing rights in Ohio, exclusive of state regulation or jurisdiction, that they had not sought to exercise for more than one hundred years. The Court held that laches barred the tribe's claims,

primarily because of "the disruption of settled expectations of both private and public land owners."

> Ninety-five percent of Ohio's land is privately owned, leaving only five percent potentially available for hunting and inland fishing by Plaintiff. This remaining land is owned and operated by various state agencies and organizations, municipalities, and townships. Public lands operated by [the State] include state parks and wildlife refuges throughout northern Ohio (the area covered by the applicable treaties). These state parks receive more than ten million visitors per year and contribute more than $290 million to the state treasury. Allowing Plaintiff to hunt and fish within these public lands would create a significant disruption for visitors to the state parks and would interfere with the integrity of wildlife management. Hunting on state land could pose a serious threat of injury to other recreational users. State parks and wildlife refuges now remain as one of the only sustainable habitats for Ohio's wild animals. Unregulated hunting and fishing would clearly interfere and perhaps cause irreversible disruption of this habitat, which has been carefully and systematically designed and managed. Allowing hunting on these lands after years of development would prejudice Defendant.

*Id.* at 978–79. The same logic and practical concerns apply here. Allowing the Nations to assert ancient, implied treaty rights without temporal limitation would create administrative chaos for the State and interfere with Oklahoma's regulatory authority over natural resources and public safety. *Sherrill* clearly demonstrates that equitable limitations apply to Indian claims when specific circumstances warrant, and this Court retains equity jurisdiction to prevent unjust outcomes based on long delay and changed conditions. Indeed, the only post-*Sherrill* case cited by the Nations in support of their theory that claimed treaty rights are not subject to laches turned on the fact that, unlike in *Sherrill*, the tribes' claims in Washington did not involve "the revival of disputes or claims that have long been left dormant," because "Washington and the Tribes have been in a more or less continuous state of conflict over treaty-based fishing rights for over one hundred years." *See United States v. Washington*, 853 F.3d 946, 968 (9th Cir. 2017). That is certainly not the case in the instant dispute, where the Nations acquiesced to State regulation for over one hundred years in Oklahoma.

In consideration of all the facts here, the Court should find that the Nations are barred by equitable principles from now claiming, after decades of acquiescence, that Oklahoma's wildlife conservation laws do not apply to tribal members on fee lands.

### III.    THE NATIONS LACK STANDING TO ASSERT CLAIMS ON BEHALF OF NON-PLAINTIFF TRIBES AND/OR NON-MEMBER INDIANS.

The Nations' standing argument here misses the mark. "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). Because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case," the Tenth Circuit has made clear that "a federal court can't 'assume' a plaintiff has demonstrated Article III standing in order to proceed to the merits of the underlying claim, regardless of the claim's significance." *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 543-44 (10th Cir. 2016). Yet, that is what the Nations argue here. *See* Doc. 66 at 10 n.10. They ask the Court to ignore their lack of standing to assert claims as to hunting by their tribal members on the lands of non-Plaintiff tribes and on behalf of non-member Indians hunting on their lands. But the Court must reject this invitation and apply the law.

The U.S. Supreme Court has made clear that "standing is not dispensed in gross," and instead, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (holding that this same principle applies where there are multiple plaintiffs); *see also Thiebaut v. Colorado Springs Utilities*, 455 Fed. Appx. 795, 802 (10th Cir. 2011) (unpublished) (rejecting a plaintiff's invitation to adopt a "standing for one is standing for all" theory). And, "[e]ach plaintiff must have standing to seek each form of relief in each claim." *Am. Humanist Ass'n, Inc. v. Douglas Cnty. Sch. Dist. RE-1*, 859 F.3d 1243, 1250 (10th Cir. 2017). Thus, the question is not whether the Nations have standing to assert some claims here, which is not in dispute, but whether they have standing as to each claim for relief, including those that purport to seek relief on behalf of non-plaintiff tribes or non-member Indians.

In their response, the Nations seek to obscure the breadth of the requested relief, Doc. 66 at 10 n.10. But this limitation is inconsistent with their Complaint. *See* Doc. 2, at 57 (seeking an injunction against the State from enforcing its laws and regulations "against Plaintiff Nations'

members hunting, fishing, and gathering on Plaintiff Nations' Reservations under the laws of Plaintiff Nations, *including Plaintiff Nations' members doing so under the Reciprocity Agreement*," or "against Plaintiff Nations' members *and all other Indians* hunting, fishing, and gathering on Plaintiff Nations' Reservations…") (emphasis added). Further, the inter-tribal Reciprocity Agreement cannot confer standing upon the Nations that does not otherwise exist, as the State is not a party to it, and there can be no case or controversy between the State and the Nations as to an agreement to which the State is not a party and cannot be bound.

If, as they suggest in their Response, the Nations do not seek to assert claims for, or obtain relief on behalf of, other non-Plaintiff tribes (or involving those tribes' Indian country) and/or as *parens patriae* on behalf of any non-member Indians, then the Court's decision on the question of standing should be easy, and it should make clear that no such claims or requests for relief will be part of this action moving forward.

## IV.     THE COURT CANNOT ENJOIN ONGOING STATE PROSECUTIONS OF TRIBAL MEMBERS UNDER THE YOUNGER ABSTENTION DOCTRINE AND THE ANTI-INJUNCTION ACT.

The Nations' Response regarding *Younger* abstention, beyond invoking self-governance and treaties in name only, fails to identify any unique interest that "could not be interposed as defenses in state court" by tribal members. *D.L. v. Unified Sch. Dist. No. 497*, 392 F.3d 1223, 1229 (10th Cir. 2004).[1] The important interest advanced by the State here, and ignored by the Nations, is the uniform

---

[1] Since the State filed its Motion to Dismiss, this Court issued a ruling in *United States v. Ballard*, No. 24-CV-0626-CVE-SH, 2026 WL 125927 (N.D. Okla. Jan. 16, 2026), rejecting the arguments of a state district attorney that the claims of a tribe—in an action originally brought by the United States—were barred under *Younger v. Harris*, 401 U.S. 37 (1971). The Court found that the district attorney failed to show "that the state courts provide an adequate forum for the issues raised in plaintiffs' complaints," in significant part because "[t]he interests of criminal defendants seeking to avoid punishment from a criminal charge and the interests of sovereign entities seeking to prevent unwarranted intrusion on their authority over their citizens have no obvious similarity." *Id.* at *7. The interests at play in the instant case—the regulatory enforcement of the State's hunting and fishing laws, which have but a minor criminal law element—are different in form when compared to the wide range of potential non-major crimes at play in *Ballard*.

enforcement of the State's wildlife laws and regulations, which is a core exercise of the police power essential for public health, safety, and equitable resource management. *See Baldwin v. Fish & Game Comm'n of Montana*, 436 U.S. 371, 391 (1978) ("[P]rotection of the wild life of the State is peculiarly within the police power, and the State has great latitude in determining what means are appropriate for its protection.") (citation omitted). "A violation of a state statute is an injury to the State and its citizens." *Indep. Sch. Dist. No. 9 of Tulsa Cnty. v. Glass*, 1982 OK 2, ¶ 10, 639 P.2d 1233, 1237. By contrast, the lone "interest" the Nations apparently seek to protect and advance by enjoining the state court proceedings is an asserted right of tribal members to hunt on non-trust lands without obtaining a State license or otherwise complying with State law (whether under claimed implied treaty rights or sovereignty interests). The Nations make no attempt to allege the State is intruding on their authority over tribal members—only that the State apparently has no similar authority. That is not a unique interest of the Nations, and there is no reason why it cannot be raised by the tribal member—as the criminal defendants did in *McGirt* and *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022).

As to the Anti-Injunction Act ("AIA"), its language preventing district courts from "grant[ing] an injunction to stay proceedings in a State court," 28 U.S.C. § 2283, is clear. The AIA "is an absolute prohibition against any injunction of any state-court proceedings, unless the injunction falls within one of the three specifically defined exceptions in the Act" and is designed "to forestall the inevitable friction between the state and federal courts that ensues from the injunction of state judicial proceedings by a federal court." *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 630 (1977). And its exceptions are to be narrowly construed and "not [to] be enlarged by loose statutory construction." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146 (1988).

In their response, the Nations contend that 28 U.S.C. § 1362 creates an absolute exception to application of the AIA for claims brought by an Indian tribe. However, this position has been rejected by the Tenth Circuit. *See Cheyenne & Arapaho Tribes v. First Bank & Tr. Co.*, 560 Fed. Appx. 699, 706

(10th Cir. 2014) (unpublished) (holding that "§ 1362 does not constitute an express Congressional exception to the AIA"); *see also Oglala Sioux Tribe v. C & W Enterprises, Inc.*, 607 F. Supp. 2d 1069, 1074 (D.S.D. 2009) (holding that 1362 "give[s] the court jurisdiction over certain cases, but do[es] not empower the court to grant particular relief" and, accordingly, does not provide for an exception to the AIA in a claim brought by an Indian tribe). Indeed, the Court in *Cheyenne & Arapaho* specifically refused to apply the case from New York that was cited by the Nations, *Cayuga Indian Nation v. Fox*, 544 F. Supp. 542, 551 n.5 (N.D.N.Y. 1982). *See* Doc. 66 at 10.

Further, while the AIA has been held inapplicable where the United States brings an action on behalf of an Indian tribe, the United States is not a party here, and the Tenth Circuit has refused to adopt a *per se* rule that the AIA is inapplicable to all suits brought by Indian tribes. *See Ute Indian Tribe of the Uintah & Ouray Reservation v. Lawrence*, 22 F.4th 892, 910 n.22 (10th Cir. 2022); *see also Ballard*, 2026 WL 125927, at *8 (recognizing that "[t]he Tenth Circuit has left open the question of whether there is an exemption to the AIA that would generally allow Indian tribes to sue to enjoin state court proceedings without the presence of the United States in the same lawsuit"). And, the AIA has been held to apply where "[t]he claims in the two cases are intimately linked, albeit not identical [because] the identicality of claims or parties is not the touchstone of the Act." *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 805 (9th Cir. 2002), *as amended on denial of reh'g* (May 15, 2002).

A federal district court can refuse to entertain jurisdiction over a claim seeking to enjoin a state court proceeding under either the AIA or *Younger. See Pueblo of Pojoaque v. Biedscheid*, 689 F. Supp. 3d 1033, 1124-33 (D.N.M. 2023). The State does not contend that either doctrine compels the Court to dismiss the Nations' claims in whole. However, they do stand as a barrier to this Court granting relief to enjoin or stay ongoing state prosecutions of tribal members for violations of the State's wildlife code and regulations, such as those against Robertson and Shepherd that are the subject of the Nations' Complaint. As to that specific request for injunctive relief, the State is entitled to dismissal.

## V.       THE NATIONS FAIL TO STATE A PLAUSIBLE CLAIM FOR RELIEF.

Even if the Court finds that the Nations' Complaint is proper and not subject to dismissal on the above grounds, the Nations have not stated, and cannot state, a claim upon which relief may be granted. At least since statehood, "Indian country has been part of the territory of Oklahoma," and Oklahoma does not "need a permission slip from Congress" to exercise its sovereign authority within Indian country. *Castro-Huerta*, 597 U.S. at 653-54. During the January 8, 2026, status conference, the Court boiled this dispute down to a fundamental question:

> *Why would the definition of Indian Country in 1151 … apply to the Supreme Court civil precedent that has been around at least 50 years dealing with geographic limits within a reservation dealing with hunting and fishing rights*?

Doc. 65 at 12:20-25, 13:8-22 (emphasis added). But the Nations sidestep the question in their filings. This is unsurprising, as their legal theory finds no support in *McGirt* or the definition of "Indian country." Indeed, even the majority in *McGirt* expressly recognized that the "only question before us … concerns the statutory definition of 'Indian country' as it applies in federal criminal law under the MCA," and "**nothing requires other civil statutes or regulations to rely on definitions found in the criminal law**." 591 U.S. at 935 (emphasis added). The Nations have failed to identify any legal basis for the Court to conclude that the State's jurisdiction over hunting and fishing on fee lands in eastern Oklahoma turns on the definition of Indian country under the MCA.

And ignoring differences in land ownership and possession is essential to the Nations' arguments here, which rely on asking the Court to apply "principles" from cases involving trust lands to the fee lands at issue here.[2] Doc. 66 at 24-31. In doing so, the Nations ask the Court to rewrite— not interpret or enforce—their ancient treaties to craft an implied and *exclusive* right to hunt and fish that displaces the State's regulatory jurisdiction. But even the Nations appear to, at least implicitly,

---

[2] The Nations' arguments would be much more compelling as to trust lands in eastern Oklahoma, but the State does not seek to enforce its wildlife laws and regulations on trust lands.

concede that land ownership and possession are important considerations—as they admit the implied treaty rights they ask the Court to create must be somewhat reflective of current-day ownership. For example, the Nations contend that these implied treaty rights, although allegedly superior to the State's interests, are limited by and subject to the consent of private landowners (Doc. 66 at 4, 38-39; Doc. 2, ¶¶ 61, 80). This position is flatly inconsistent with the "exclusive" treaty rights they ask the Court to find here. *See Mille Lacs Band*, 952 F. Supp. at 1378 (holding that usufructuary treaty rights could be exercised only on public or private lands "open to the general public for hunting, fishing and gathering by operation of state law"). The Nations likewise concede that they lack any legal basis "to regulate non-Indian hunting, fishing, and gathering" within Indian country (Doc. 3 at 13 n.16)—a result dictated by *Montana v. United States*, 450 U.S. 544, 557-67 (1981) (holding that tribes have no authority "to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers"). That the Nations do not claim a right to regulate non-Indians confirms their understanding that alienation impacts jurisdiction.[3] For his part, even the Attorney General, who purported to perform a *Bracker* balancing test (though in an extraordinarily conclusory fashion without the benefit of the factual record the Court has here), recognized the important role land ownership plays in the jurisdictional analysis, concluding that "[t]he State's interests are likely sufficiently strong on its own land to permit enforcement of the Wildlife Code against any person hunting or fishing there, including Indians."

---

[3] The Nations' arguments based on *Mescalero Apache* are in tension with this result, requiring them to concede that they rely heavily on it only for its "principles," but not its facts (Doc. 66 at 43). In *Mescalero Apache*, the Court held that <u>only</u> the tribe—and not New Mexico—had regulatory and enforcement authority over hunting and fishing on the tribe's reservation, by both Indians and non-Indians. *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 337-44 (1983). But that holding was driven by the facts, and critically, the fact that the tribe owned over 99% of the lands where such hunting and fishing was taking place—thus, distinguishing it from *Montana*. *Id.* at 330-31. And the Nations' insistence that the facts are irrelevant is telling—as is their concession that they lack the authority here to seek to enjoin State jurisdiction over hunting and fishing by non-Indians. Put simply, *Mescalero Apache* does not even address alienated fee lands, let alone stand for the legal principle that tribe members are granted a special right to hunt and fish free of state regulation on lands which are no longer owned by, or held in trust for, the tribe.

2025 OK AG 19, ¶ 3 n.2.[4]

The Nations' request to have the Court rewrite their treaties to create hunting and fishing rights untethered to land ownership conflicts with the fundamental principle that Congress expresses its intentions through the actual language of the text of the law. *Castro-Huerta*, 597 U.S. at 642. In treaties, just as with all congressional acts, "the Court may not 'replace the actual text with speculation as to Congress' intent'" and must instead "'presume more modestly' that 'the legislature says what it means and means what it says.'" *Id.* (citations omitted). Indeed, the Supreme Court in *Castro-Huerta* rejected a similar treaty-based theory as is advanced by the Nations here, explaining that "admission of a State into the Union necessarily repeals the provisions of any prior statute, or of any existing treaty that is inconsistent with the State's exercise of criminal jurisdiction throughout the whole of the territory within its limits, including Indian country . . ." 597 U.S. at 654 (cleaned up) (citation omitted).

*Castro-Huerta* supplies the framework for this Court to consider preemption of State jurisdiction in Indian country, *i.e.*, "by federal law under ordinary principles of federal preemption or … when the exercise of state jurisdiction would unlawfully infringe on tribal self-government." 597 U.S. at 652–53. The Nations' Response fails to demonstrate why either of these circumstances is present here, and moreover, no implied treaty right can supplant the State's jurisdiction over hunting and fishing on fee lands in eastern Oklahoma, because: (1) hunting and fishing rights are necessarily tied to land possession and ownership, and such rights must be read in light of the subsequent alienation of reservation lands; and (2) even within Indian country, the State's enforcement of non-discriminatory laws on hunting and fishing by Indians in the interest of conservation is expressly permitted under controlling law.

---

[4] The Attorney General, however, fails to explain why the State's interests would not be equally strong on all fee lands it leases from, or regulates for the benefit of, private landowners and/or co-manages with the federal government—one of many fundamental legal errors in his analysis.

The Nations seek to avoid the question posed by the Court by focusing instead on whether their "reservations" have been diminished. Doc. 66 at 24-35. But this is a straw man argument—a position never taken by the State in its briefs and one which does not address why the definition of Indian country is applicable to the State's exercise of jurisdiction over hunting and fishing. "Whether a reservation has been disestablished or diminished depends on whether its boundaries were erased or constricted, not on who owns title to land inside the lines." *Murphy v. Royal*, 875 F.3d 896, 952 (10th Cir. 2017), *aff'd sub nom. Sharp v. Murphy*, 591 U.S. 977 (2020); *see also McGirt*, 591 U.S. at 906 (holding that 18 U.S.C. § 1151 "contemplates private land ownership within reservation boundaries," so for purposes of applying that statute, it does not "matter whether these individual parcels have passed hands to non-Indians"). The question here is not whether the outer boundaries of the Nations' "reservations" has changed but rather the extent of the State's jurisdiction over hunting and fishing within those outer boundaries. It is axiomatic that the State is permitted to exercise *some* jurisdiction. Indeed, the Supreme Court has consistently made clear that "Indian country is part of the State, not separate from the State," and "State sovereignty does not end at a reservation's border." *Castro-Huerta*, 597 U.S. at 636-37; *Nevada v. Hicks*, 533 U.S. 353, 361 (2001).

Even *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 406 (1968), at most stands for the proposition that silence as to hunting and fishing does not preclude a federal court from nevertheless concluding that the grant of ownership or possessory land rights to a tribe in a treaty also "includes the right to fish and hunt" on the granted lands. *But see Castro-Huerta*, 597 U.S. at 653–54. It does not, however, support the far broader claim that all Indian treaties silent as to hunting and fishing necessarily guarantee such rights without regard to the tribes' continued ownership or possession of the granted lands. Indeed, *Menominee* involved only tribal lands, which were still held in trust for the tribe. *See Menominee Tribe of Indians v. U.S.*, 388 F.2d 998, 1001 (Ct. Cl. 1967) (the lower court noted that after the Termination Act, which terminated federal supervision over the tribe's lands, interest in

15

the property that constituted the reservation was transferred from the government but still held in trust for the benefit of the tribe).[5]

As the State has demonstrated (Doc. 46 at 20-24; Doc. 47 at 25-27), Supreme Court precedent clearly provides that geography ***does*** matter under both prongs of the *Castro-Huerta* preemption test. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 151 (1980) ("[T]here is a significant geographical component to tribal sovereignty."). The Court has held that when treaties intend to reserve to Indian tribes hunting and fishing rights that are not tied to continued ownership or possession of the lands, they say so—expressly. For example, an 1854 treaty with the Puyallup tribe included the following express language:

> The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory … together with the privilege of hunting, gathering roots and berries, and pasturing their horses on open and unclaimed lands.

*Puyallup Tribe v. Dep't of Game of Wash.* ("*Puyallup* I"), 391 U.S. 392, 395 (1968). The Court held that the "usual and accustomed" language expressly reserved the right to fish on lands not held by, or in trust for, the tribe, but subject to Washington state regulations necessary for conservation. *Id.* at 398. And an 1837 treaty with the Chippewa tribe in Minnesota contained the following express language:

> The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied *[sic]* to the Indians, during the pleasure of the President of the United States.

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 177 (1999). The Court found that this language regarding "the territory ceded" expressly permitted tribe members to hunt and fish on lands not held in trust by, or in trust for, the tribe—exclusive of regulation by the State of Minnesota except as necessary in the interest of conservation. *Id.* at 201-04. By contrast, an 1864 treaty provided to

---

[5] The facts of *Menominee* are also unique, as it was the tribe there who argued to the Court of Claims that the tribe's right to hunt and fish free of state regulation on tribal lands had been abrogated in order to obtain financial compensation for the extinguishment of such rights from the federal government. 388 F.2d at 1000.

several tribes in Oregon, including the Klamath tribe, "… the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits." *Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 755 (1985). The Court held that this treaty language did ***not*** secure to the Klamath tribe any "special hunting and fishing rights that are independent of any ownership of land." *Id.* at 765–66.

Because the treaties with the Nations here do not mention hunting or fishing at all, they certainly cannot be read to create special hunting and fishing rights in favor of the Plaintiff Nations that are independent of any ownership or possession of the lands. And regardless, "treaty rights with respect to reservation lands ***must be read*** in light of the subsequent alienation of those lands." *Montana*, 450 U.S. at 561 (emphasis added). The Court's analysis in *Puyallup III* makes this point abundantly clear as to hunting and fishing rights—even those that may be sourced from a treaty:

> Puyallups alienated, in fee simple absolute, all but 22 acres of their 18,000-acre reservation. None of the 22 acres abuts on the Puyallup River. Neither the Tribe nor its members continue to hold Puyallup River fishing grounds for their "exclusive use." On the contrary, it is undisputed that non-Indian licensees of respondent fish in great numbers within the reservation, and under the close supervision of respondent's wardens. Although it is conceded that the State of Washington exercises civil and criminal jurisdiction within the reservation for most purposes, petitioner contends that it may not do so with respect to fishing. Again with particular reference to the facts of this case, we also reject this contention.

*Puyallup Tribe, Inc. v. Dep't of Game of State of Wash.* ("*Puyallup III*"), 433 U.S. 165, 174–75 (1977).

Finally, whatever implied rights the treaties may provide to the Nations, if any, it is undisputed that those rights remain subject to State regulation "in the interest of conservation."

> [A]n Indian tribe's treaty rights to hunt, fish, and gather on state land are not irreconcilable with a State's sovereignty over the natural resources in the State. Rather, Indian treaty rights can coexist with state management of natural resources. … Here, the 1837 Treaty gave the Chippewa the right to hunt, fish, and gather in the ceded territory free of territorial, and later state, regulation, a privilege that others did not enjoy. Today, this freedom from state regulation curtails the State's ability to regulate hunting, fishing, and gathering by the Chippewa in the ceded lands. But this Court's cases have also recognized that Indian treaty-based usufructuary rights do not guarantee the Indians 'absolute freedom' from state regulation. We have repeatedly reaffirmed state authority to impose reasonable and necessary nondiscriminatory

regulations on Indian hunting, fishing, and gathering rights in the interest of conservation.

*Mille Lacs Band*, 526 U.S. at 204–05 (citations omitted); *see also Herrera v. Wyoming*, 587 U.S. 329, 339 (2019) ("States can impose reasonable and nondiscriminatory regulations on an Indian tribe's treaty-based hunting, fishing, and gathering rights on state land when necessary for conservation."); *Puyallup I*, 391 U.S. at 398 ("But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians."). It is generally understood that State law can also address any "substantial detriment to the public safety." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wis.*, 760 F.2d 177, 183 (7th Cir. 1985).

The Nations argue that the State cannot establish the so-called "conservation necessity" standard, a test they cobble together from an assortment of district court decisions from Washington, Oregon, and Wisconsin. Doc. 66 at 22-24 & n.29. But the entire discussion misses the point. Since the Nations have failed to identify a single State wildlife law or regulation that the tribes themselves would not also apply against tribal members in Oklahoma, each of the State's laws is entitled to a presumption of validity under the conservation necessity standard. The State bears the burden of establishing the conservation standard only when it attempts to impose non-discriminatory regulations on tribal members that are *not* applicable, or would *not* be as stringent, under tribal law. For example, in the *Puyallup* cases, the State of Washington sought to regulate fishing activities by tribal members that would have been subject to no tribal regulation at all. To the contrary, here, the Nations implicitly accept that the State of Oklahoma's wildlife laws and regulations are necessary and appropriate for conservation—because they adopted those laws and regulations in whole. Such adoption by the tribes here stamps Oklahoma's laws with a "presumption of validity" and obviates the need for any further determination of conservation necessity as to any specific State law also adopted by the Nations:

> We therefore find that if an Indian tribe has enacted wildlife laws similar to the state or federal laws that are being enforced against tribe members, the tribal laws create a presumption of validity. The courts must make a finding of the validity of the use of state or federal wildlife laws against tribe members. However, there is no need for a hearing on the issue of conservation necessity if the tribe itself has enacted similar, valid laws. **Trial courts need only establish the existence of such similar laws in order to establish the validity of the state or federal laws.**

*United States v. Williams*, 898 F.2d 727, 729–30 (9th Cir. 1990) (emphasis added). Although it was the United States enforcing state law against a tribal member in *Williams*, Washington and Oregon have both adopted the Ninth Circuit's approach in actions brought by the State against tribal members. *See State v. McCormack*, 812 P.2d 483, 485 (Wash. 1991) (holding that "tribal enactment of a similar wildlife measure establishes that conservation is necessary even with respect to tribal activities" when considering a law of the State of Washington); *State v. Wagner*, 524 P.3d 564, 566-67 (Or. App. 2022) (holding that the conservation necessity is established "if the tribe itself has enacted similar, valid laws" to those of the State of Oregon that it is seeking to enforce against tribal members).

Considering all of the State's arguments, it is clear that the Nations fail to state a claim upon which relief can be granted. They have no treaty-based right to hunt and fish free of State regulation on alienated fee lands. And, in any event, the State is expressly permitted by controlling law to impose non-discriminatory regulations on hunting and fishing by tribal members, particularly in furtherance of conservation and public safety. Not only do the Nations here fail to show that the State's laws are not necessary or appropriate, the Nations' wholesale adoption of the State's wildlife laws entitles them to a presumption of validity and enforceability under the conservation necessity standard. Accordingly, the Nations' claims are subject to dismissal under Rule 12(b)(6).

## <u>CONCLUSION</u>

Defendants respectfully request the Court dismiss the Complaint in its entirety under Rules 12(b)(1) and 12(b)(6).

Dated: December 19, 2025

_s/ Phillip G. Whaley_
Phillip G. Whaley, OBA #13371
Grant M. Lucky, OBA #17398
Patrick R. Pearce, Jr., OBA #18802
RYAN WHALEY
400 North Walnut Avenue
Oklahoma City, OK 73104
(405) 239-6040
(405) 239-6766 FAX
pwhaley@ryanwhaley.com
glucky@ryanwhaley.com
rpearce@ryanwhaley.com

_Attorneys for Defendants_
_Wade Free, in his official capacity as Director,_
_Oklahoma Department of Wildlife Conservation_
_Nels Rodefeld, in his official capacity as Assistant_
_Director, Oklahoma Department of Wildlife_
_Conservation_
_Nathan Erdman, in his official capacity as Chief_
_of Law Enforcement Division, Oklahoma_
_Department of Wildlife Conservation_

_s/ Audrey A. Weaver_
_(Signed by Filing Attorney with Permission)_
Audrey A. Weaver, OBA #33258
Senior Litigation Counsel
Office of Governor J. Kevin Stitt
200 N. Lincoln Blvd., Suite 212
Oklahoma City, OK  73105
(405) 522-0425
audrey.weaver@gov.ok.gov

_Attorney for Defendants_
_J. Kevin Stitt, in his official capacity as_
_Governor of the State of Oklahoma_
_Russell Cochran, in his official capacity as_
_special prosecutor employed by the Governor_

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2026, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants.

_s/ Phillip G. Whaley_
Phillip G. Whaley