2026 WL 1336060
Only the Westlaw citation is currently available.
United States District Court, E.D. Oklahoma.

MUSCOGEE (CREEK) NATION, a
federally recognized Indian tribe, Plaintiff,

v.

CITY OF HENRYETTA,

OKLAHOMA Defendant.

25-CV-227-JAR
|
Filed 05/13/2026

**OPINION & ORDER GRANTING PRELIMINARY INJUNCTION**

United States Magistrate Judge

**\*1** Sovereignty is not a matter of preference; it is a matter of law. This case does not require the Court[1] to break new ground. It requires the Court to hold the line. In its Order (Docket No. 73) denying the City's motion to dismiss, the Court held that _Ute Indian Tribe of the Uintah and Ouray Reservation v. State of Utah_, 790 F.3d 1000 (10th Cir. 2015), _McGirt v. Oklahoma_, 591 U.S. 894 (2020), and _Hooper v. City of Tulsa_, 71 F.4th 1270 (10th Cir. 2023) leave no room for municipal prosecutions of Indians in Indian country absent congressional authorization. That holding controls. This Order enforces it. Jurisdiction does not arise because a municipality asserts it. Sovereignty does not yield to repetition. The constitutional boundaries of sovereignty are not optional. They are fixed by the Constitution, defined by Congress, and confirmed by the Supreme Court. This Court's duty is to honor them.

That conclusion rests on settled federal law. For decades, States and their political subdivisions have lacked criminal jurisdiction over Indians in "Indian country" absent congressional authorization. _McGirt v. Oklahoma_, 591 U.S. at 898 (quoting _Nesonsott v. Samuels_, 507 U.S. 99, 102–103 (1993)). The rule is neither novel nor unsettled. It has been affirmed repeatedly by the Tenth Circuit and the Supreme Court. This Court does not reopen that framework. It applies it as defined by Congress and the Supreme Court.

This case concerns a constitutional promise. The rule of law, not the rule of preference, governs the reach of every government within the United States. When Congress speaks with clarity, its voice is supreme. When the Supreme Court interprets that command, its word is binding. When a municipality, however well-intentioned, claims authority that Congress never gave, that claim fails.

It also reflects a constitutional commitment. The treaties between the United States and the Muscogee (Creek) Nation are not relics of history; they are living agreements, ratified by the Senate and protected by the Constitution. Article VI makes those treaties the supreme law of the land. That commitment did not expire with time, statehood, or convenience. Enforcing it today is not an act of politics or preference. It is an act of fidelity to this Nation's word.

The Muscogee (Creek) Nation seeks not favor, but enforcement of treaties solemnly ratified, statutes deliberately enacted, and decisions lawfully pronounced. The City of Henryetta opposes, asserting jurisdiction contrary to those authorities and invoking a theory of concurrent power the Constitution has never recognized. The question is narrow: whether any municipal subdivision of Oklahoma may prosecute an Indian, whether member or non-member, for conduct occurring within Indian country absent explicit congressional authorization.[2]

**\*2** That question was settled long before _McGirt_. _McGirt_ did not create the rule. It enforced it. Yet Henryetta persists, relying on a state-court decision, _City of Tulsa v. O'Brien_, --- P.3d ----, 2024 WL 5001684, 24 OK CR 31 (Okla. Crim. App. Dec. 5, 2024), to assert concurrent municipal jurisdiction over Indians within the Creek Reservation. That claim cannot survive the Supremacy Clause. Article VI declares that federal treaties, statutes, and controlling Supreme Court precedent are the supreme law of the land. When federal and state law conflict, state law yields.

The record before the Court is extensive. Over 250 pages of live testimony and argument were taken on October 7, 2025. (Docket No. 71 at 4-288). The witnesses included the Nation's Secretary Zechariah Harjo, Chief Richard Phillips of the Lighthorse Police, Chief of Police of the City of Coweta Michael Bell, Deputy Attorney General Geraldine Wisner, Court Administrator Kevin Dellinger, and, for the City, Police Chief Steven Norman and City Attorney John Insabella. The testimony at hearing established that the Muscogee (Creek) Nation maintains a fully funded, professionally

staffed justice system recognized by 64 jurisdictions across its Reservation. The City of Henryetta stands nearly alone in declining partnership with the Nation. Its attorney identifies no congressional authorization. Its police chief identifies no credible public-safety breakdown attributable to jurisdictional limits. Every witness testified candidly; every witness left the legal question untouched: no one pointed to an act of Congress granting the City criminal jurisdiction over Indians within the Creek Reservation.

That silence is more telling than any asserted need for concurrent authority. As the Tenth Circuit made clear in _Ute_, "invasion of tribal sovereignty can constitute irreparable injury." 790 F.3d at 1005 (quoting _Wyandotte Nation v. Sebelius_, 443 F.3d 1247, 1255 (10th Cir. 2006)). The Supreme Court held that Congress promised the Creek Reservation would endure "in perpetuity," and that Congress never clearly withdrew that promise. _McGirt_, 591 U.S. at 937.

This Order does not create new law. It enforces old promises. It reaffirms that within the geographic boundaries of the Creek Reservation, the Constitution, federal statutes, and treaties govern jurisdiction: not municipal preference, not state expedience, and not political convenience.

## I. FINDINGS OF FACT

1. The Muscogee (Creek) Nation ("the Nation") is a federally recognized Indian tribe whose Reservation encompasses approximately 5,000 square miles, and 11 counties in Northeastern Oklahoma. (Testimony of Lighthorse Police Chief Richard Phillips, Docket No. 71 at page 94, lns. 14–19).

2. The United States Supreme Court has held that the Nation's Reservation has never been disestablished and remains Indian country "in perpetuity." _McGirt_, 591 U.S. at 937.

3. The City of Henryetta is located entirely within the historical boundaries of the Nation's Reservation. (Answer of City of Henryetta, Docket No. 75 at ¶ 12).

4. The Nation operated a police force and exercised criminal jurisdiction within its Reservation prior to the Supreme Court's decision in _McGirt_. 591 U.S. at 912.

5. Since _McGirt_, the Nation has substantially increased funding for its Lighthorse Police Department, primarily through tribal revenues. (MCN Ex. 48; MCN Ex. 47;

Testimony of Secretary Zechariah Harjo, Docket No. 71 at pages 22, lns. 5-18 and page 27, lns. 7-16).

*3  6. As of 2025, Lighthorse employs approximately 127 commissioned officers and 32 civilian employees, reflecting a significant increase in personnel since July 2020. (Testimony of Chief Richard Phillips, Docket No. 71 at page 48, lns. 23-25, page 49, lns. 1-13, and page 50, lns. 1-6).

7. Lighthorse officers receive federal, state, and field training prior to independent service, including training at the Federal Law Enforcement Training Center. (Testimony of Chief Richard Phillips, Docket No. 71 at page 51, lns. 17-25, page 52, lns. 1-24).

8. Lighthorse officers enforce criminal and traffic laws within the Reservation, including issuing citations and impounding vehicles when required for public safety. (Testimony of Chief Richard Phillips, Docket No. 71 at page 71, lns. 23-25, and page 72, lns. 1-19; Testimony of Deputy Attorney General Geraldine Wisner, Docket No. 71 at page 159, lns. 10-25 and page 160, lns. 1-23).

9. The Nation has entered into cross-deputization agreements with sixty-four law enforcement agencies operating within the Reservation. (MCN Ex. 36; Testimony of Chief Richard Phillips, Docket No. 71 at page 66, lns. 1-13).

10. Under those agreements, cross-commissioned officers may investigate, detain, and arrest suspects regardless of Indian status, with prosecutions referred to the appropriate jurisdiction. (MCN Ex. 37; Testimony of Chief Richard Phillips, Docket No. 71 at page 63, lns. 20-25, page 64, lns. 1-17).

11. When a cross-commissioned agency arrests an Indian defendant, custody is transferred to Lighthorse, which generally transports the detainee to jail. (Testimony of Chief Richard Phillips, Docket No. 71 at page 68, lns. 1-13, and page 69, lns. 1-9; Declaration of Coweta Chief of Police Michael Bell, Docket No. 51 at ¶ 10).

12. Lighthorse provides personnel and equipment support to cross-deputized agencies without financial compensation. (Testimony of Chief Richard Phillips, Docket No. 71 at page 123, lns. 22-25, and page 124, lns. 1-2).

13. A municipal police department of comparable size to Henryetta's has operated under a cross-deputization

agreement with the Nation, enabling its officers to respond immediately to incidents involving Indian and non-Indian suspects and to refer cases to the appropriate prosecuting authority. (Declaration of Coweta Chief of Police Michael Bell, Docket No. 51 at ¶¶ 2-5; Testimony of Chief Bell, Docket No. 71 at pages 114-117).

14. Under that arrangement, the municipal department has relied on Lighthorse for detainee transport and additional manpower without delay or financial cost to the municipality. (Declaration of Coweta Chief of Police Michael Bell, Docket No. 51 - ¶¶ 10–11; Testimony of Chief Bell, Docket No. 71 at page 118, lns. 2-25, and page 119, lns. 1-6).

15. Under cross-deputization agreements, officers in the field are not required to determine jurisdiction at the time of arrest; instead, cases are routed to the appropriate prosecuting authority after investigation, allowing law enforcement to proceed without delay or uncertainty. (Declaration of Coweta Chief of Police Michael Bell, Docket No. 51 at ¶ 6).

16. The record reflects that Lighthorse officers respond promptly to assume custody of tribal detainees and transport them to appropriate detention facilities, often within one to two hours. (Declaration of Coweta Chief of Police Michael Bell, Docket No. 51 at ¶ 10).

*4 17. Cross-deputization increases available law enforcement personnel and resources to participating municipalities without additional cost. (Declaration of Coweta Chief of Police Michael Bell, Docket No. 51 at ¶ 11).

18. Investigations involving Indian and non-Indian suspects are coordinated between municipal and tribal authorities, with cases transferred to the appropriate jurisdiction upon confirmation of status. (Declaration of Coweta Chief of Police Michael Bell, Docket No. 51 at ¶¶ 5-6).

19. The record includes specific instances in which coordinated efforts between municipal and tribal officers resulted in the successful apprehension of suspects in serious criminal investigations. (Declaration of Coweta Chief of Police Michael Bell, Docket No. 51 at ¶ 8).

20. Under cross-deputization agreements, municipal and Lighthorse officers may arrest, detain, search, and investigate all suspects within the jurisdiction, regardless of Indian status, and refer cases to the appropriate prosecuting authority without regard to jurisdictional uncertainty. (Declaration of

Chief of Police for the City of Okmulgee Danny Owen, Docket No. 52 at ¶¶ 4, 12).

21. These cross-deputization arrangements allow officers in the field to perform their duties without concern for jurisdictional boundaries, with jurisdictional determinations addressed at the prosecution stage. (Declaration of Chief of Police for the City of Okmulgee Danny Owen, Docket No. 52 at ¶ 12).

22. The record includes specific instances in which coordinated response between municipal and Lighthorse officers resulted in the investigation and arrest of both tribal and non-tribal suspects in serious criminal incidents. (Declaration of Chief of Police for the City of Okmulgee Danny Owen, Docket No. 52 at ¶ 8).

23. Testimony establishes that cross-deputization increases available personnel and resources for law enforcement and improves response time and coordination in both routine and emergency situations. (Declaration of Chief of Police for the City of Okmulgee Danny Owen, Docket No. 52 at ¶¶ 5-7, 11).

24. Henryetta is one of only three local law enforcement agencies within the Reservation that has not entered into a cross-deputization agreement with the Nation. (MCN Ex. 36; Testimony of Chief Richard Phillips, Docket No. 71 at page 66, lns. 1-13).

25. The Nation has offered to enter into a cross-deputization agreement with Henryetta on the same terms as its agreements with other municipalities. (Testimony of Chief Richard Phillips, Docket No. 71 at page 89, lns. 2-19; Testimony of Deputy Attorney General Wisner, Docket No. 71 at page 158, lns. 17-25 and page 159, ln. 1; MCN Ex. 71).

26. The Nation's Office of the Attorney General increased from one full-time prosecutor in 2019 to thirteen full-time prosecutors by fiscal year 2026. (Testimony of Deputy Attorney General Wisner, Docket No. 71 at page 144, lns. 7-12 and page 145, lns. 11-18).

27. The Nation's District Court increased from three judges in 2020 to seven judges by 2025, with a corresponding increase in court staff. (Testimony of Court Administrator Kevin Dellinger, Docket No. 71 at page 187, lns. 23-25 and page 188, lns. 6-8).

28. The Nation's District Court currently adjudicates more than 1,000 felony cases and more than 2,200 traffic citations annually. (Testimony of Court Administrator Dellinger, Docket No. 71 at page 195, lns. 8-20 and page 197. lns. 12-14).

**\*5** 29. The Nation's courts impose incarceration, including pretrial detention and prison sentences, when necessary to protect public safety. (Testimony of Court Administrator Dellinger, Docket No. 71 at page 201, lns. 9-20, and page 202, lns. 13-22).

30. Defendants in the Nation's District Court are provided appointed counsel, and local law enforcement officers routinely testify in those proceedings. (Testimony of Court Administrator Dellinger, Docket No. 71 at page 189, lns. 20-25).

31. The Nation's criminal code incorporates state and local law, such that substantially the same criminal prohibitions apply to Indians within Henryetta as apply to non-Indians. (Testimony of Deputy Attorney General Geraldine Wisner, Docket No. 71 at page 159, lns. 10-25, and page 160, lns. 1-23).

32. Following *McGirt*, the City of Henryetta issued citations and prosecutes both Muscogee (Creek) citizens and non-member Indians within the Reservation and intends to continue to do so. (Testimony of City Attorney John Insabella, Docket No. 71 at page 208, lns. 18-25, page 209, lns. 1-25, and page 210, lns. 1-3).

33. City Attorney John Insabella testified that under *O'Brien* the City has a good faith belief it holds concurrent jurisdiction to prosecute non-member Indians for minor offenses. (Testimony of City Attorney John Insabella, Docket No. 71 at page 212, lns. 4-8).

34. The parties stipulated that, while the Nation's Motion for Preliminary Injunction remains pending, or until further order of the Court, the City of Henryetta will not prosecute in its municipal courts enrolled members of the Nation, nor refer such individuals for prosecution in state court. (Docket No. 65).

35. The parties further stipulated that, through October 7, 2025, the City would not prosecute in its municipal courts enrolled members of federally recognized tribes who are not members of the Nation, nor refer such individuals for prosecution in state court. (Docket No. 65).

36. The City Attorney stated in his declaration that the City does not prosecute members of the Nation in municipal court and has exercised prosecutorial discretion to dismiss pending citations against such individuals, while intending to continue prosecutions of non-member Indians. (Declaration of John Insabella, Docket No. 41, Exhibit 2 at ¶¶ 2, 5).

37. The City Attorney stated in his declaration that the City intends to continue prosecuting non-member Indians and that its asserted authority rests on its interpretation of *O'Brien, McGirt*, and *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022), not on any identified act of Congress. (Declaration of John Insabella, Docket No. 41, Exhibit 2 at ¶ 4).

## II. LEGAL STANDARD FOR PRELIMINARY INJUNCTION

Federal courts apply the familiar four-factor test when considering a motion for preliminary injunction:

> (1) that it has a substantial likelihood of prevailing on the merits;
>
> (2) that it will suffer irreparable harm unless the preliminary injunction is issued;
>
> (3) that the threatened injury outweighs the harm the preliminary injunction might cause the opposing party; and
>
> (4) that the preliminary injunction if issued will not adversely affect the public interest.

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001). The third and fourth factors "merge" when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A preliminary injunction is "an extraordinary remedy, the right to relief must be clear and unequivocal." *Dominion Video Satellite. Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004).

**\*6** The City argues that the requested injunction would alter the status quo. In this Circuit, the status quo is defined "by the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1100 (10th Cir. 1991),

*overruled on other grounds*, 23 F.4th 1262 (10th Cir. 2022). Under that definition, the City's ongoing prosecutions are part of the existing relationship between the parties. The Court therefore assumes, without deciding, that the requested injunction would alter the status quo and is disfavored. Disfavored injunctions require a strong showing on likelihood of success and the balance of harms. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quoting *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016)). That assumption does not alter the outcome. The Nation meets that heightened standard for the reasons that follow.

This Court's equitable authority is well settled. When a government actor invades the sovereignty of a federally recognized Tribe, that invasion itself constitutes irreparable harm and justifies injunctive relief. *Ute*, 790 F.3d at 1005–06 (quoting *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006)). The Tenth Circuit has repeatedly recognized that no monetary or retrospective remedy can repair the constitutional injury that results when a local government exercises power Congress has withheld. *Id*.

Accordingly, the Court now turns to the merits. First, the Nation's likelihood of success, then the remaining equitable factors.

## III. ANALYSIS

### A LIKELIHOOD OF SUCCESS ON THE MERITS

The Nation is likely to succeed on the merits because Congress, not Oklahoma or its municipalities, defines criminal jurisdiction in Indian country. *See generally Ute*, 790 F.3d 1000; *McGirt*, 591 U.S. 894; *Hooper*, 71 F.4th 1270. Taken together, those decisions establish that absent clear congressional authorization, neither Oklahoma nor its political subdivisions may prosecute Indians for conduct committed within reservation boundaries. The City identifies no such authorization because none exists. City Attorney John Insabella testified that the City's assertion of jurisdiction rests on its interpretation of *O'Brien* and not on any identified statute or act of Congress.

This rule did not begin with *McGirt*. For more than half a century, the Supreme Court has held that once Congress establishes a reservation, it remains intact until Congress clearly says otherwise. *Solem v. Bartlett*, 465 U.S. 463, 470 (1984). Historical practice, population shifts, and local

custom cannot substitute for congressional action. *Nebraska v. Parker*, 577 U.S. 481, 493 (2016). Nor did allotment or the transfer of individual parcels dissolve reservation status. *Mattz v. Arnett*, 412 U.S. 481, 497 (1973); *Seymour v. Superintendent*, 368 U.S. 351, 356–58 (1962) *McGirt* did not create these principles. It enforced them.

Nor did this principle originate with the Major Crimes Act. *McGirt* itself traced the doctrine to *Ex parte Crow Dog*, where the Supreme Court recognized that criminal jurisdiction over Indians in Indian country had, "from the beginning," been governed by federal treaties, statutes, and the political branches—not by unilateral assertions of state authority. *Crow Dog*, 109 U.S. 556, 572 (1883); *McGirt*, 591 **U.sj** at 929. *McGirt* did not create that rule. It reaffirmed a principle the Supreme Court has recognized for more than a century.

The same rule appears outside the Major Crimes Act context. In *Hagen v. Utah*, the Supreme Court again recognized that "Congress has not granted criminal jurisdiction to ... Utah to try crimes committed by Indians in Indian country." 510 U.S. 399, 408 (1994). The rule limiting state criminal jurisdiction over Indians is not offense-specific. It is structural.

**\*7** The record further establishes that multiple municipalities within the Reservation operate under cross-deputization agreements with the Nation, allowing officers to respond to incidents involving Indian and non-Indian suspects and refer cases to the appropriate prosecuting authority. These facts undermine the City's claim that jurisdictional limits prevent effective law enforcement. Henryetta's refusal to enter the same agreements available to other municipalities reflects a policy choice, not a legal necessity. Policy cannot create authority Congress never gave. The question before this Court is whether any municipal subdivision of Oklahoma may lawfully prosecute an Indian for conduct occurring within the Creek Reservation. The answer is found not in speculation, but in statute, treaty, and binding precedent. This case is governed by a single rule: in Indian country, criminal jurisdiction over Indians exists only where Congress has affirmatively conferred it; absent that grant, it does not. That rule does not turn on tribal membership. The absence of congressional authorization applies to Indians in Indian country—member and non-member alike.

**1. The Controlling Rule: Congress Alone Defines Jurisdiction in Indian Country**

As the Tenth Circuit held in *Ute*, unless Congress creates an exception, States possess "no authority" to prosecute Indians for offenses committed in Indian country. 790 F.3d at 1004. Against that settled framework, *McGirt* applied longstanding Supreme Court doctrine to the Creek Reservation and held that Congress never disestablished it. *McGirt v. Oklahoma*, 591 U.S. 894, 903–04 (2020). Because the Reservation remains intact, state courts "generally have no jurisdiction to try Indians for conduct committed in Indian country" absent congressional authorization. *McGirt*, 591 U.S. 894, 898 (2020) (quoting *Negonsott v. Samuels*, 507 U.S. 99, 102–03 (1993)). Nothing in this record, and nothing in any federal statute, shows Congress ever extended that criminal authority to Oklahoma municipalities. The City identifies no act of Congress comparable to Public Law 280, no express delegation of federal authority, and no statutory text granting such power. That silence is not a gap for local governments to fill. Under Article VI, it ends the inquiry.

The City's reliance on *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), is misplaced. *Cabazon* arose in California under Public Law 280, a congressional grant of criminal jurisdiction Oklahoma does not possess. See *Cabazon*, 480 U.S. at 207–12. Far from supporting the City's position, *Cabazon* reaffirmed that "tribal sovereignty is...subordinate to, only the Federal Government, not the States." *Id.* at 207 (quoting *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 154 (1980)). Where Congress has not conferred criminal jurisdiction in the first instance, neither a State nor its political subdivisions may create it through inference, practice, or policy. Henryetta cannot invoke a Public Law 280 framework to manufacture municipal criminal jurisdiction where Congress granted none.

Nor may historical practice, demographics, or longstanding local custom supply jurisdiction where Congress never conferred it. As the Supreme Court explained in *McGirt*, courts do not redraw reservation boundaries based on "historical practices and demographics," because such extratextual considerations are of only "limited interpretive value." *McGirt*, 591 U.S. at 914–15 (quoting *Nebraska v. Parker*, 577 U.S. 481, 498 (2016)). The City's reliance on decades of municipal prosecutions therefore proves only practice—not lawful authority.

**2. The Supremacy Clause Controls**

The Supremacy Clause declares that the Laws of the United States "shall be the supreme Law of the Land" *U.S. CONST. art. VI.* C1 2. When state or local law conflicts with federal statutes or treaties, the latter prevail. *McGirt* applied this command with unmistakable force: "If Congress wishes to break the proraise of a reservation, it must say so." 591 U.S. at 904. No municipal ordinance or state-court decision can amend that command.

The Supreme Court has reaffirmed that Congress's power to legislate with respect to Indian affairs is plenary and exclusive, derived from the Constitution's text and structure, and that when Congress acts within that sphere, state sovereignty yields. *Haaland v. Brackeen*, 599 U.S. 255, 273-74 (2023). Congress alone defines the jurisdictional line in Indian country. When it has not extended state power, no municipality may conjure it.

**\*8** The Tenth Amendment is residual, not generative; it reserves powers not delegated. Indian affairs were delegated to Congress through the Indian Commerce Clause, *U.S. CONST. art. I, § 8, cl. 3.* The Tenth Amendment cannot reclaim what the Constitution expressly gave away. Where Congress has spoken, the States must listen; where Congress has been silent, they must stand aside. The Constitution's silence here is not an opening; it is a boundary.

**3. The City's Reliance on *Castro-Huerta* is Misplaced**

Some have read *Castro-Huerta* to expand state power further. That reading finds no support in the text, history, or decisions of the Supreme Court or this Circuit. Henryetta relies on *Castro-Huerta* as if it rewrote the jurisdictional rule. It did not. It answered a narrow question and nothing more. *Castro-Huerta* arose from a single circumstance: whether a State may prosecute a non-Indian defendant for a crime committed against an Indian in Indian country. 597 U.S. at 632–33. The Supreme Court held that, in that limited setting, the State and the Federal Government may exercise concurrent jurisdiction. *Id.* at 638–39.

The opinion was deliberate in its boundaries. The Court repeatedly framed the case as involving a non-Indian defendant. *Id.* at 634. And it expressly declined to address the

opposite question: "This case does not involve the converse situation of a State's prosecution of crimes committed by an Indian ... We express no view on state jurisdiction over a criminal case of that kind." *Id.* at 650 n.6.

That limitation is not incidental. It is controlling. That limitation reflects the very authorities *Castro-Huerta* relied upon, each involving crimes committed by or against non-Indians—not Indian defendants. What *Castro-Huerta* decided for nonIndian defendants is the only question it answered. What it expressly reserved remains governed by existing law. Silence is not expansion. A decision that declines to reach a question does not invite a lower court to answer it.

The Supreme Court has recently cautioned that when one of its decisions employs "unusually explicit" and "aggressively limiting language," lower courts may not extend that decision beyond the precise question presented. *Shinn v. Ramirez*, 596 U.S. 366, 387-388 (2022). *Castro-Huerta* does exactly that. It repeatedly confines its holding to non-Indian defendants and expressly disclaims any view regarding state prosecution of Indian defendants. 597 U.S. at 639 n.2, 650 n.6, 655 n.9. Henryetta asks this Court to do precisely what *Shinn* forbids: extend a Supreme Court holding beyond a question the Court expressly declined to answer. What the Supreme Court expressly reserved, this Court will not infer by extension.

Henryetta's reliance on the General Crimes Act, 18 U.S.C. § 1152, fares no better. The General Crimes Act extends certain federal enclave crimes into Indian country and addresses the relationship between federal and tribal criminal jurisdiction. It does not affirmatively confer criminal jurisdiction upon the States, much less upon municipal subdivisions. *Castro-Huerta* recognized concurrent federal and state jurisdiction only in the narrow circumstance of a non-Indian defendant committing a crime against an Indian victim. 597 U.S. at 638–39. Nothing in § 1152 purports to authorize state or municipal prosecution of Indian defendants in Indian country, and nothing in *Castro-Huerta* held otherwise. To treat the General Crimes Act as an affirmative grant of municipal criminal authority would not interpret federal law; it would expand it beyond both its text and its holding.

**\*9** Nor does the opinion disturb the settled rule this Court has already applied. Binding precedent establishes that States lack criminal jurisdiction over Indians in Indian country absent congressional authorization. That rule predates *McGirt*,[3] was reaffirmed in *McGirt*, and was left untouched by *Castro-Huerta*.

Henryetta's argument depends on collapsing that distinction. It cannot. The City points to the Court's statement that "Indian country is part of the State, not separate from the State" and that "a State has jurisdiction over all of its territory, including Indian Country." *Castro-Huerta*, 597 U.S. at 636. It also relies on the Court's observation that "Indian country is part of a State's territory and that, unless preempted, States have jurisdiction over crimes committed in Indian country". *Id.* at 638. While *Castro-Huerta* emphasized that States do not require congressional authorization to exercise their general sovereign authority, that principle does not extend to criminal jurisdiction over Indians in Indian country. That general language does not displace the Court's express reservation of the Indian-defendant question. *Castro-Huerta* addressed jurisdiction over a non-Indian defendant. It did not transform territorial presence into jurisdiction over Indian persons. The State's general territorial authority does not extend to criminal jurisdiction over Indians in Indian country absent congressional authorization.

Henryetta's reading also confuses territorial sovereignty with criminal jurisdiction over Indian persons. States unquestionably retain sovereign authority over their territory, including reservation land within state boundaries. *Castro-Huerta*, 597 U.S. at 636–38. However, jurisdiction over land does not itself create jurisdiction over people. Territorial sovereignty is not self-executing criminal jurisdiction over every person within that territory. Indian tribes occupy a unique constitutional status, and jurisdiction over Indian defendants in Indian country has long been governed by treaties, federal statutes, and congressional enactments—not by generalized appeals to state sovereignty. *McGirt*, 591 U.S. at 905. *Castro-Huerta* did not erase that distinction. It recognized concurrent state authority only as to non-Indian defendants and expressly reserved the Indian-defendant question. 597 U.S. at 650 n.6. To treat general statements about state territorial sovereignty as an affirmative grant of criminal jurisdiction over Indians would elevate dicta over holding and general language over controlling precedent.

The Constitution does not permit that leap, and *Castro-Huerta* did not attempt it. Even accepting the City's premise at its highest, the argument still fails. Municipalities are subdivisions of the State. They cannot exercise jurisdiction the State itself does not possess. Even under *Castro-Huerta's* broadest language, the Supreme Court spoke in terms of state sovereignty, not municipal autonomy. Nothing in *Castro-Huerta* suggests that a political subdivision may exercise

independent criminal jurisdiction in Indian country absent authority clearly conferred by Congress. If the State lacks authority to prosecute Indians in Indian country absent congressional authorization, the City necessarily lacks it as well.

**\*10** Finally, Henryetta's reading would invert the structure the Supreme Court preserved. *Castro-Huerta* did not overrule prior precedent, and it did not expand state authority beyond the narrow circumstance before it. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997); *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016). To read it otherwise is not interpretation. It is revision.

This Court does not extend decisions beyond their holdings. It applies them as written. *Castro-Huerta* speaks to non-Indian defendants and no one else. That is where it begins. That is where it ends. To the extent Henryetta interprets *Castro-Huerta* as a license for local enforcement, that interpretation conflicts with *McGirt* and *Ute* and is therefore foreclosed by controlling Supreme Court and Tenth Circuit precedent.

### 4. *O'Brien* cannot override federal law

The City leans heavily on *O'Brien*, but that case cannot bear the weight placed upon it. *O'Brien* may bind Oklahoma courts on matters of state law; it does not control this Court's interpretation of federal jurisdiction under Article VI. It is a state court decision that extends federal law beyond its bounds in an area neither entrusted to it nor left ambiguous. The Oklahoma Court of Criminal Appeals took what the Supreme Court declined to decide in *Castro-Huerta* whether a State may prosecute an Indian defendant, and declared an answer of its own making. That answer extends beyond the Supreme Court's holding. The Supreme Court's holding was confined to crimes committed by non-Indians against Indians in Indian country. *O'Brien* extended that reasoning to the opposite circumstance, and in doing so extends federal law beyond the jurisdictional boundaries Congress has defined. *O'Brien* reaches its conclusion by extending *Castro-Huerta* beyond its holding. However, a decision that expressly confines itself to non-Indian defendants cannot be transformed into authority over Indian defendants by inference. The Supreme Court's silence on that question is not a gap for lower courts to fill. It is a boundary they must respect.

The Tenth Circuit has already spoken where *O'Brien* went silent. In *Hooper*, the court reaffirmed that § 14 of the Curtis Act no longer grants municipal jurisdiction over

Indian defendants. 71 F.4th at 1285-88. Even if the State possessed the authority *O'Brien* assumes, a municipality could not exceed it. Municipal courts exercise only derivative authority. They do not create it. If the State lacks jurisdiction over Indians in Indian country, its political subdivisions necessarily lack it as well. *Hooper*, 71 F.4th at 1286–87. That holding binds this Court; *O'Brien*'s speculation does not. Whatever persuasive value a state court decision may have, it cannot override the Supremacy Clause or controlling federal precedent. Under Article VI, the hierarchy is clear: Congress speaks through statute, the Supreme Court interprets, and this Court enforces. State disagreement is not binding authority; it cannot override federal supremacy. The *O'Brien* decision does not address controlling Tenth Circuit authority. The Tenth Circuit already answered the question *O'Brien* attempts to resolve. Absent congressional authorization, States possess "no authority" to prosecute Indians in Indian country. *Ute*, 790 F.3d at 1004. *O'Brien* does not reconcile its holding with that rule.

**\*11** Henryetta attempts to distinguish *Hooper* by arguing that, unlike Tulsa, it never adopted a post-statehood charter and therefore remains protected by § 14 of the Curtis Act. But *Hooper* expressly rejected that premise, holding that "upon statehood, even prior to Tulsa's adoption of a new charter under Oklahoma law," Tulsa ceased to be a municipality organized under Mansfield's Digest, and therefore "Section 14 of the Curtis Act no longer applied to Tulsa upon statehood." 71 F.4th at 1286–87. Henryetta identifies no act of Congress restoring or extending § 14 as a present-day source of municipal criminal jurisdiction over Indians in Indian country.

The City's own attorney, John Insabella, conceded that *O'Brien* is the primary legal authority for Henryetta's prosecutions and identified no statute granting such power. That admission confirms what the law already makes plain: municipal jurisdiction cannot exist where Congress has been silent. *O'Brien* involved a Tulsa misdemeanor prosecution and a municipal defendant invoking a state appellate forum. This injunction concerns a sovereign Nation invoking federal protection from continuing constitutional injury. Different parties, different posture, different law. *O'Brien* underscores the importance of federal supremacy, to prevent precisely this kind of state departure from constitutional boundaries. The Oklahoma Court of Criminal Appeals attempted to resolve a question the Supreme Court expressly declined to decide. That role is reserved to the United States Supreme Court within our hierarchical system of law.

Case 4:25-cv-00630-CVE-JFJ     Document 90-1 Filed in USDC ND/OK on 05/15/26     Page 9
of 13
MUSCOGEE (CREEK) NATION, a federally recognized Indian..., Slip Copy (2026)

The City may quote *O'Brien* for comfort, but comfort is not precedent. Federal law governs within Indian country because Congress said so, and because Article VI makes that command supreme. Where the Tenth Circuit and the Supreme Court have spoken, state courts may not depart from that authority. *O'Brien* does not control. It stands not as precedent, but as proof of why this injunction is necessary.

### 5. *Ute* is Controlling

Unlike *Castro-Huerta*, which expressly reserved the Indian-defendant question, *Ute Indian Tribe of the Uintah and Ouray Reservation v. State of Utah*, 790 F.3d 1000 (10th Cir. 2015), squarely addressed it. In this Circuit, that ends the matter. In *Ute*, the Tenth Circuit addressed a comparable assertion of local jurisdiction over tribal members within reservation boundaries. There, county officials exercised criminal authority over a tribal member in Indian country without congressional authorization. The court held that such actions constituted irreparable injury to tribal sovereignty and affirmed injunctive relief barring those exercises of jurisdiction. *Ute*, 790 F.3d at 1005–06. The same principle governs here. Henryetta's prosecutions of Indians within the Creek Reservation reflect the same assertion of local authority over Indian defendants in Indian country absent congressional consent. The record here reinforces *Ute*'s lesson. Like the county officials enjoined in that case, Henryetta acts without congressional sanction, asserting power on a record that shows no breakdown in law enforcement and confirms that other municipalities operate successfully under cross-deputization agreements. The absence of injury, and the presence of successful models, leaves the City's claim of necessity unsupported on this record. In this Circuit, *Ute* does not merely inform the analysis. It controls the result.

### 6. *White Mountain Apache Tribe v. Bracker* Does Not Alter the Threshold Jurisdictional Rule

**\*12**  The City urges the Court to apply the interest-balancing framework described in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), and relies on a recent decision from the Northern District of Oklahoma that began with a preemption analysis to deny injunctive relief. This Court declines. Jurisdictional analysis should not begin with a presumption of state authority and then ask whether it has been displaced. *Bracker* does not create state jurisdiction where Congress has withheld it. It presumes some arguable exercise of state authority and then asks whether that authority is displaced by federal law or tribal sovereignty in the specific context presented. 448 U.S. 136, 143–45 (1980). Where the defendant is an Indian and Congress has never granted state or municipal criminal jurisdiction, there *is* nothing to balance. Where the answer to the threshold question is no, the scales never come into play.

In *Castro-Huerta*. the Supreme Court began with a presumption of state authority because the defendant was not an Indian. 597 U.S. at 632, 634–35, 650 n.6. That starting point was no accident. The Court's reasoning confirms why. In *Castro-Huerta*, the Supreme Court emphasized that "a state prosecution of a non-Indian does not involve the exercise of state power over any Indian or over any tribe." 597 U.S. at 650. That premise disappears here. Henryetta seeks to prosecute Indian defendants within the Creek Reservation. That is not state authority operating adjacent to tribal sovereignty. It is state power exercised directly upon it. This case begins where *Castro-Huerta* deliberately stopped. The City's premise, that a State may exercise criminal jurisdiction in Indian country unless Congress withdraws it, reverses the governing rule. Criminal jurisdiction over Indians exists only where Congress has affirmatively conferred it. *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d at 1004 ("unless Congress provides an exception... states possess 'no authority' to prosecute Indians for offenses in Indian country"). Where Congress has not conferred jurisdiction in the first instance, there is no state authority to presume. *Bracker* addresses regulatory preemption where some measure of state authority is otherwise plausible and the inquiry turns on whether that authority is displaced by competing federal and tribal interests. The question presented here is different. This case presents a threshold jurisdictional question: whether the State or its municipalities may prosecute Indians in Indian country absent congressional authorization. Binding precedent from the Supreme Court and the Tenth Circuit answers no. Jurisdiction is the starting line. If a sovereign lacks authority to prosecute in the first instance, no balancing test can supply it.

### 7. The City's Inconsistent Assertion of Jurisdiction and Its Application to the Record

The City's position is internally inconsistent. On one hand, it asserts criminal jurisdiction over Indians within the Reservation under *O'Brien*. On the other, it concedes that

it dismisses prosecutions when defendants are identified as Muscogee (Creek) citizens. Those two positions cannot coexist.

By asserting jurisdiction in theory while abandoning it in practice for one class of Indians, the City effectively operates a multi-tiered system of justice: one in which Muscogee (Creek) citizens are spared municipal prosecution while non-member Indians remain subject to it. Federal law does not permit such a regime. Criminal jurisdiction in Indian country does not turn on tribal affiliation, prosecutorial grace, or selective restraint. It turns on congressional authorization.

Nor does *McGirt* support the City's attempt to distinguish between tribal members and non-members. The defendant in *McGirt* was not a Muscogee (Creek) citizen, but an enrolled citizen of the Seminole Nation of Oklahoma. *McGirt*, 591 U.S. at 898. The Supreme Court's jurisdictional analysis did not turn on tribal enrollment in the governing Tribe. It turned on two facts: that the defendant was an Indian, and that the offense occurred within the boundaries of the Creek Reservation. *Id.* Federal criminal jurisdiction in Indian country therefore does not rise or fall based on whether the defendant is a citizen of the governing Tribe or another federally recognized Tribe. The City's member-versus-non-member distinction finds no support in *McGirt*, and none in any act of Congress. The City's own stipulations confirm that its asserted authority is not grounded in law, but applied selectively in practice.

**\*13** That inconsistency carries legal consequence. A municipality cannot claim jurisdiction under state law while simultaneously conceding, through its conduct, that such jurisdiction fails when federal law is invoked. Selective enforcement also reinforces irreparable harm. The Nation cannot know which Indians within its Reservation will be prosecuted, under what theory, or for how long the City's restraint will hold. That uncertainty is not a temporary inconvenience; it is an ongoing intrusion on the Nation's sovereign authority to administer its own system of justice. When a municipality asserts criminal jurisdiction it does not possess and then selectively abandons it, the harm is not confined to individual prosecutions. It is the structural displacement of the Nation's courts, prosecutors, and police: an injury that, once inflicted, no dismissal, reversal, or reimbursement can repair. Jurisdiction either exists or it does not. It does not exist in fractions.

### B. IRREPARABLE HARM

The Supreme Court and the Tenth Circuit have long recognized that an invasion of tribal sovereignty is itself an irreparable injury. *Ute*, 790 F.3d at 1005 (10th Cir. 2015). The injury lies not in the number of citations issued, but in the very act of a municipality asserting power that Congress withheld. Sovereignty, once invaded, cannot be restored by later dismissal or reimbursement. The record establishes that the Nation's justice system is not symbolic but fully operational, handling more than 1,000 criminal cases each year through professional prosecutors, judges, and modem electronic filing systems. Interference with that system is an invasion of sovereignty twice over: it usurps jurisdiction and undermines a court that already exercises lawful authority and protects victims within its jurisdiction.

### 1. Evidence of Ongoing Intrusion

The record establishes that Henryetta continues to assert criminal jurisdiction over Indians within the Reservation. City Attorney John Insabella testified that, following *McGirt*, the City has issued citations and prosecuted Muscogee (Creek) citizens. He further declared a good faith belief that the City possesses concurrent jurisdiction over non-member Indians under *O'Brien*. The parties stipulated that the City has temporarily refrained from prosecuting certain categories of Indians while this motion remains pending or through a date certain, and that it has exercised prosecutorial discretion to dismiss pending citations against Muscogee (Creek) citizens. Those limitations are temporary and selective. The City's own declaration confirms that it intends to continue prosecuting non-member Indians based on its interpretation of *O'Brien*, *McGirt*, and *Castro-Huerta*, not on any identified act of Congress. These are not past violations; they are ongoing assertions of authority.

These are not isolated acts. They are official exercises of authority by a political subdivision that displace the Nation's courts, prosecutors, and police. Each municipal prosecution asserts jurisdiction federal law does not permit and directly interferes with the Nation's administration of its own system of justice.

### 2. Legal Character of the Harm

The irreparable harm here is constitutional. When a municipality asserts criminal jurisdiction in Indian country without congressional sanction, it inflicts a sovereign injury

"perhaps as serious as any to come our way." *Ute*, 790 F.3d at 1005. No monetary or retrospective relief can repair the invasion of sovereignty itself.

Deputy Attorney General Geri Wisner and Court Administrator Kevin Dellinger testified that the Nation's justice system handles more than 1,000 felony cases and more than 2,200 traffic citations each year under rules of evidence and procedure substantially identical to those in state and federal courts, and that its courts are fully staffed, conduct jury and bench trials, and provide appointed counsel to defendants. This record confirms that the Creek Nation's judiciary is a functioning court of law providing full due process, and that municipal intrusion displaces a system already operating at full capacity.

 **\*14**  Having found that the City's assertion of jurisdiction invades sovereignty itself, the Court turns to the question of consequence: whether enforcing the Constitution disrupts public safety or, as the record shows, restores it.

### 3. Futility of Post-hoc Remedies

No damages remedy can repair an unlawful assertion of criminal jurisdiction. Even if the City ceased prosecutions tomorrow, its continued claim of authority would chill the exercise of tribal power, confuse officers in the field, and undermine public confidence in the reservation's legal order. The Court therefore finds that the Nation faces ongoing and irreparable harm absent an injunction.

The City's temporary cessation of certain prosecutions does not eliminate that injury. The harm is not limited to individual prosecutions; it is the continuing assertion of criminal jurisdiction the City does not possess. That assertion creates uncertainty, disrupts the Nation's ability to govern, and invades its sovereignty each time it is exercised or threatened. Voluntary pauses in enforcement do not moot that harm, particularly where the City maintains it may resume such prosecutions at any time.

As the Tenth Circuit has recognized, the invasion of tribal sovereignty constitutes irreparable harm. That harm is present here. It is ongoing.

### C. BALANCE OF EQUITIES AND PUBLIC INTEREST

### 1. The Equities Favor Fidelity to Law, Not Expedience

The balance of equities and the public interest favor injunctive relief. When the dispute is governmental, the final two injunction factors merge. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001). The question is whether the public interest is served by the continued exercise of unlawful authority or the enforcement of federal law. The answer is clear. An injunction imposes no legally cognizable hardship on the City because it merely prevents the exercise of power the City has "no legal entitlement" to exercise in the first place. *Ute*, 790 F.3d 1000, 1007 (10th Cir. 2015).

The Nation faces an ongoing invasion of its sovereignty. It affects the Nation's ability to govern, to enforce its laws, and to maintain a coherent system of justice within its Reservation. The Nation's investment in lawful governance is substantial and well-documented. As the record demonstrates, the Nation's Department of Justice operates on funding derived primarily from tribal revenues, supporting courts, prosecutors, and police that have functioned without interruption for decades. That investment includes an expanded judiciary, an independent Attorney General, and a professional Lighthorse force coordinating with 64 of 67 jurisdictions within the Reservation. Henryetta, by contrast, faces no legally cognizable harm from an injunction. It does not lose lawful authority; it loses only the ability to exercise power it does not possess. The loss of unlawful authority is not a harm the law recognizes.

### 2. Public Safety is Not Threatened by the Injunction

The Nation's Exhibit 36 proves what the record already made plain. Sixty-four jurisdictions: counties, municipalities, district attorneys, school police departments, and state agencies have entered cross-deputization agreements with the Nation. These include but are not limited to Creek County Sheriff's Office (2000), Okmulgee County Sheriff's Office, Muskogee County Sheriff's Office (2002), McIntosh County Sheriff's Office (2000), Hughes County Sheriff's Office (2025), Tulsa County Sheriff's Office (2020), and Wagoner County Sheriff's Office (2025); cities such as Wagoner (2022), Okmulgee (2002), Eufaula (2003), Broken Arrow (2006), Beggs (2017), Bixby (2020), Coweta (2020), Sapulpa (2021), and Tulsa (2021); and state entities including the Oklahoma Highway Patrol (2020), the Department of

Wildlife Conservation (2020), the Bureau of Narcotics (2020), and the Grand River Dam Authority (2020). All are partners in public safety within the Reservation. Many of these compacts predate *McGirt*, proving that cooperation was not born of litigation but of principle. The Creek Nation's approach to public safety has been cooperative, lawful, and inclusive. It protects every citizen, Native and non-Native alike.

**\*15**  Chief Richard Phillips, head of the Muscogee (Creek) Nation Lighthorse Police Department, testified that his agency coordinates with 64 of the 67 jurisdictions within the Reservation under cross-deputization agreements; Henryetta is one of only three jurisdictions that has refused to enter such an agreement. That refusal is illuminated by contrast. Within the same Reservation, two cities followed fundamentally different paths. In Coweta, Chief Michael Bell, head of the Coweta Police Department, testified that the City's cross-commissioning arrangement with the Nation operates seamlessly, that officers from both jurisdictions respond jointly, and that the absence of hesitation in the field improves public safety. Coweta chose partnership and found clarity; Henryetta chose isolation and operates outside that cooperative framework. Coweta's streets show what lawful cooperation looks like: swift response, shared authority, and unified protection. Henryetta's refusal to join the same network does not reveal a flaw in the system; it reveals a flaw in the City's policy.

The City has declined every invitation to negotiate a cross-deputization compact. The record leaves no ambiguity: the City's refusal to participate is a choice, and its projected disorder is self-created. The danger is not a dual system of justice. It is a single city stepping away from cooperation. Cross-deputization does not divide authority; it coordinates it. It ensures that within the Reservation, law enforcement operates with clarity, continuity, and shared responsibility.

The record reflects a functioning cooperative enforcement framework, further confirming that the absence of municipal jurisdiction does not create a public safety vacuum.

### 3. Federal Supremacy Leaves No Room for Municipal Compromise

The City suggests that, because *O'Brien* remains binding on Oklahoma's lower courts, this Court should defer. Comity is not abdication. The Supremacy Clause does not allow a state

court to redraw federal jurisdiction lines drawn by Congress and affirmed by the Supreme Court. Deference to contrary state precedent would invert that hierarchy.

The Court's duty is not to balance sovereignties as if they were equities; it is to uphold the one sovereignty that binds them both, the Constitution of the United States. Where Congress has spoken and the Supreme Court has interpreted that command, the balance of harms and the public interest favor obedience.

### 4. Practical Consequences of Injunction

An injunction here restores the jurisdictional arrangement federal law requires within the Creek Reservation and preserves lawful cooperation through cross-deputization, an option Henryetta declined. It does not strip Henryetta of authority it ever lawfully held; it merely prevents continued exercise of authority Congress never gave. The Nation continues to prosecute Indian offenders, protect victims, and coordinate with every willing agency. Public safety and constitutional order thus converge, not diverge. The balance of harms favors the Nation. *It* suffers an ongoing invasion of sovereignty, while the City faces only the loss of authority it does not lawfully possess. The public interest is served by enforcing the Constitution and respecting the jurisdictional boundaries Congress has established. The public has no interest in the exercise of unlawful authority.

### IV. CONCLUSION

The record leaves no doubt. The law leaves no room. The balance of harm leaves no question. The public interest is not close. What remains is the Court's duty. That duty is clear.

The Constitution is not a suggestion. It is a covenant. Its promises are not advisory; they are law. This case concerns one of those promises: that federal law governs within Indian country, that sovereignty once recognized cannot be taken without Congress, and that treaties solemnly ratified mean tomorrow what they meant yesterday.

The record tells a tale of two cities. One chose partnership; the other declined that same cooperative framework. In Coweta, cooperation produced clarity, safety, and shared purpose. In Henryetta, refusal produced confusion and the exercise of

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

authority the Constitution does not permit. The difference is not geography, resources, or necessity. It is obedience to law.

 **\*16**  The City of Henryetta asked this Court to recognize authority Congress never granted, grounded in a state-court decision that cannot override federal law, and to extend a recent Supreme Court decision beyond the limits that Court imposed. The Nation asked only that the Constitution be enforced. That is the only request this Court can grant.

This injunction draws no new line. It enforces the one Congress already drew.

**IT IS THEREFORE ORDERED** that Plaintiff Muscogee (Creek) Nation's Motion for Preliminary Injunction (Docket No. 11) is GRANTED.

**IT IS FURTHER ORDERED** that the City of Henryetta, Oklahoma, and all its officers, agents, and employees are ENJOINED from initiating, pursuing, or enforcing any municipal criminal prosecution or citation against any Indian, whether or not a member of the Muscogee (Creek) Nation, for conduct occurring within the boundaries of the Muscogee (Creek) Reservation, until further Order of this Court. This injunction applies to prosecutions under both state and municipal ordinances, including traffic, misdemeanor, and code violations.

Nothing in this Order precludes Henryetta from entering or executing a lawful cross-deputization agreement with the Muscogee (Creek) Nation or from cooperating in investigations consistent with federal and tribal law.

The Court retains jurisdiction to monitor compliance and to modify this injunction as justice requires.

**IT IS SO ORDERED** this 13th day of May, 2026.

**All Citations**

Slip Copy, 2026 WL 1336060

## Footnotes

1   The parties expressly consented to the jurisdiction of this United States Magistrate Judge. The United States Magistrate Judge therefore exercises complete jurisdiction over this case through and including trial and the entry of a final judgment in accordance with 28 U.S.C. Section 636(c)(1) and Fed. R. Civ. P. 73(a). See (Docket No. 38).

2   On November 7, 2025, the City of Henryetta filed a Notice of Decision (Docket No. 72) attaching the Northern District of Oklahoma's Order in *Muscogee (Creek) Nation v. Kunzweiler*, No. 25-CV-75-GKF-JFJ (N.D. Okla. Nov. 7, 2025). That decision, based on a different record, is not controlling in this District. This Court's analysis proceeds from the evidence before it and from binding Supreme Court and Tenth Circuit authority.

3   *Ute* held that "unless Congress provides an exception to the rule—and it hasn't here—states possess 'no authority' to prosecute Indians for offenses in Indian country," 790 F.3d at 1004 (quoting *Chevenne-Arapaho Tribes of Okla. v. Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980)), and accordingly, the State and local governmental entities had "no legal entitlement" to prosecute an Indian for an Indian country traffic offense, *Id.* at 1004; see also, e.g., *United States v. Sands*, 968 F.2d 1058, 1061–63 (10th Cir. 1992) (finding Oklahoma had no criminal jurisdiction over Indian in Indian country because it lacked congressional authorization); *Ross v. Neff*, 905 F.2d 1349, 1352–53 (10th Cir. 1990) (same).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.